UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NML CAPITAL, LTD. and EM LTD.,

               Plaintiffs,

- against -

THE REPUBLIC OF ARGENTINA and BANCO
DE LA NACIÓN ARGENTINA,

               Defendants.

               08 Civ. 7974 (TPG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NML CAPITAL, LTD.,

               Plaintiff,

- against -

THE REPUBLIC OF ARGENTINA,

               Defendant.

               03 Civ. 8845 (TPG)
               05 Civ. 2434 (TPG)
               06 Civ. 6466 (TPG)
               07 Civ. 1910 (TPG)
               07 Civ. 2690 (TPG)
               07 Civ. 6563 (TPG)
               08 Civ. 2541 (TPG)
               08 Civ. 3302 (TPG)
               08 Civ. 6978 (TPG)
               09 Civ. 1707 (TPG)
               09 Civ. 1708 (TPG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EM LTD.,

               Plaintiff,

- against -

THE REPUBLIC OF ARGENTINA,

               Defendant.

               03 Civ. 2507 (TPG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SECOND SUPPLEMENTAL DECLARATION OF JUAN CARLOS FABREGA

Juan Carlos Fabrega declares as follows:

1.     I am the President of defendant Banco de la Nación Argentina ("BNA") and have been employed by BNA since February 3, 1969.  I served as BNA's General Manager from 2003 until my appointment as its President on February 4, 2010.  I submit this declaration in opposition to (i) plaintiffs' motion for reconsideration of the Court's September 30, 2009

Opinion; (ii) plaintiffs' May 28, 2010 motion for leave to amend the complaint; (iii) plaintiffs'

motion to confirm ex parte attachments dated May 28, 2010; and (iv) in support of BNA's

motion to vacate the May 28, 2010 ex parte attachments.

2.      I have previously submitted declarations to the Court dated October 28, 2008 and

February 6, 2009 in this matter.  Those declarations set forth facts demonstrating that BNA is the

largest commercial bank in Argentina, [1] and is an autarkic entity that operates independently and

autonomously from the Republic.  Those declarations also rebutted plaintiffs' unsubstantiated

allegations of control, all helping to establish, as the Court has already found in its September 30,

2009 Opinion, that BNA is not an alter ego of the Republic.  For the convenience of the Court,

copies of those declarations are attached hereto as Exhibits A and B.

3.      In this declaration, I put before the Court the facts relating to certain 2009 and

2010 loan transactions (each a "Loan" and together the "Loans") between BNA and the Republic

of Argentina (the "Republic"), of which plaintiffs complain (relying on erroneous newspaper

articles), and explain why the Loans presented good commercial banking opportunities that have

generated significant revenue without risk to BNA.  I also explain the facts relating to other loan

programs which plaintiffs once again mistakenly claim evidence control of BNA by the

Republic, but which demonstrate that no such control exists.  This declaration is based upon my

personal knowledge and upon my review of BNA's books and records.

### Loans to the Republic Continue to Require Special Guaranties

4.      As I explained in my February 6, 2009 declaration, pursuant to Article 25 of

BNA's Charter, BNA may not lend to the Republic, the provinces or municipalities unless special

guaranties are in place that permit the automatic reimbursement of the credit by debiting an

account maintained at BNA in the event of default.  I further explained that in November 2008

---

[1] BNA currently has more than 600 branches and approximately 16,000 employees.

the Argentine Congress enacted Article 74 of Law 26,422 (the Argentine National Budget for 2009) ("Article 74"), which ratified the requirement for, and the issuance of, special guaranties under Article 25 of BNA's Charter in connection with loans to the Republic for the financing of capital expenditures or the amortization of debt.

5.     In obtaining and moving to confirm the 2008 ex parte attachments, plaintiffs represented to the Court that Article 74 removed the requirement in BNA's Charter that the Republic provide special guaranties in connection with loans from BNA.  However, as enacted by the Argentine Congress in 2008, Article 74 did no such thing and, in fact, imposed greater restrictions on loans to the Republic for financing capital expenses and the amortization of debt. Plaintiffs have now conceded that their misstatement of Article 74 was based upon a prior draft of the legislation that did not contain the special guaranty requirement.  As enacted, Article 74 provides that the Coordinator of the Financial Administration Systems is authorized to issue the special guaranties required by Article 25 of BNA's Charter for the issuance of loans to the Republic in those circumstances where i) the proceeds of the loans are applied to the financing of capital expenditures or the amortization of debt, and ii) where the balance of the loan does not exceed 30% of the deposits of the non-financial public sector of the Republic.  If both of those circumstances are not met, the Coordinator cannot issue the required special guaranty and BNA cannot provide the loan to the Republic.  All of these prerequisites have been met in connection with the Loans.  A copy of an accurate translation of Article 74 is attached as Exhibit C.

6.     Accordingly, the special guaranties required by BNA's Charter remain a prerequisite to loans to the Republic and in the event of default authorize BNA to debit designated Republic accounts to repay itself in full for non-payment of principal, interest and default interest subject only to giving fifteen (15) day notice of a continuing payment default.

### BNA's Loan Application Process

7.     In the case of each of the Loans the following process was followed:

    (a)    BNA received a request from the Secretary of Finance of the Ministry of the Economy and Public Finance to analyze and put before BNA's Board of Directors for its approval a proposed Loan, together with a certification that the proposed Loan complied with the requirements of Article 74 of Law 26,422, including that the proceeds of the Loans would be used for the repayment of outstanding public debt;

    (b)    upon the favorable analysis of the request by BNA's management, BNA's General Manager submitted the proposed financing to BNA's Board with a recommendation that the Loan be made; in each instance the Board approved the Loan and issued a resolution to that effect;

    (c)    upon being notified of such resolution and agreeing to the terms proposed by BNA, the Secretaries of Finance and Treasury, exercising the functions of the Coordinator of the Financial Administration Systems, issued a joint resolution, which contained the special guaranty required by Article 25 of BNA's Charter and Article 74, and confirmed that the Loan would be used for repayment of outstanding debt;

    (d)    the Board resolution approving the Loan was then transferred to BNA's accounting department, which in turn requested the analysis by BNA's outside auditor, KPMG, to verify compliance with Central Bank Resolution No. 76/09 (ensuring that all of BNA's loans to the Republic do not exceed 50% of BNA's capital);

     (e)     BNA transferred all of the documentation concerning the Loan, including the report of the outside auditor, to the Central Bank for a determination whether the Loan satisfied the requirements of Resolution 76/09, which the Central Bank evidenced through the issuance of a resolution;

     (f)     upon receipt of the Central Bank resolution, and after determining that it had the necessary liquidity, BNA funded the Loans on the dates of disbursement.

A representative sample of the documents reflecting each step in this process is attached as Exhibit D.

     8.     The Board of Directors of BNA must approve all loans made by BNA to the Republic. In reviewing the Republic's request for the Loans, BNA conducted its standard loan analysis, which includes an evaluation of the potential risk versus the potential benefits to BNA of making a loan. Of particular importance to BNA's Board in the case of the Loans was the existence of the special guaranties issued with respect to each Loan. The special guaranties provided BNA the ability to automatically reimburse itself on fifteen days notice in the event of default, which effectively eliminated the risk, and without which none of the Loans could have been made. Also of special consideration was with respect to special reports from BNA's outside auditor KPMG confirming the compliance with items 1.1, 1.2 and 3 of Central Bank Resolution 76/09, and the joint resolution from the Secretaries of Finance and Treasury confirming compliance with the requirement that the proceeds of the Loans be used for the repayment of outstanding public debt of the Republic. In addition, the Board conditioned each disbursement of each Loan on BNA having sufficient liquidity on the dates of disbursement. As a result of this

risk/reward analysis, and the fact that the Loans are profitable transactions and thus beneficial to BNA, BNA determined to make the Loans.

### The Loans

9.      BNA's Board of Directors adopted Resolutions Nos. 1610 and 2102 of 2009 and 284 and 288 of 2010 approving each of the Loans on the terms set out in the resolutions.

Resolution No. 1610

10.     The terms and conditions of the Loan for up to 7,300,000,000 pesos approved on May 21, 2009 are as follows:

(a)     **Drawdown**:  Five installments commencing on May 26, 2009 in the amount of 50,000,000 pesos, with subsequent installments on June 15, 2009 in the amount of 1,650,000,000 pesos, July 15 in the amount of 1,800,000,000 pesos, September 15, 2009 in the amount of 3,000,000,000 pesos and November 15, 2009 in the amount of 800,000,000 pesos.

(b)     **Interest Rate**:  determined by the sum of the

(i)     **Base Rate**: BADLAR Rate, which is the annual nominal rate reported by the daily survey of public banks for 30 to 35-day fixed term deposits for amounts greater than or equal to one million pesos, plus

(ii)    **Spread:** 100 basis points.

        As of the day the first two installments of this Loan were drawn (June 19, 2009), the nominal annual rate charged was 13.69%.

(c)     **Payment of Interest:**  The applicable interest rate is adjusted monthly at the start of each new interest period.  The interest on the loan is payable

monthly on the fifth business day of the month, beginning on the second month after each drawdown.

(d)   **Repayment of Principal:**  The Republic must repay principal in twenty-four (24) equal and consecutive monthly installments in pesos beginning on the fifth business day of January 2010.

(e)   **Default Interest:**  The Loan provides for a 1% penalty interest on all past due amounts.

A copy of Resolution No. 1610 is attached as Exhibit E.

<u>Board Resolution No. 2102</u>

11.   The terms and conditions of the Loan for up to 1,000,000,000 pesos approved on July 2, 2009 are as follows:

(a)   **Drawdown:**  A single drawdown of all principal, which occurred on July 15, 2009.

(b)   **Interest Rate:**  determined by the sum of the

(i)   **Base Rate:** BADLAR Rate, plus

(ii)   **Spread:** 100 basis points.

As of the day this loan was drawn (July 15, 2009), the nominal annual rate charged was 12.19%.

(c)   **Payment of Interest:**  The applicable interest rate is adjusted monthly at the start of each new interest period.  The interest on the loan is payable monthly on the fifth business day of the month, beginning on the second month after its drawdown.

(d)    **Repayment of Principal:**  The Republic must repay principal in twenty-four (24) equal and consecutive monthly installments in pesos beginning on the fifth business day of January  2010.

(e)    **Default Interest:**  The Loan provides for a 1% penalty interest of all past due amounts.

A copy of Resolution No. 2102 is attached as Exhibit F.

<u>Board Resolution No 284</u>

12.     The terms and conditions of the Loan for up to 900,000,000 pesos approved on January 28, 2010 are as follows:

(a)    **Drawdown**:  A single drawdown of all principal, which occurred on February 5, 2010.

(b)    **Interest Rate**:  determined by the sum of the

        (i)    **Base Rate**: BADLAR Rate, plus

        (ii)    **Spread:** 100 basis points.

            As of the day this loan was drawn (February 5, 2010), the nominal annual rate charged was 9.81%.

(c)    **Payment of Interest:**  The applicable interest rate is adjusted monthly at the start of each new interest period.  The interest on the loan is payable monthly on the fifth business day of the month, beginning on the second month after its drawdown.

(d)    **Repayment of Principal:**  The Republic must repay principal in twenty-four (24) equal and consecutive monthly installments in pesos beginning on the fifth business day of November 2010.

    (e)    **Default Interest:** The Loan provides for a 1% penalty interest of all past

due amounts.

A copy of Resolution No. 284 is attached as Exhibit G.

    13.    The terms and conditions of the Loan for an amount up to US$156 million

approved on January 28, 2010 are as follows:

    (a)    **Drawdown**: A single drawdown of all principal, which occurred on

February 5, 2010, after the required authorization of the Central Bank of

Argentina relating to dollar denominated loans was obtained.

    (b)    **Fixed Annual Nominal Interest Rate**: 2.75%

    (c)    **Payment of Interest:** Interest is payable monthly, on the fifth day of each

month commencing on the second month after drawdown.

    (d)    **Repayment of Principal:** The Republic must repay principal in twenty-

four (24) equal and consecutive monthly installments in U.S. dollars

beginning on the fifth business day of November 2010.

    (e)    **Default Interest:** The Loan provides for a 0.25% penalty interest on all

past due amounts.

See Resolution No. 284 attached as Exhibit G.

<u>Board Resolution No 288</u>

    14.    The terms and conditions of the Loan for an amount up to 4,150,040,000 pesos

approved on January 28, 2010 are as follows:

    (a)    **Drawdown**: BNA will provide funding to the Republic in eleven (11)

monthly installments, the first being in the amount of 691,673,333.34

pesos made on March 5, 2010 and the remaining ten each in the amount of

345,836,666 pesos.  The installments are made on the first business day

following the 2010 due dates of each payment of principal of the Loans made pursuant to Resolutions 1610 and 2102, provided payment in full of principal and interest due are received by BNA from the Republic at least 24 hours in advance of the drawdown.

(b) **Interest Rate**:  determined by the sum of the

    (i)    **Base Rate**: BADLAR Rate, plus

    (ii)    **Spread:** 100 basis points.

    As of the day this loan was first drawn (March 5, 2010), the nominal annual rate charged was 9.69%.

(c) **Payment of Interest**:  The applicable interest rate is adjusted monthly at the start of each new interest period.  Interest on the loan is payable monthly on the fifth day of the month beginning on the second month after the first drawdown takes place.

(d) **Repayment of Principal**:  The Republic is required to make payments of principal in 24 equal monthly installments beginning on the fifth business day of January 2011.

(e) **Default Interest.**  The loan provides for a 1% penalty interest over all past due amounts.

A copy of Resolution No. 288 Loan is attached as Exhibit H.

<u>**Interest Rate Determination**</u>

15.    The rate of interest agreed to with respect to the peso Loans (13.69% per annum on the initial drawdown date of June 19, 2009; 12.19% on July 15, 2009; 9.81% on February 5, 2010; and 9.69% on March 5, 2010) compares favorably with loans made by BNA to commercial borrowers during the same period.  For example, at the time, and currently, lines of

credit open by BNA to customers in the agricultural and cattle sectors fluctuate between 6% and 9% per annum, depending on customer risk, which is lower than the rate on the peso Loans made to the Republic. Similarly, the rate set on the dollar Loan to the Republic of 2.75% per annum compares favorably with dollar loans currently outstanding to BNA first line customers for dollars loans, which fluctuate between 1.25% per annum to 2.60% per annum.

16.     Plaintiffs' argument that the interest rates charged to the Republic on the Loans can be compared to the interest rates charged on payroll loans and mortgages is simply wrong. These are extremely different credit risks and no commercial banking comparison can be made between uncollateralized payroll loans to consumers and loans to the Republic for which guaranties with direct access to funds in the event of default have been provided.

### The Loans Comply With BNA's Charter

17.     The Special Guaranty. As required, BNA has been given special guaranties by the Republic for the Loans. The special guaranties permit access to Republic funds on deposit with BNA in the event of default by debiting the account holding such funds upon fifteen days written notice to the Secretary of Finance and the Department of Treasury. The special guaranty remains in effect until the Loans are fully repaid.

### The Republic's Deposits at BNA

18.     As further required by Article 74, prior to the approval of the Loans, BNA's Board determined that the balance of all outstanding loans by BNA to the Republic would not exceed thirty (30%) percent of the deposits at BNA of the non-financial national public sector of the Republic. Currently, and at the moment each of the Loans was granted, the total amount of the outstanding loans granted by BNA to the Republic is/was less than 30 % of the Republic's deposits at BNA.

## The Loans are Current

19.    All of the Republic's payment obligations on the Loans have been met and are

current, as reflected in the table below.  As of July 7, 2010, BNA had received payments of

interest on the Loans amounting to 831,588,138.80 pesos and US$1,786,520.54.  Payments of

principal in the total amount of 2,420,856,666.69 pesos have been received by BNA.

| Date Received | Principal | Interest | |
|---|---|---|---|
| | | Pesos | U.S. Dollars |
| August 7, 2009 | | 31,243,205.48 | |
| September 7, 2009 | | 65,087,095.89 | |
| October 7, 2009 | | 49,709,589.04 | |
| November 9, 2009 | | 102,066,575.32 | |
| December 7, 2009 | | 74,104,109.60 | |
| January 8, 2010 | | 88,801,534.25 | |
| February 5, 2010 | | 57,304,109.59 | |
| March 5, 2010 | 691,673,333.34 | 62,461,479.45 | |
| March 8, 2010 | 345,836,666.67 | 307,273.51 | |
| April 9, 2010 | 345,836,666.67 | 82,707,034.68 | 740,465.75 |
| May 7, 2010 | 345,836,666.67 | 73,161,571.46 | 329,095.89 |
| June 7, 2010 | 345,836,666.67 | 73,337,909.92 | 364,356.16 |
| July 7, 2010 | 345,836,666.67 | 71,296,650.61 | 352,602.74 |
| | | | |
| Total | 2,420,856,666.69 | 831,588,138.80 | 1,786,520.54 |

## The Loans Benefit BNA

20.    The Loans presented a good commercial banking opportunity for BNA.  They

were in no way an imposition from the Republic, and in fact, BNA would welcome more loans

on terms such as the Loans. To begin with, the Loans were made from up to 30% of the funds of

the Republic on deposit with BNA.  The Loans were made at a rate above that offered to other

prime customers in BNA's current loan portfolio. The fact that the Loans are guarantied by the Republic's deposits in accounts maintained at BNA neutralizes the risk of non payment. Interest in excess of 800 million pesos and nearly two million dollars have already been paid to BNA. In addition the spread between interest on deposits paid to the Republic and interest on the Loans, constitutes an important source of revenue to BNA. Moreover, BNA realizes a marginal profit. If the Loans had not been made, those funds would have been deposited in the "Pases" market maintained by the Central Bank of Argentina for deposits by financial institutions of their excess liquidity, at a rate at all times lower than that of the interest rates obtained from the Loans. Finally, with respect to the dollar Loan, if BNA does not lend its dollar liquidity, it must deposit the excess with the Central Bank where it earns no interest. In short, the Loans are a substantial benefit to BNA and not an imposition as the plaintiffs would claim.

### Plaintiffs' Other Claims of Control

21.    Beyond focusing on the Loans as justification for this Court's reconsideration, amendment to the complaint, and/or confirmation of the May 2010 Orders, plaintiffs revert to the types of claims generated by new stories concerning economic development programs which were used by them initially and which this Court has already found did "not add up to a degree of de facto ownership or control of BNA's funds sufficient to justify an alter ego ruling." The result with respect to these three repackaged claims should be no different now.

> (a)    **Financing for the Middle Class.** Plaintiffs allege that "in late 2008, as a way of gaining political support, the Kirchners appealed to an important constituency by implementing a program under which BNA was charged with distributing mortgages to middle-class families – with the terms dictated by the government" and "in April 2010 [the Argentine President] announced . . . a new line of credit for the middle class to obtain

mortgages for home purchases. . . at an interest rate pegged to the borrower's salary. . . " Plaintiffs' Moving Memorandum at p. 15. To begin with, in the case of mortgage loans for the middle class, the terms are not "dictated by the government," nor is the interest rate "pegged to the borrower's salary." The actual interest charged on these loans is 15.11%, which is comparable to market rates. The rate is determined by BNA based on its cost of funds. The loans are profitable to BNA because the actual rate of interest charged by BNA (15.11%) is greater than the marginal cost to BNA of obtaining funds, which is 12.02%. In addition, the average cost of funds to BNA is 9.3%. In either instance (the marginal rate or the average rate), BNA's cost of obtaining funds is lower than the 15.11% charged to the mortgage borrowers. Moreover, in addition to being profitable, these loans by no means can be characterized as forced upon BNA by the Republic. To the contrary, these promotions for homeownership are available to all Argentine financial institutions, not just BNA.

(b)   **Iveco Truck Financing.** Plaintiffs allege that "[i]n March 2009, in another illustration of the government's manipulation of BNA to achieve political ends, the government entered into an agreement with truck manufacturer Iveco whereby BNA would provide purchasers of Iveco vehicles with very attractive financing terms, including no-interest loans . . . [t]his served the Kirchners' political goals of increasing local production and maintaining jobs . . . ." Plaintiffs' Moving Memorandum at p. 15.

With respect to the Iveco agreement, BNA made credit available to the
purchasers through BNA's financing lines for the acquisition of new Iveco
trucks produced in Argentina. Contrary to plaintiffs' assertions, the loans
made to truck purchasers are not no-interest loans. Rather, the rate of
interest on such loans fluctuates between 10.50% and 12%.

(c)   **Financing for the Agricultural Sector**. Plaintiffs allege that "in another
attempt to curry favor with an important constituency" the Republic has
directed various lending programs, including subsidized loans for dairy
farmers and wheat producers and subsidized lines of credit for the
purchase of domestically produced farm equipment. Plaintiffs' Moving
Memorandum at p. 16. Here again, all Argentine banks, not just BNA, are
eligible to participate in subsidized loans to various sectors of the
Argentine economy such as the agricultural sector. The Republic pays
BNA (and the other participating banks) a subsidy, which is received by
BNA above the direct interest paid to BNA by the borrower. The interest
rate charged to the borrower, combined with the government subsidy
results in a market rate of interest. In the case of BNA, the interest rate
realized is greater than its costs of funds resulting in a profit to BNA. In
addition, the risk of loss on the loan is reduced because of the subsidy
since the interest rate which the borrower pays is lower than the total rate
received by BNA. In short, as was established in connection with similar
programs that the plaintiffs complained of in their 2008 motion, and which
were discarded by the Court as not supporting the level of control of BNA

by the Republic that would warrant a finding of alter ego, these programs are available to all banks, were not forced upon BNA and did not result in a loss to BNA.

I declare under penalty of perjury of the United States of America that the foregoing is true and correct.

Executed on July 27, 2010

/s/ Juan Carlos Fabrega
Juan Carlos Fabrega

## **CERTIFICATION**

I hereby certify that I am fluent in both the English and Spanish languages and have reviewed the attached English language translation of the Second Supplemental Declaration of Juan Carlos Fábrega, dated July 27, 2010 and it is a correct and accurate translation of the Spanish language.

I further certify under penalty of perjury that the foregoing is true and correct.

Executed on:  July 30, 2010

_____
Mario Diaz-Cruz, III

TRIBUNAL DE DISTRIT0 DE ESTADOS UNIDOS
DISTRITO SUR DE NUEVA YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EM LTD. y NML CAPITAL, LTD.,                    08 Civ. 7974 (TPG)

           Demandantes,

- contra -

LA REPÚBLICA ARGENTINA y BANCO
DE LA NACIÓN ARGENTINA,

           Demandados.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                    03 Civ. 8845 (TPG)

NML CAPITAL, LTD.,                              05 Civ. 2434 (TPG)
                                    06 Civ. 6466 (TPG)
           Demandante,                   07 Civ. 1910 (TPG)
                                    07 Civ. 2690 (TPG)
- contra -                                     07 Civ. 6563 (TPG)

LA REPÚBLICA ARGENTINA,                         08 Civ. 2541 (TPG)
                                    08 Civ. 3302 (TPG)
           Demandada.                    08 Civ. 6978 (TPG)
                                    09 Civ. 1707 (TPG)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   09 Civ. 1708 (TPG)

EM LTD.,

           Demandante,                   03 Civ. 2507 (TPG)

- contra -

LA REPÚBLICA ARGENTINA,

           Demandada.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SEGUNDA DECLARACIÓN COMPLEMENTARIA DE JUAN CARLOS FABREGA

      Juan Carlos Fábrega declara lo siguiente:

      1. Soy el Presidente del demandado  Banco de la Nación Argentina (el "BNA") y he sido empleado del BNA desde el 3 de  febrero de 1969. Me desempeñé como Gerente General del BNA desde 2003 hasta mi designación como Presidente del mismo el 4 de febrero de 2010. Presento esta declaración en oposición a (i) la moción de los demandantes de reconsideración del Dictamen del Tribunal del 30 de septiembre de 2009; (ii) la moción de los demandantes del 28 de mayo de 2010 de autorización para modificar la demanda; (iii) la moción de los demandantes para confirmar los embargos ex parte de fecha 28 de mayo de 2010; y (iv) en respaldo de la moción del BNA para anular los embargos ex parte del 28 de mayo de 2010.

2.  Con anterioridad he presentado declaraciones al Tribunal con fecha 28 de octubre de 2008 y 6 de febrero de 2009 sobre esta cuestión.  Dichas declaraciones plantean hechos que demuestran que el BNA es el banco comercial más grande de la Argentina[1], y es una entidad autárquica que opera en forma independiente y autónoma de la República. Estas declaraciones también rebatían alegatos de control no comprobados de los demandantes, que ayudan a establecer, como ya había determinado el Tribunal en su Dictamen del 30 de septiembre de 2009, que el BNA no es un alter ego de la República.  Para conveniencia del Tribunal, se adjuntan copias de dichas declaraciones como Elementos de Prueba A y B

3.  En esta declaración, expongo al Tribunal los hechos referidos a ciertas operaciones de préstamo de 2009 y 2010 (cada una, un "Préstamo" y en conjunto los "Préstamos") entre el BNA y la República Argentina (la "República"), respecto de las cuales reclaman los demandantes (basándose en artículos periodísticos erróneos) y explico por qué los Préstamos presentaban buenas oportunidades bancarias comerciales que han generado ingresos significativos sin riesgo para el BNA. También explico los hechos referidos a otros programas de préstamos respecto de los cuales los demandantes alegan en forma errónea y que demuestran una vez más que no existe respecto de los mismos control del BNA por parte de la República. Esta declaración se basa en mi conocimiento personal y en mi revisión de los libros y registros del BNA.

## Los Préstamos a la República Continúan Requiriendo Garantías Especiales

4  Como expliqué en mi declaración del 6 de febrero de 2009,  conforme al Artículo 25 de la Carta Orgánica del  BNA, el BNA no puede conceder préstamos a la República, provincias o municipalidades salvo que cuenten con garantías especiales que permitan el reembolso automático del crédito mediante el débito de una cuenta mantenida en el BNA en caso de incumplimiento. También expliqué que en noviembre de 2008, el Congreso argentino sancionó el Artículo 74 de la Ley 26.422 (el Presupuesto Nacional Argentino 2009) ("Artículo 74"), que ratificó el requisito y la emisión de garantías especiales bajo el Artículo 25 de la Carta Orgánica del BNA en relación con préstamos a la República para la financiación de gastos de capital o la amortización de deuda.

5. Al obtener y solicitar confirmar los embargos ex parte de 2008, los demandantes declararon al Tribunal que el Artículo 74 suprimía el requisito de la Carta Orgánica del BNA, esto es que la República proporcionara garantías especiales en relación con los préstamos que le otorgara el BNA. No obstante, tal como fue aprobado por el Congreso Argentino en 2008, el Artículo 74 no indica nada de eso y, de hecho, impuso mayores restricciones sobre los préstamos a la República para la financiación de gastos de capital y la amortización de deuda. Los demandantes ahora han aceptado que su errónea interpretación del Artículo 74 estuvo basada en un borrador anterior de la legislación que no contenía el requisito de la garantía especial. El Artículo 74, como fue sancionado, estipula que el Organo Coordinador de los Sistemas de Administración Financiera está autorizado a dar las garantías especiales requeridas por el Artículo 25 de la Carta Orgánica del BNA para el otorgamiento de préstamos a la República en aquellas circunstancias en que i) el producido de los préstamos se aplique al financiamiento de

---

[1] El BNA actualmente posee más de 600 sucursales y aproximadamente 16.000 empleados.

gastos de capital o la amortización de deuda, y ii) cuando el saldo del préstamo no exceda el 30% de los depósitos del sector público no financiero de la República. Si no se cumplen ambas circunstancias, el Organo Coordinador no puede emitir la garantía especial requerida y el BNA no puede proporcionar el préstamo a la República. Todos estos prerrequisitos han sido cumplidos en relación con los Préstamos. Se adjunta una copia de una traducción fiel del Artículo 74 como Elemento de Prueba C.

6. Por consiguiente, las garantías especiales requeridas por la Carta Orgánica del BNA continúan siendo un prerrequisito para los préstamos a la República y en caso de incumplimiento autorizan al BNA a debitar las cuentas designadas de la República para reembolsarse íntegramente por la falta de pago de capital, intereses e intereses moratorios sólo sujeto a cursar un aviso con quince (15) días de antelación de un incumplimiento de pago continuo.

### Proceso de Solicitud de Préstamos del BNA

7. En el caso de cada uno de los Préstamos se siguió el siguiente proceso:

(a) El BNA recibió un pedido del Secretario de Finanzas del Ministerio de Economía y Finanzas Públicas para analizar y elevar al Directorio del BNA para su aprobación un préstamo propuesto, junto con una certificación de que el Préstamo propuesto cumpliera con los requisitos del Artículo 74 de la Ley 26.422, incluyendo que el producido de los Préstamos se utilizaría para la amortización de deuda pública pendiente;

(b) tras el análisis favorable del pedido por parte de la gerencia del BNA, el Gerente General del BNA presentó la financiación propuesta al Directorio del BNA con una recomendación de que se efectuara el Préstamo; y en cada instancia el Directorio aprobó el Préstamo y emitió una resolución a tal efecto;

(c) tras ser notificados de dicha resolución y aceptar los términos propuestos por el BNA, los Secretarios de Finanzas y de Hacienda en ejercicio de las funciones del Organo Coordinador, emitieron una resolución conjunta, que contenía la garantía especial requerida por el Artículo 25 de la Carta Orgánica del BNA y el Artículo 74, y confirmaron que el Préstamo sería utilizado para la amortización de deuda pendiente;

(d) la resolución del Directorio que aprobaba el Préstamo luego fue remitida al departamento de contabilidad del BNA, que a su vez solicitó el análisis del auditor externo del BNA, KPMG, para verificar el cumplimiento de la Resolución N° 76/09 del Banco Central (asegurando que la totalidad de los préstamos del BNA a la República no excediera el 50% del capital del BNA);

(e) el BNA remitió toda la documentación referida al Préstamo, incluyendo el informe del auditor externo, al Banco Central para que determinara si el

Préstamo cumplía con los requisitos de la Resolución 76/09, lo que el Banco Central evidenció mediante la emisión de una resolución;

(f)    tras el recibo de la resolución del Banco Central, y luego de determinar que contaba con la liquidez necesaria, el BNA fondeó los Préstamos en las fechas de desembolso.

Se adjunta una muestra representativa de los documentos que reflejan cada etapa de este proceso como Elemento de Prueba D.

8.   El Directorio del BNA debe aprobar todos los préstamos efectuados a la República. Al revisar la solicitud de los Préstamos de la República, el BNA efectuó su análisis estándar del préstamo, que incluye una evaluación del riesgo potencial para el BNA contra los beneficios potenciales de efectuar el Préstamo. De particular importancia para el Directorio del BNA en el caso de los Préstamos fue la existencia de las garantías especiales emitidas con respecto a cada Préstamo, las cuales le proporcionaban al BNA la capacidad de reembolsarse automáticamente tras un aviso con quince días de antelación en el caso de incumplimiento, que eliminaban efectivamente el riesgo, y sin las cuales no se podría haber efectuado ninguno de los Préstamos . También se tuvo consideración especial respecto de los informes especiales de los auditores externos del BNA, KPMG, confirmando el cumplimiento de los puntos 1.1, 1.2 y 3 de la Resolución 76/09 del Banco Central, y  de la resolución conjunta de las Secretarías de Finanzas y de Hacienda confirmando el cumplimiento del requisito de que el producido de los Préstamos sea utilizado para la amortización de deuda pública pendiente de la República. Asimismo, el Directorio condicionó cada desembolso a que el BNA tuviera liquidez suficiente en las fechas de desembolso.  Como resultado de este análisis de riesgo-recompensa, y del hecho de que los Préstamos son transacciones redituables, y por consiguiente beneficiosas para el BNA,  el BNA decidió efectuar los Préstamos.

## Los Préstamos

9.   El Directorio del BNA adoptó las Resoluciones N° 1610 y 2102 de 2009, y 284 y 288 de 2010 aprobando cada uno de los Préstamos en los términos indicados en las resoluciones.

Resolución N° 1610

10.   Los términos y condiciones del Préstamo por hasta 7.300.000.000  de pesos aprobado el 21 de mayo de 2009 son los siguientes:

(a)    **Desembolso**: Cinco cuotas comenzando el 26 de mayo de 2009 por la suma de 50.000.000 de pesos, con cuotas subsiguientes el 15 de junio de 2009 por la suma de 1.650.000.000 de pesos, el 15 de julio por la suma de 1.800.000.000 de pesos, el 15 de septiembre de 2009 por la suma de 3.000.000.000  de pesos, y el 15 de noviembre de 2009 por la suma de 800.000.000  pesos.

(b)    **Tasa de Interés**: determinada por la suma de la

4

    (i)    **Tasa Base**: Tasa BADLAR, que es la tasa nominal anual informada mediante la muestra diaria de bancos públicos para depósitos a plazo fijo de 30 a 35 días por importes superiores o iguales a un millón de pesos, más

    (ii)    **Margen:** 100 puntos básicos.

    Al día que se produjo el desembolso del préstamo (las primeras dos cuotas el 19 de junio de 2009), la tasa nominal anual cobrada fue la del 13,69%.

(c) **Pago de Intereses**: La tasa de interés aplicable se ajusta mensualmente al comienzo de cada nuevo período de interés. El interés sobre el préstamo es pagadero mensualmente el quinto día hábil del mes, comenzando el segundo mes luego de cada desembolso.

(d) **Reintegro de Capital**: La República debe reintegrar el capital en veinticuatro (24) cuotas mensuales, iguales y consecutivas en pesos comenzando el quinto día hábil de enero de 2010.

(e) **Interés por Incumplimiento**: El Préstamo estipula un interés punitorio del 1% de todos los importes vencidos .

Se adjunta una copia de la Resolución N° 1610 como Elemento de Prueba E.

<u>Resolución del Directorio N° 2102</u>

11.   Los términos y condiciones del Préstamo por hasta 1.000.000.000 de pesos aprobado el 2 de julio de 2009 son los siguientes:

    (a)    **Desembolso**: Un único desembolso de todo el capital, que tuvo lugar el 15 de julio de 2009

    (b)    **Tasa de Interés:** determinada por la suma de la
        (i)    **Tasa Base:** Tasa BADLAR, más
        (ii)    **Margen:** 100 puntos básicos.

        Al día en que se produjo el desembolso del préstamo (15 de julio de 2009), la tasa nominal anual cobrada fue la del 12,19%.

    (c)    **Pago de Intereses:** La tasa de interés aplicable se ajusta mensualmente al comienzo de cada nuevo período de interés. El interés sobre el préstamo es pagadero mensualmente el quinto día hábil del mes, comenzando el segundo mes luego de su desembolso.

    (d)    **Reintegro de Capital:** La República debe reintegrar el capital en veinticuatro (24) cuotas mensuales, iguales y consecutivas en pesos comenzando el quinto día hábil de enero de 2010.

    (e)    **Interés por Incumplimiento:** El Préstamo estipula un interés punitorio del 1% sobre todos los importes vencidos

Se adjunta una copia de la Resolución N° 2102 como Elemento de Prueba F.

Resolución del Directorio N° 284

12.    Los términos y condiciones del Préstamo por hasta 900.000.000 de pesos aprobado el 28 de enero de 2010 son los siguientes:

(a)    **Desembolso**: Un único desembolso de todo el capital, que tuvo lugar el 5 de febrero de 2010.

(b)    **Tasa de Interés**: determinada por la suma de la
   (i)    **Tasa Base**: Tasa BADLAR, más
   (ii)   **Margen**: 100 puntos básicos.

   Al día en que se produjo el desembolso de este préstamo (5 de febrero de 2010), la tasa nominal anual cobrada fue la del 9,81%.

(c)    **Pago de Intereses**: La tasa de interés aplicable se ajusta mensualmente al comienzo de cada nuevo período de interés. El interés sobre el préstamo es pagadero mensualmente el quinto día hábil del mes, comenzando el segundo mes luego de su desembolso.

(d)    **Reintegro de Capital**: La República debe reintegrar el capital en veinticuatro (24) cuotas mensuales, iguales y consecutivas en pesos comenzando el quinto día hábil de noviembre de 2010.

(e)    **Interés por Incumplimiento**: El Préstamo estipula un interés punitorio del 1% de todos los importes vencidos.

Se adjunta una copia de la Resolución N° 284 como Elemento de Prueba G.

13. Los términos y condiciones del Préstamo por un importe de hasta U$S 156 millones aprobado el 28 de enero de 2010 son los siguientes:

(a)    **Desembolso**: Un único desembolso de todo el capital, que tuvo lugar el 5 de febrero de 2010, luego de que se obtuvo la autorización requerida del Banco Central de Argentina relacionada con préstamos denominados en dólares.

(b)    **Tasa de Interés Nominal Anual Fija**: 2,75%

(c)    **Pago de Intereses**: El interés es pagadero mensualmente, el quinto día de cada mes, comenzando el segundo mes luego del desembolso.

(d)    **Reintegro de Capital**: La República debe reintegrar el capital en veinticuatro (24) cuotas mensuales, iguales y consecutivas en dólares estadounidenses comenzando el quinto día hábil de noviembre de 2010.

(e)    **Interés por Incumplimiento**: El Préstamo estipula un interés punitorio del 0,25% sobre todos los importes vencidos

Véase la Resolución N° 284 adjunta como Elemento de Prueba G.

Resolución del Directorio N° 288

14.    Los términos y condiciones del Préstamo por un importe de hasta $4.150.040.000,00 de pesos aprobado el 28 de enero de 2010 son los siguientes:

(a) **Desembolso**: El BNA proveerá de fondeo a la República en once (11) cuotas mensuales, la primera por la suma de 691.673.333,34 de pesos efectuada el 5 de marzo de 2010 y las diez restantes, cada una por la suma de 345.836.666 de pesos. Los desembolsos se efectivizarán el primer día hábil siguiente a la fecha de vencimiento de cada una de las cuotas –período 2010- correspondientes a las financiaciones otorgadas conforme resoluciones Nros. 1610 y 2102, siempre que el BNA reciba de la República el pago íntegro de capital e intereses adeudados por lo menos 24 horas antes del desembolso.

(b) **Tasa de Interés:** Determinada por la suma de la:
    (i) **Tasa Base**: Tasa BADLAR, más
    (ii) **Margen:** 100 puntos básicos.

    Al día en que se produjo el desembolso de este préstamo (5 de marzo de 2010), la tasa nominal anual cobrada fue la del 9,69%.

(c) **Pago de Intereses:** La tasa de interés aplicable se ajusta mensualmente al comienzo de cada nuevo período de interés. Los intereses sobre el préstamo son pagaderos mensualmente el quinto día del mes a partir del segundo mes después que tenga lugar el primer desembolso

(d) **Reintegro de Capital**: La República debe efectuar pagos de capital en 24 cuotas mensuales iguales, a partir del quinto día **hábil** de enero de 2011.

(e) **Interés por Incumplimiento**: El préstamo estipula un interés punitorio del 1% sobre todos los importes vencidos.

Se adjunta una copia de la Resolución N° 288 como Elemento de Prueba H.

**Determinación de la Tasa de Interés**

15.    La tasa de interés convenida con respecto a los Préstamos en pesos (13,69% anual en la fecha de desembolso inicial del 19 de junio de 2009; 12,19% el 15 de julio de 2009, 9,81% el 5 de febrero y 9,69% el 5 de marzo de 2010) es comparable de manera favorable con los Préstamos efectuados por el BNA a prestatarios comerciales durante el mismo período. Por ejemplo, en ese momento, y actualmente, las líneas de crédito abiertas por el BNA para clientes de los sectores agrícola y ganadero fluctúan entre el 6% y el 9% anual, según el riesgo del cliente, por debajo de la tasa sobre los Préstamos en pesos efectuados a la República. De manera similar, la tasa establecida sobre el Préstamo en dólares a la República, del 2,75% anual, es comparable de manera favorable con los préstamos en dólares actualmente pendientes para clientes de primera línea del BNA de Préstamos en dólares, que fluctúa entre el 1,25% y el 2,60% anual.

7

16.    El argumento de los Demandantes de que las tasas de interés cobradas a la República sobre los Préstamos pueden compararse con las tasas de interés sobre préstamos sueldo e hipotecarios es simplemente errónea. Estos son riesgos crediticios sumamente diferentes y no se puede efectuar una comparación bancaria comercial entre préstamos sueldo no garantizados a consumidores y préstamos para la República para los cuales se han suministrado garantías con acceso directo a fondos en caso de incumplimiento.

## Los Préstamos Cumplen Con la Carta Orgánica del BNA

17. La Garantía Especial. Tal como es requerido, la República le ha dado una garantía especial al BNA por los Préstamos. Las garantías especiales permiten el acceso a fondos de la República depositados en el BNA en caso de incumplimiento, debitando de la cuenta que mantiene dichos fondos mediante aviso escrito con quince días de antelación al Secretario de Finanzas y a la Secretaría de Hacienda. La garantía especial permanece en vigencia hasta que los Préstamos sean reintegrados en su totalidad.

## Los Depósitos de la República en el BNA.

18.    Tal como lo requiere también el Artículo 74, antes de la aprobación de los Préstamos, el Directorio del BNA determinó que el saldo de todos los préstamos pendientes del BNA a la República no excediera el treinta (30%) de los depósitos en el BNA del sector público nacional no-financiero de la República. Actualmente, y al momento en que fueron otorgados cada uno de los Préstamos, el importe total de los préstamos pendientes otorgados por el BNA a la República es/era inferior al 30% de los depósitos de la República en el BNA.

## Los Préstamos Están al Día

19. Todas las obligaciones de pago de la República sobre los Préstamos han sido satisfechas y están al día, tal como se refleja en el siguiente cuadro. Al 7 de julio de 2010, el BNA había recibido pagos de intereses sobre los Préstamos por 831.588.138,80 pesos  y U$S 1.786.520,54. El BNA ha recibido pagos de capital por un importe total de 2.420.856.666,69.

| Fecha de Recibo | Capital | Intereses | |
|---|---|---|---|
| | | Pesos | Dólares USA |
| Agosto 7, 2009 | | 31.243.205.48 | |
| Septiembre 7, 2009 | | 65.087.095.89 | |
| Octubre 7, 2009 | | 49.709.589.04 | |
| Noviembre 9, 2009 | | 102.066.575.32 | |
| Diciembre 7, 2009 | | 74.104.109.60 | |
| Enero 8, 2010 | | 88.801.534.25 | |
| Febrero 5, 2010 | | 57.304.109.59 | |
| Marzo 5, 2010 | 691.673.333.34 | 62.461.479.45 | |
| Marzo 8, 2010 | 345.836.666.67 | 307.273.51 | |
| Abril 9, 2010 | 345.836.666.68 | 82.707.034.68 | 740.465.75 |
| Mayo 7, 2010 | 345.836.666.67 | 73.161.571.46 | 329.095.89 |
| Junio 7, 2010 | 345.836.666.67 | 73.337.909.92 | 364.356.16 |
| Julio 7, 2010 | 345.836.666.67 | 71.296.650.61 | 352.602.74 |
| Total | 2.420.856.666.69 | 831.588.138.80 | 1.786.520.54 |

## Los Préstamos Benefician al BNA

20.    Los Préstamos presentaron una buena oportunidad bancaria comercial para el BNA. De ningún modo fueron una imposición de la República y, de hecho, el BNA aceptaría con agrado efectuar más préstamos bajo las condiciones de los Préstamos. Por empezar, los Préstamos fueron efectuados por hasta el 30% de los fondos de la República depositados en el BNA. Los Préstamos fueron efectuados a una tasa superior a la ofrecida a otros clientes principales de la cartera actual de préstamos del BNA. El hecho de que los Préstamos estén garantizados por los depósitos de la República en cuentas mantenidas en el BNA neutraliza el riesgo de falta de pago. Ya se han pagado al BNA intereses superiores a 800 millones de pesos y casi dos millones de dólares. Además, el margen entre los intereses sobre los depósitos pagados a la República y los intereses sobre los Préstamos constituye una importante fuente de ingresos para el BNA. Asimismo, el BNA obtiene una ganancia marginal. Si no se hubieran efectuado los Préstamos, esos fondos se habrían depositado en el mercado de pases mantenido por el Banco Central de Argentina para depósitos efectuados por las entidades financieras de su excedente, a una tasa menor en todo momento a las tasas de interés obtenidas por los Préstamos. Finalmente, con respecto al Préstamo en dólares, si el BNA no presta su liquidez en dólares o control de Préstamos, debe depositar el excedente en el Banco Central donde no obtiene intereses. En resumen, los Préstamos constituyen un beneficio sustancial para el BNA y no una imposición como alegan los demandantes.

### Otros Alegatos de Control de los Demandantes

21.    Más allá de centrarse en los Préstamos como justificación para la reconsideración de este Tribunal, la modificación de la demanda y/o la confirmación de las Órdenes de mayo de 2010, los demandantes vuelven a los tipos de demandas generadas por nuevas historias respecto de programas de desarrollo económico que utilizaron inicialmente y que este Tribunal ya determinó que "no dieron como resultado un grado de titularidad o control de hecho de los fondos del BNA como para justificar de manera suficiente un fallo de alter ego." El resultado con respecto a estas tres demandas reformuladas no tiene por qué ser diferente ahora.

(a)    **Financiamiento para la Clase Media**. Los demandantes alegan que "a fines de 2008, como una forma de obtener apoyo político, los Kirchner apelaron a un importante grupo de su interés mediante la implementación de un programa según el cual el BNA debía distribuir préstamos hipotecarios a familias de clase media, según condiciones dictadas por el gobierno" y "en abril de 2010, [la Presidenta Argentina] anunció ..... una nueva línea de crédito para la clase media, para obtener préstamos hipotecarios destinados a la compra de viviendas..... a una tasa de interés vinculada al salario del prestatario...." Memorándum de Solicitud de los Demandantes en p. 15. Para comenzar, en el caso de los préstamos hipotecarios para la clase media, los términos no están "dictados por el gobierno," ni la tasa de interés está "vinculada al salario del prestatario." El interés real cobrado sobre estos préstamos es del 15,11%, que es comparable con las tasas del mercado. La tasa la determina el BNA en base a su costo de fondos. Los préstamos son redituables para el BNA porque la tasa de interés real cobrada por el BNA (15,11%) es mayor que

el costo marginal para el BNA por la obtención de fondos, que es el del 12,02%. Además, el costo promedio de los fondos para el BNA es del 9,3%. En cualquiera de los casos (la tasa marginal o la tasa promedio), el costo del BNA por la obtención de fondos es menor que el 15,11% que se le cobra a los tomadores de préstamos hipotecarios. Asimismo, además de ser rentables, estos préstamos de ningún modo pueden ser caracterizados como impuestos por la República al BNA. Por el contrario, estas promociones para la compra de viviendas están disponibles para todas las entidades financieras argentinas, no sólo el BNA.

(b) **Financiación de Camiones Iveco.** Los Demandantes alegan que "en marzo de 2009, en otra demostración de la manipulación del BNA por parte del gobierno para lograr fines políticos, el gobierno celebró un convenio con el fabricante de camiones Iveco por el cual el BNA otorgaría a compradores de vehículos de Iveco condiciones de financiamiento muy atractivas, incluidos préstamos sin intereses ..."Esto servía a los objetivos políticos de los Kirchner de aumentar la producción local y mantener los puestos de trabajo......" Memorándum de Solicitud de los Demandantes en p. 15. Con respecto al convenio con Iveco, el BNA otorgó créditos a los compradores a través de las líneas de financiación del BNA para la adquisición de nuevos camiones Iveco fabricados en Argentina. Contrariamente a las afirmaciones de los demandantes, los préstamos otorgados a los compradores de camiones no son préstamos sin interés. Por el contrario, la tasa de interés sobre dichos préstamos fluctúan entre el 10,50% y 12%.

(c) **Financiación para el Sector Agrícola.** Los Demandantes alegan que "en otro intento por congraciarse con un importante electorado" la República ha ordenado varios programas crediticios, incluyendo préstamos subsidiados para los productores lecheros y de trigo, y líneas de crédito subsidiadas para la compra de maquinaria agrícola de producción nacional. Memorándum de Solicitud de los Demandantes en p.16. Reiteramos, todos los bancos Argentinos, no sólo el BNA, pueden participar en los préstamos subsidiados a los diversos sectores de la economía argentina, como el sector agrícola. La República paga al BNA (y a los otros bancos participantes) un subsidio, que es recibido por el BNA por sobre el interés directo pagado al BNA por el prestatario. La tasa de interés cobrada al tomador del préstamo, combinada con el subsidio del gobierno da como resultado una tasa de interés de mercado. En el caso del BNA, la tasa de interés obtenida es mayor que sus costos de fondos generando una ganancia para el BNA. Asimismo, el riesgo de pérdida sobre el préstamo se reduce debido al subsidio, ya que la tasa de interés que el prestatario paga es menor que la tasa total recibida por el BNA. En resumen, como fuera establecido en relación con programas similares que los demandantes objetaron en su moción de 2008, y que fuera descartado por el Tribunal por no respaldar el nivel de control del BNA por parte de

10

la República que pudiera justificar un fallo de alter ego, dichos programas están disponibles para todos los bancos, no fueron impuestos al BNA y no ocasionan una pérdida para el BNA.

Declaro bajo pena de perjurio bajo las leyes de los Estados Unidos de América que lo antedicho es verdadero y correcto.

Formalizado el 27 de julio de 2010

Juan Carlos Fábrega