UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

NML CAPITAL, LTD.,

               Plaintiff,

                                      08 Civ. 6978 (TPG)
        v.                           09 Civ. 1707 (TPG)
                                      09 Civ. 1708 (TPG)

REPUBLIC OF ARGENTINA,

               Defendant.

-------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION BY NML CAPITAL, LTD. FOR PARTIAL SUMMARY JUDGMENT AND FOR INJUNCTIVE RELIEF PURSUANT TO THE EQUAL TREATMENT PROVISION

**GIBSON, DUNN & CRUTCHER LLP**
Theodore B. Olson
Matthew D. McGill
Jason J. Mendro
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
(202) 955-8500

**DECHERT LLP**
Robert A. Cohen
Charles I. Poret
1095 Avenue of the Americas
New York, NY  10036-6796
(212) 698-3500

*Attorneys for Plaintiff NML Capital, Ltd.*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ............................................................................................. 1

II.  BACKGROUND ............................................................................................. 3

    A.  Argentina Issues Bonds In 1994 Containing An Equal Treatment Provision .................................................................................................. 3

    B.  Argentina Defaults On Its Sovereign Debt In 2001 ................................ 4

    C.  In 2005, Argentina Subordinates NML's Rank To Creditors Who Agreed To Accept Less Than What They Were Owed ....................................... 4

    D.  In 2010, Argentina Lowers NML's Rank Again ................................... 6

    E.  This Court Reserves Questions About The Scope Of The Equal Treatment Provision .................................................................................................. 7

III.  ARGUMENT .................................................................................................. 9

    A.  NML Is Entitled To Partial Summary Judgment For Breach Of The Equal Treatment Provision ................................................................................. 9

        1.  Argentina Has Paid Other External Creditors While Withholding Payment From NML In Breach Of The Equal Treatment Provision ....... 10

        2.  Argentina Has Enacted Laws And Formal Decrees Subordinating NML's Rank In Breach of Argentina's Own Interpretation Of The Equal Treatment Provision ................................................................. 13

    B.  NML Is Entitled To Specific Performance Of The Equal Treatment Provision .................................................................................................. 17

        1.  Argentina's Breach Of The Equal Treatment Provision Caused NML Irreparable Injury For Which There Is No Adequate Remedy At Law ...................................................................................................... 19

        2.  The Balance Of Equities Favors Specific Performance ......................... 24

        3.  The Public Interest In Enforcing Contractual Guarantees And Maintaining Confidence In Debt Markets Demands Injunctive Relief ..................................................................................................... 26

IV.  CONCLUSION ............................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Archibald v. Marshalls of MA, Inc.*,
    No. 09 Civ. 2323(LAP), 2009 WL 3817404 (S.D.N.Y. Nov. 12, 2009) ..........................20

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................................................9

*BIB Constr. Co. v. Fireman's Ins. Co.*,
    214 A.D.2d 521 (1st Dept. 1995)....................................................................................22

*In re Bd. of Dirs. of Multicanal, S.A.*,
    307 B.R. 384 (Bankr. S.D.N.Y. 2004) ............................................................................12

*Capital Ventures Int'l v. Republic of Argentina*,
    443 F.3d 214 (2d Cir. 2006)..............................................................................................4

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
    511 F.3d 535 (6th Cir. 2007) ..........................................................................................25

*Charles W. & Ruby W. Norton, Inc. v. Leadville Corp.*,
    570 F.2d 911 (10th Cir. 1978) ........................................................................................14

*Chi. Truck Drivers v. Bhd. Labor Leasing*,
    207 F.3d 500 (8th Cir. 2000) ..........................................................................................25

*CSX Transp., Inc. v. Williams*,
    406 F.3d 667 (D.C. Cir. 2005) ........................................................................................21

*Danielson v. Local 275*,
    479 F.2d 1033 (2d Cir. 1973)..........................................................................................21

*E.A. Renfroe & Co., Inc. v. Moran*,
    249 F. App'x 88 (11th Cir. 2007) ...................................................................................20

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ........................................................................................................19

*Elliott Assocs. L.P.*,
    General Docket No. 2000/QR/92
    (Court of Appeals of Brussels, 8th Chamber, Sept. 26, 2000)....................................11, 12

**TABLE OF AUTHORITIES (continued)**

<u>Page(s)</u>

*EM Ltd. v. Republic of Argentina*,
    473 F.3d 463 (2d Cir. 2007).............................................................................................3

*EM Ltd. v. The Republic of Argentina*,
    --- F. Supp. 2d ---, 2010 WL 1404119 (S.D.N.Y. Apr. 7, 2010) ............................ *passim*

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002)...............................................................................................21

*Hudson Valley Bank v. Kissel*,
    No. FSTCV054006330S, 2009 WL 3644837 (Conn. Super. Ct. Sept. 29, 2009) .......10, 17

*Ind. Funeral Directors, Ins. Trust v. Trustmark Ins. Corp.*,
    347 F.3d 652 (7th Cir. 2003) ...........................................................................16

*Jewett Orthopaedic Clinic, P.A. v. White*,
    629 So. 2d 922 (Fla. Dist. Ct. App. 1993) .......................................................22

*Jomark Textiles, Inc. v. Int'l Fire & Marine Ins. Co., Ltd.*,
    771 F. Supp. 577 (S.D.N.Y. 1989)..................................................................16

*LNC Invs. LLC v. Republic of Nicaragua*,
    Folio 2000 No. 1061, R.K. 240/03 (Commercial Ct. of Brussels Sept. 11, 2003) ............11

*MHR Capital Partners LP v. Presstek, Inc.*,
    912 N.E.2d 43 (N.Y. 2009).................................................................................10

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
    67 F.3d 435 (2d Cir. 1995)...............................................................................10

*Moticka v. Weck Closure Sys.*,
    183 F. App'x 343 (4th Cir. 2006) ..................................................................16

*Nat'l Sur. Corp. v. Titan Constr. Corp.*,
    26 N.Y.S.2d 227 (N.Y. Sup. Ct. 1940) ..........................................................23

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
    992 F.2d 430 (2d Cir. 1993)..........................................................................19, 23

*NML Capital v. Republic of Argentina*,
    --- F.3d ---, Nos. 09-2707-cv(L) *et al.*, 2010 WL 3704570 (2d Cir. Sept. 23, 2010) ........24

*PCTV Gold, Inc. v. SpeedNet, Inc.*,
    508 F.3d 1137 (8th Cir. 2007) ......................................................................25

iii

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Red Mountain Fin., Inc. v. Democratic Republic of Congo*,
    No. CV 00-0164 R (BQRx) (C.D. Cal. May 29, 2001) ......................................................11

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010).....................................................................................................20

*TCW Gem V. Ltd. v. Grupo Iusacell Celular, S.A. de C.V.*,
    801 N.Y.S.2d 243 (Sup. Ct. 2004)........................................................................................23

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999).....................................................................................................22

*Washington v. Cnty. of Rockland*,
    373 F.3d 310 (2d Cir. 2004)...................................................................................................10

*In re Worldcom, Inc.*,
    343 B.R. 486 (Bankr. S.D.N.Y. 2006)...................................................................................22

**Rules**

Fed. R. Civ. P. 56...........................................................................................................................1, 9

Fed. R. Civ. P. 65..........................................................................................................................3, 25

**Other Sources**

Brief for the United States as *Amicus Curiae* Supporting Respondents,
    *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992)
    (No. 91-763), 1992 U.S. S. Ct. Briefs LEXIS 199 ...............................................................26

Calligar, Dee Martin, *Subordination Agreements*, 70 Yale L.J. 376 (1961) ................................14

Olivares-Caminal, *To Rank Pari Passu or not to Rank Pari
    Passu; that is the Question in Sovereign Bonds*, Working Papers ....................................15

Gelpern, *After Argentina* (Rutgers Sch. of Law – Newark Research Paper
    No. 011; Inst. for Int'l Econ. Working Paper No. 2005-PB05-2).......................................16

Restatement (Second) of Contracts § 360.......................................................................................20

Pursuant to Federal Rule of Procedure 56(a), NML Capital, Ltd. respectfully moves for partial summary judgment on its claim that the Republic of Argentina has breached its contractual obligation under the bonds at issue in these cases and, in particular, its obligation to treat NML equally with other external creditors.  NML also requests an injunction requiring Argentina to pay NML ratably if and when it makes payments to other external creditors, including bondholders who participated in Argentina's 2005 and 2010 "exchanges."

## I.     **INTRODUCTION**

For most of the past decade, NML has litigated over its right to receive payment on billions of dollars of defaulted Argentine bonds.  Although NML has won a mountain of favorable judgments, Argentina has steadfastly refused to honor those judgments.  Instead of respecting the authority of this Court, Argentina has gone to extraordinary measures to evade repayment, enacting laws that proclaim that it will ***never*** repay NML or satisfy its U.S. judgments because NML refused to submit to Argentina's coercive "exchange offers," which would have forced NML to accept pennies on the dollar in return for releasing its multi-billion dollar claims.  Those creditors who did acquiesce to these take-it-or-leave-it demands now receive payments from Argentina, while NML—despite this Court's judgments—receives nothing.

Argentina's refusal to pay NML while paying other creditors not only breaches Argentina's payment obligations under the bonds,[1] but also independently violates a provision of the bond documents that requires all creditors who demand payment to be treated equally.  That provision states that "[t]he payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated Ex-

---

[1]   NML moves separately for partial summary judgment on its claim for money damages for Argentina's failure to make payments due on the bonds and respectfully requests that the Court rule on these motions concurrently.

ternal Indebtedness."  Rule 56.1 Statement of Facts ("SOF") ¶ 8 (hereinafter, the "Equal Treatment Provision").  By creating a class of creditors who are guaranteed payment while formally condemning NML to a lower rank that is barred from receiving any payment at all, Argentina has breached this Equal Treatment Provision.  In the wake of Argentina's exchange offers and its infamous law not only barring payments under non-tendered bonds, but also barring payment of the judgments of this Court, Argentina's payment obligations to NML simply cannot be said to "rank at least equally" to those of the performing bonds issued under the exchange offers.  NML thus seeks partial summary judgment in these three pre-judgment cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708) for Argentina's breach of contract.[2]

NML requests that this Court specifically enforce the Equal Treatment Provision by requiring Argentina to pay NML ratably if and when it makes payments on other external indebtedness, including payments to the bondholders who participated in exchange offers.  Such an order is the only remedy that would be adequate to restore NML to the position that it was guaranteed to maintain among Argentina's other external creditors.  And it would advance the interests of justice by requiring Argentina at last, and on penalty of contempt, to pay NML—as it is abundantly capable of doing—on a par with the creditors it is certain to pay.  The order also would provide a critical tool in preventing Argentina from continuing to evade its legal obligations by utilizing its agents in the United States, including its counsel, to maintain an unlawful preferen-

---

[2]   NML's claim for breach of the Equal Treatment Provision has been presented to, and is properly before, this Court in all of NML's cases against Argentina.  As Argentina agreed, "[h]aving sued under the FAA, plaintiffs have put at issue all the provisions in that agreement that are relevant to the rights and obligations of the parties, including their right to use the Pari Passu Clause as an enforcement mechanism."  D.E. 29, at 14, No. 03 Civ. 2507 (S.D.N.Y. Dec. 12, 2003).  NML has focused in the present motion on cases 08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708 to simplify the issues before the Court and, for the avoidance of doubt, is simultaneously moving to amend its complaints in these cases to clarify that breach of the Equal Treatment Provision is pleaded as an independent cause of action.  NML reserves the right to seek enforcement of the Equal Treatment Provision in its other cases.

tial payment scheme.  *See* Fed. R. Civ. P. 65(d) (providing that injunctions may bind the parties and their "officers, agents, servants, employees, and attorneys").  This motion thus seeks an end to Argentina's relentless defiance of the U.S. court system.

## II.     BACKGROUND

### A.     Argentina Issues Bonds In 1994 Containing An Equal Treatment Provision

Argentina issued the bonds held by NML pursuant to the 1994 "Fiscal Agency Agreement" (FAA).  SOF ¶ 1.  The FAA was entered into at a time when investors' memories of the history of Argentina's past defaults were fresh.  *See EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007) (cataloguing Argentina's numerous defaults since the early nineteenth century).  For that reason, Argentina needed to bolster investor confidence in its promise to honor its contractual commitments.  Paragraph 1(c) of the FAA therefore provided a critical protection for investors: a guarantee that Argentina would treat bondholders equally with other holders of its unsubordinated debt.  That Equal Treatment Provision reads:

> The Securities will constitute . . . direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank <u>pari</u> <u>passu</u> and without any preference among themselves.  ***The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness*** . . . .

SOF ¶ 8 (emphasis added).  The FAA defines the term "External Indebtedness" to mean "obligations (other than the Securities [governed by the FAA]) for borrowed money or evidenced by securities, debentures, notes or other similar instruments denominated or payable . . . in a currency other than the lawful currency of the Republic."[3]  Cohen Decl. Ex. A ¶ 11.  The Equal Treatment Provision thus ensures that all holders of Argentina's External Indebtedness receive

---

[3]  The FAA exempts from the definition of "External Indebtedness" certain "Domestic Foreign Currency Indebtedness" not relevant here.  Cohen Decl. Ex. A ¶ 11.

equal treatment in terms of payment and provides hesitant lenders with an enhanced enforcement tool in case of default.  Since the Equal Treatment Provision requires that the "payment obligation" under the bonds would "rank at least equally" with other External Indebtedness, the provision guarantees that no bondholder's right to payment can be subordinated to that of any other external creditor and that no other external creditor can be given priority in terms of when or how it will be paid.

**B.      Argentina Defaults On Its Sovereign Debt In 2001**

As its public finances deteriorated in late 2001, Argentina announced a moratorium on the payment of outstanding public debt.  SOF ¶ 9.  A week later, Argentina enacted Law 25,561, which declared a state of economic and social emergency and granted expansive powers to the Executive to restructure Argentina's outstanding public debt.  Cohen Decl. Ex. B.  Argentina ultimately ceased servicing all of its External Indebtedness.  Argentina has extended this moratorium each year in its annual budget.  It has refused to repay principal or interest to any creditors subject to the moratorium (except as described below), even though many creditors, including NML, have obtained money judgments from this Court requiring payment.

**C.      In 2005, Argentina Subordinates NML's Rank To Creditors Who Agreed To Accept Less Than What They Were Owed**

In 2005, Argentina issued an "exchange offer," which offered creditors the option to exchange their defaulted bonds for newly issued bonds of substantially less value but that would actually be paid.  *See Capital Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 217 (2d Cir. 2006).  Argentina made clear that it would not repay those bondholders who did not participate in the exchange offer.  By doing so, Argentina pressured investors to accept the 2005 exchange offer, which was not an attractive offer for most non-Argentine bondholders, requiring, as it did, that participants accept an enormous discount of approximately 70%.  SOF ¶ 10.

4

Argentina implemented this policy in part by inserting a clause into the terms of the securities issued in the 2005 exchange offer called a "RUFO clause," which gave those who participated in the 2005 exchange offer special rights in the event that Argentina offered a second such offer at a later date.  But even these special rights were insufficient to persuade creditors to accept the exchange offer.  As Argentina observed, "[a]fter the 2005 Debt Exchange was launched, certain creditors expressed strong concern that the RUFO Clause did not provide sufficient protection to tendering bond holders that Argentina might, at a later date, strike a more favorable deal with holdout creditors."  *See* Cohen Decl. Ex. J, at 4 (2010 exchange prospectus).

At the insistence of those creditors who demanded "legal reassurance that hold-out creditors would not be able to receive more advantageous terms in the future," Argentina passed Law 26,017, the so-called "Lock Law."  SOF ¶ 11; Cohen Decl. Ex. F (Law 26,017); *id.* Ex. J, at 4 (2010 exchange prospectus).  The Lock Law "prohibited the Executive Branch from reopening the Debt Exchange without Congressional approval and also prohibited any type of settlement involving untendered securities that were eligible to participate in the 2005 Debt Exchange."  SOF ¶ 13; Cohen Decl. Ex. F (Law 26,017).  Argentina thus *enacted legislation to prohibit itself* from paying (or otherwise negotiating with) bondholders who did not participate in the 2005 exchange.  Article 3 of the law prohibits Argentina "from conducting any type of in-court, out-of-court or private settlement with respect to the [non-tendered] bonds," and Article 4 ordered the "removal of the bonds . . . from listing on all domestic and foreign securities markets and exchanges."  SOF ¶¶ 14–15.  Argentina thus made clear, as a matter of Argentine law, that bondholders who opted not to participate in the 2005 exchange offer would never be repaid.  "[T]he Republic has literally proclaimed its repudiation of its legal obligations."  *EM Ltd. v. Republic of*

*Argentina*, --- F. Supp. 2d ---, Nos. 03 Civ. 2507 *et al.*, 2010 WL 1404119, at \*6 (S.D.N.Y. Apr. 7, 2010) (Griesa, J.) (hereinafter "Apr. 7 Op.").

Together, the Lock Law and the 2005 exchange created two classes of bondholders: a higher rank that participated in the 2005 exchange and would thereafter receive the interest and principal payments due them, and a lower rank that was legislatively consigned to receive nothing.  In the end, approximately 76% of the bonds Argentina issued under the FAA were tendered in the 2005 exchange, and the remaining 24% that were not tendered, including NML's bonds, were lowered in rank to non-paying status.  SOF ¶ 16.

**D.     In 2010, Argentina Lowers NML's Rank Again**

In 2009, Argentina concluded that there was an opportunity to induce some of the remaining bondholders to accept a steep discount, and it decided to conduct another exchange offer.[4]  As with the 2005 exchange offer, Argentina told bondholders that they would be permitted to swap their defaulted bonds for newly issued bonds of significantly reduced value on which Argentina would promise to make full and timely payments.  SOF ¶ 20.  To overcome the prohibition on any such offer in the Lock Law, Argentina enacted Law 26,547, which temporarily suspended the provisions of the Lock Law.  *Id.* ¶ 18; Cohen Decl. Ex G (Law 26,547).  Argentina then announced that it would conduct the new exchange offer in 2010.

Law 26,547 preserved the Lock Law's prohibition on repaying non-tendering bondholders through any avenue other than the exchange offer, forbidding the Executive from "offer[ing] to the holders of public debt that have brought judicial, administrative, or arbitration proceedings or any other type of proceeding treatment more favorable than the treatment afforded to holders

---

[4]   *See La Nación*, "Restarting negotiations with the bondholders that remain in default," (Feb. 5, 2009) and "The holdouts more ready to deal," (Jul. 20, 2009) (Cohen Decl. Exs. 21–22).

who did not bring such proceedings." SOF ¶ 19.  Thus, Law 26,547 not only created a second class of preferred bondholders to be seated alongside the class created in the 2005 exchange offer, but it also again legislatively repudiated this Court's judgments, many of which had been entered by the time the law went into effect.[5]

The 2010 exchange was completed in September 2010, and the 2010 exchange bondholders are scheduled to begin receiving semi-annual interest payments in December 2010.  SOF ¶¶ 21–22.  Consistent with its offering memorandum and Law 26,547, Argentina promised to honor bonds issued in the 2010 exchange by paying 100% of the interest due on a semi-annual basis, while holders of bonds who did not participate in the exchange offers would continue to receive nothing.

**E.      This Court Reserves Questions About The Scope Of The Equal Treatment Provision**

NML initially sued Argentina in this Court to recover for defaulted bonds in 2003.  *See* Case No. 03-cv-8845 (S.D.N.Y.).  In 2003, Argentina realized that if it treated NML differently than other creditors, its action could be challenged as a violation of the Equal Treatment Provision of the FAA.  Argentina sought an order under NY CPLR § 5240 that would have barred holders of defaulted bonds from relying on the Equal Treatment Provision to demand payment on a par with those who would participate in an exchange offer.  *See* D.E. 29, No. 03 Civ. 2507 (TPG) (S.D.N.Y. Dec. 12, 2003).  The Court, however, did not issue the requested relief.  Instead, at the Court's urging, the parties entered into a stipulation agreeing that NML would give

---

[5]   This repudiation is in direct conflict with Argentina's previous waiver of sovereign immunity, its agreement to personal jurisdiction in this Court, and its agreement that the FAA would be governed by New York law.  SOF ¶¶ 4, 6–7.  "These provisions resound with all appearances of good faith. . . .  Unfortunately the Republic has turned these assurances into a dead letter.  The good faith was in the words but not in the deeds."  Apr. 7 Op. at *5.

this Court and Argentina 30 days' notice before seeking relief under the Equal Treatment Provision in another forum.  D.E. 31, No. 02 Civ. 3804 (TPG) (S.D.N.Y. Feb. 2, 2004).

In the briefing that the parties submitted on Argentina's motion before they entered into the stipulation, the Court was presented with two different interpretations of the Equal Treatment Provision.  NML's position was that the plain language of the Equal Treatment Provision that "the payment obligations . . . shall at all times rank at least equally" in paragraph 1(c) required Argentina to *pay* all holders demanding payment of External Indebtedness equally in all *payment* situations, *i.e.*, that Argentina could not pay any other external creditors unless it also paid NML—regardless of whether Argentina formally codified the unequal treatment in a legislative act.  Argentina, in contrast, argued that the provision prohibits discrimination or unequal payment among creditors only when the unequal treatment results from the enactment or enforcement of a "law or governmental decree" of Argentina itself.  D.E. 29, at 19, No. 03 Civ. 2507 (TPG) (S.D.N.Y. Dec. 12, 2003).  Because of the stipulation, this Court never had occasion to apply the Equal Treatment Provision.  As detailed below, it is still unnecessary to resolve the parties' disagreement as to the meaning of the provision because, as a result of the Lock Law and other legal measures that Argentina has since promulgated to lower the rank of its payment obligations to non-tendering bondholders, the Equal Treatment Provision has been breached under either the plain language or Argentina's interpretation.

In the seven years since the stipulation, Argentina has refused to make good on *any* of its debts to NML, flouting this Court's judgments.  In contrast, since the passage of the Lock Law and the establishment of a new class of bondholders in the 2005 exchange, Argentina has paid

100% of the interest due to those bondholders who participated in the exchange, and it will soon

begin payments to those who accepted the 2010 exchange offer.  SOF ¶¶ 17, 22.[6]

### III.    ARGUMENT

Because the Equal Treatment Provision means *at least* that Argentina may not *enact laws*

that subordinate NML's debt—Argentina has conceded that much—the Lock Law and other le-

gal measures discussed above breach the provision.  Those measures declare *as a matter of law*

that Argentina will not honor its debts to any creditor who did not participate in the exchange

offers, clearly relegating NML's debt to a lower rank relative to that of other debt.  For that rea-

son, NML is entitled to partial summary judgment on its claim that Argentina has violated the

Equal Treatment Provision.

This Court has wide discretion to impose equitable remedies for Argentina's violation of

that provision and to tailor those remedies to the unique circumstances of this case.  NML re-

spectfully requests an order of specific performance requiring Argentina to make ratable pay-

ments on its payment obligations to NML if and when it makes payments to those creditors who

accepted the exchange offers.  Such an order would ensure that Argentina ceases its violations of

the Equal Treatment Provision and may, at last, bring an end to this litigation.

### A.    NML Is Entitled To Partial Summary Judgment For Breach Of The Equal Treat-ment Provision

Summary judgment "should be rendered if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Once the movant presents evidence to support each of the elements of its claim, the burden shifts

---

[6]   The payments will begin in December 2010 and semi-annual interest payments are to be made thereaf-ter on different dates for the different bonds issued in the Exchange.  SOF ¶ 22.

to the non-moving party to present evidence of a real factual dispute as to a material issue in the case.  Fed. R. Civ. P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

NML is entitled to partial summary judgment for Argentina's breach of the Equal Treatment Provision.  The undisputed facts show that since the passage of the Lock Law in 2005, Argentina has continuously violated the Equal Treatment Provision through the creation of classes of preferred bondholders who have received interest payments while NML and other similarly situated bondholders have received nothing.  *See* SOF ¶¶ 10–22.  NML's ownership of the bonds (*id.* ¶ 1), Argentina's contractual obligation in the Equal Treatment Provision (*id.* ¶ 8), the circumstances of the default and moratorium (*id.* ¶ 9), the enactment of the Lock Law and other legal measures (*id.* ¶¶ 9, 11, 18), and the implementation of the exchange offers (*id.* ¶¶ 10, 16–17, 20–21) are all undisputed.

Even the interpretation of the relevant provision of the FAA, which is an issue of law in any event, is not in dispute in this motion.  *See Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 439 (2d Cir. 1995) ("The proper interpretation of the contract is a question of law for the court.").  As discussed below, NML prevails under either Argentina's interpretation of the provision or the plain language.  Therefore, because "there are no genuine issues of material fact," this Court may determine whether NML is "entitled to judgment as a matter of law."  *Washington v. Cnty. of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004).

### 1. Argentina Has Paid Other External Creditors While Withholding Payment From NML In Breach Of The Equal Treatment Provision

In its earlier briefing, NML set out a plain-language interpretation of the Equal Treatment Provision.  *See MHR Capital Partners LP v. Presstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009) (parties' intentions are presumed to be expressed by the plain meaning of the contract language).  Because the Equal Treatment Provision specifies that Argentina's "payment obligations" on

NML's bonds must be treated equally with its External Indebtedness, Argentina agreed through the provision that it would not prioritize Argentina's payment obligations to other external creditors over its payment obligations to NML.  In other words, it would be a violation of the clause to repay certain creditors at a higher rate or sooner in time than others.  *Cf. Hudson Valley Bank v. Kissel*, No. FSTCV054006330S, 2009 WL 3644837, at *10 (Conn. Super. Ct. Sept. 29, 2009) ("In finance, the phrase 'pari passu' refers to two or more loans, bonds, or series of preferred stock having equal rights of payment or level of seniority being paid at an equal pro rata basis."). Argentina may not make such discriminatory payments.  If Argentina wishes to pay one of its creditors that which is due to the creditor, it must also pay NML that which is due to NML at the same time and to the same extent.  As noted NYU law professor Andreas Lowenfeld has explained in a similar context, "[a] borrower from Tom, Dick, and Harry, can't say 'I will pay Tom and Dick in full, and if there is anything left over, I'll pay Harry.'  If there is not enough money to go around, the borrower . . . must pay all three of them on the same basis . . . ."  Cohen Decl. Ex. V, at 5–6 (January 14, 2004 Letter from Kevin Reed to The Honorable Thomas P. Griesa).[7]

Every court that has interpreted a similar equal-treatment provision in a sovereign debt instrument has adopted NML's plain-language interpretation.  *See, e.g.*, *Red Mountain Fin., Inc. v. Democratic Republic of Congo*, No. CV 00-0164 R (BQRx) (C.D. Cal. May 29, 2001) (injunction order) (Cohen Decl. Ex. Y) (enjoining defendants subject to equal-treatment provision from "making any payments or authoriz[ing] any payments to be made on their behalves with respect to any [debt] unless and until [the defendants] make or cause to be made a proportionate payment

---

[7]   Professor Lowenfeld, a Professor of International Law at New York University Law School, provided a Declaration on which the Court in Brussels relied in issuing an injunction based on a comparable contractual provision in *Elliott Associates L.P. v. The Republic of Peru*, General Docket No. 2000/QR/92 (Court of Appeals of Brussels, 8th Chamber, Sept. 26, 2000).

to [the plaintiff] at the same time");[8] *LNC Invs. LLC v. Republic of Nicaragua*, Folio 2000 No. 1061, R.K. 240/03 (Commercial Ct. of Brussels Sept. 11, 2003) (Cohen Decl. Ex. W) (holding that Nicaragua's payments to other external creditors "constitute blatant violations of the *pari passu* clause since the Republic of Nicaragua consistently excludes [the plaintiff] from them, although the latter has the right to receive an egalitarian payment or at least a payment that is proportionate to the ones made to the" other creditors), *rev'd in part on other grounds*, Gen. Doc. No. 2003/KR/334 (Court of Appeals of Brussels, 9th Chamber, Mar. 19, 2004); *Elliott Assocs. L.P.*, General Docket No. 2000/QR/92, at ¶ 6 (Court of Appeals of Brussels, 8th Chamber, Sept. 26, 2000) (Cohen Decl. Ex. X) (unofficial translation) (emphasis added).

In addition, the plain-meaning interpretation of equal-treatment provisions comports with common sense and business realities. It makes eminent business sense for a lender to a sovereign—especially one with as checkered a history of default as Argentina—to demand priority-of-payment protection. *See In re Bd. of Dirs. of Multicanal, S.A.*, 307 B.R. 384, 393 (Bankr. S.D.N.Y. 2004) (bankruptcy proceedings not available where debtor is a sovereign).

Sophisticated parties recognize that these provisions mean what they say and are not mere boilerplate. Sovereign debt issuers make considered choices whether to include equal-treatment provisions. *See* Scott Decl., ¶¶ 14–21. In fact, Argentina itself has unmistakably acknowledged that equal-treatment provisions have legal effect by electing to include such provisions in some of its bond issuances and not others. *See id.* ¶ 20. For example, Argentina omitted equal-treatment provisions from the documents governing both the 2005 and 2010 exchange of-

---

[8]  The order in *Red Mountain* was later vacated under the terms of a settlement.

fers.  *Id.*  On the other hand, Argentina elected to issue bonds that are subject to the Equal Treatment Provision even *after* a Belgian court made the effect of the clause clear.[9]

Under the plain-language interpretation, Argentina's decision to make timely interest payments to other creditors while denying any payments to NML violates the Equal Treatment Provision.  *See* Scott Decl. ¶¶ 23–24.  There is no question that the 2005 and 2010 debt issued by Argentina meets the FAA's definition of External Indebtedness.  *See* Cohen Decl. Ex. A ¶ 11. Refusing to pay NML, while paying the holders of that debt, thus violates the Equal Treatment Provision under the plain-language interpretation, even in the absence of the Lock Law and other measures.  Therefore, NML is entitled to partial summary judgment.

**2.  Argentina Has Enacted Laws And Formal Decrees Subordinating NML's Rank In Breach of Argentina's Own Interpretation Of The Equal Treatment Provision**

In contrast to NML, Argentina has advanced an interpretation of the Equal Treatment Provision that is narrower than what its plain language demands.  In Argentina's view, the sole effect of the provision is "to ensure that debt issued under the FAA will not be subordinated, *by law or contract*, to a senior payment right of any other class of unsecured debt; it does not, how-ever, regulate the timing or amount of payments made to any of the Republic's creditors."  D.E. 29, at 16, No. 03 Civ. 2507 (TPG) (S.D.N.Y. Dec. 12, 2003) (emphasis added).  Argentina thus argued that the clause's purpose is to "prohibit the Republic from creating, or permitting the creation of, senior debt that has a *legal right* ('rank') to be paid before the debt issued under the FAA and allegedly held by NML."  D.E. 31, at 5, No. 03 Civ. 8845 (TPG) (S.D.N.Y. Mar. 22, 2004) (emphasis in original).

---

[9]  The Court of Appeals of Brussels decided *Elliott Associates* on September 26, 2000.  Argentina none-theless issued bonds pursuant to the FAA, and thus subject to Equal Treatment Provision, in 2001.  Scott Decl. ¶ 15.

Argentina's construction is unduly narrow and renders the contractual right to equal treatment *almost* meaningless. Under its view, Argentina may always make preferential payments, as it pleases, to favored creditors while continuously denying any payment at all to bondholders who are entitled to equal treatment; the only limitation, Argentina contends, is that it cannot enact laws or enter into contracts that purport to codify such disparate treatment as Argentina's obligation. This interpretation would relegate a crucial contractual right of bondholders to a paper-thin restriction on Argentina's ability to formalize its discrimination against them.

Even under Argentina's anemic view of its contractual obligations, however, NML is entitled to partial summary judgment. Through its enactment of the Lock Law, which repudiated all of NML's claims for payment, Argentina lowered the rank of its payment obligations to NML relative to its payment obligations to other investors. The Lock Law made clear to potential participants that if they did not tender their bonds, they would receive nothing and that no other offer would or could legally be made, whereas if they acceded to the exchange offer they would receive at least some of the interest for which they had originally contracted. Article 2 of the Lock Law provides that the exchange may not be reopened. SOF ¶ 13. Article 3 prohibits Argentina from conducting any type of settlement in relation to non-tendered bonds. *Id.* ¶ 14. And Article 4 orders the removal of non-tendering bonds from listing on all domestic and foreign markets and exchanges. *Id.* ¶ 14.

This *formal*, *legal* lowering of NML's rank violates the Equal Treatment Provision even under Argentina's interpretation (as well as under NML's interpretation). As a direct consequence of the Lock Law and the terms of the 2005 bonds, as soon as the 2005 exchange closed, Argentina proceeded to pay the holders of the newly created 2005 bonds 100% of the amounts due to them, while *legally prohibiting itself* from paying anything to NML and other similarly

situated creditors.  Put another way, when the payments of those bondholders who participated in the exchange come due, they get paid; when NML's payments come due, it receives nothing. That is the definition of a subordination in rank.  *See* Dee Martin Calligar, *Subordination Agreements*, 70 Yale L.J. 376, 378 (1961) (defining a "'complete' subordination agreement" as one "under which no payment of principal or interest on the subordinated debt is permitted so long as the debtor is obligated to the senior creditor"); *see also Charles W. & Ruby W. Norton, Inc. v. Leadville Corp.*, 570 F.2d 911, 913 (10th Cir. 1978) (characterizing Calligar's article as "the fountain of all knowledge on this subject").  Argentina intended to achieve just such "complete subordination" by enacting a law that forbids Argentina to make any payments to NML and other bondholders who did not participate in the exchanges.  Such a brazen and uniquely tailored repudiation of Argentina's payment obligations must, by any sensible standard, be viewed as a violation of the Equal Treatment Provision.

Argentina compounded its violation of the Equal Treatment Provision in 2009 when it enacted Law 26,547, which, as discussed above, suspended the Lock Law's prohibition on re-opening the exchange in order to create yet *another* class of preferred bondholders in 2010, while reaffirming that Argentina would make no payments to NML or other creditors who refused to participate in the exchange offers.  And Law 26,547 instituted a new prohibition—no payment could be made to bondholders who were also judgment creditors.  SOF ¶ 19.  Like the Lock Law, Law 26,547 firmly sets the rank of Argentina's payment obligations to NML beneath the rank of its payment obligations to the participating bondholders, in direct violation of the Equal Treatment Provision of the FAA.

It is no surprise, then, that even those legal scholars who have endorsed Argentina's interpretation of the Equal Treatment Provision have concluded that the Lock Law breaches the

15

provision.  In a recent working paper, Dr. Rodrigo Olivares-Caminal, a professor at the University of Warwick, determined that because "Argentina expressly stated that bonds of the holdout creditors will remain 'non-performing' and then passed a law by which the exchange offer was locked . . . Argentina indirectly granted a legal priority to those creditors that entered the exchange offer."  Rodrigo Olivares-Caminal, *To Rank Pari Passu or not to Rank Pari Passu; that is the Question in Sovereign Bonds*, Working Papers at 43 (Cohen Decl. Ex. U).  Indeed, Argentina's Lock Law undermines even the *amici* who supported Argentina in the earlier briefing and their contention that a ruling in favor of NML would have dire consequences:  "[I]nasmuch as Argentina's domestic law hurts its case against pari passu enforcement, it also takes away a key legal argument for the supporting agencies.  The fact that few if any other countries have enacted such laws also diminishes the systemic importance of Argentina's case and the policy impetus for intervention."  Anna Gelpern, *After Argentina* 7 (Rutgers Sch. of Law – Newark Research Paper No. 011; Inst. for Int'l Econ. Working Paper No. 2005-PB05-2), *available at* SSRN: http://ssrn.com/abstract=880794.[10]

The Lock Law and the other formal, legal measures described above violate the Equal Treatment Provision by, in Argentina's words, giving the newly issued debt a "legal right" to "be paid before the debt issued under the FAA."  D.E. 31, at 5, No. 03 Civ. 8845 (TPG) (S.D.N.Y. Mar. 22, 2004).  Argentina therefore has violated the Equal Treatment Provision under *either* its own narrow interpretation or the plain language of the provision.

---

[10]  Thus if this Court grants summary judgment to NML without deciding among the parties' interpretations or based on Argentina's interpretation alone, there could be little concern that its ruling would have significant implications on other sovereign debtors.  Argentina has literally enacted laws subordinating the rank of payment obligations that are expressly protected against such subordination.  These circumstances are extraordinary and rare—perhaps *sui generis*.

Because NML is entitled to partial summary judgment under either construction, this Court need not resolve that interpretative dispute to grant NML's motion. *See, e.g., Ind. Funeral Dirs., Ins. Trust v. Trustmark Ins. Corp.*, 347 F.3d 652, 654–55 (7th Cir. 2003) ("The parties do not agree on the meaning of this provision. . . . [But plaintiff's] reliance on the . . . provision to recover under the policy is doomed under either interpretation; summary judgment in favor of [defendant] was appropriate."); *Moticka v. Weck Closure Sys.*, 183 F. App'x 343, 348 (4th Cir. 2006) ("Although there is some dispute as to whether, under Weck's policy, FMLA and short-term disability leave run concurrently or consecutively, we need not resolve this question. Under either interpretation, partial summary judgment was appropriate."); *Jomark Textiles, Inc. v. Int'l Fire & Marine Ins. Co., Ltd.*, 771 F. Supp. 577, 579 (S.D.N.Y. 1989) ("[T]he Court concludes that it need not reach this issue because under either interpretation [of the insurance contract], defendant is entitled to summary judgment."). This Court should therefore enter partial summary judgment in favor of NML.

**B.    NML Is Entitled To Specific Performance Of The Equal Treatment Provision**

The Court should order specific performance of the Equal Treatment Provision requiring Argentina to restore NML to the rank it was guaranteed it would hold among other external creditors. To counteract Argentina's unlawful efforts to lower NML's rank, this Court should order Argentina to pay NML ratably if and when it makes payments on its other External Indebtedness, including its indebtedness to the 2005 and 2010 bondholders.[11]

*Ratably* means that Argentina must pay NML the same percentage of what is currently due to NML as it pays the other creditors based on what is due to them:  If Argentina pays the

---

[11] The Equal Treatment Provision applies on its face to all of Argentina's external indebtedness. This motion focuses on the 2005 and 2010 exchange-offer participants because NML is aware of that debt.

exchange-offer participants 100% of what is currently due to them, then the Equal Treatment

Provision obligates Argentina to pay NML 100% of what is currently due to it; and if Argentina

were to provide only a fixed sum less than the total amount of its current payment obligations

under the exchange-offer bonds and NML's bonds, then NML would be entitled to a ratable

share of that fixed sum based on the relative size of the current payment obligation due to each

creditor.  *See Hudson Valley Bank*, 2009 WL 3644837, at *10 ("Court proceedings where this

legal theory is most commonly found is when creditors are said to be paid pari passu with each

creditor being paid pro rata in accordance with the amount of his claim.").  In short, Argentina

must treat the payment obligations under NML's bonds as having the same rank and claim to

payment as its External Indebtedness, and it may not pay other external creditors on terms more

favorable than those enjoyed (or suffered) by NML.  NML is entitled to an order commanding

Argentina to provide the equal treatment it promised to those who purchased its bonds.

     If Argentina defies this Court's injunction as it has this Court's money judgments, it will

be not only Argentina that could face contempt, but also any attorney or agent or other person

who aids or abets Argentina's contemptuous conduct.  Argentina cannot carry on its campaign of

defiance of this Court except with the assistance of attorneys and other agents—many of whom

are located in the Southern District of New York and, upon being given notice of the permanent

injunction requested by NML, would be bound by it not to aid Argentina in its violation.  By cut-

ting off Argentina from that assistance, this Court can bring this litigation to an end.[12]

---

[12] Argentina makes payments on the dollar-denominated bonds issued in the 2005 exchange through a two-step process.  First, it must provide its paying "agent," The Bank of New York ("BNY"), or a trustee paying agent appointed by BNY, "the amount of such payment, in immediately available funds, not later than 1:00 P.M. local time at the place of payment, not later than the Business Day prior to each . . . Interest Payment Date."  Cohen Decl. Ex. L ¶ 2(a) (Form of Par Bonds).  Second, Argentina must direct BNY "to hold these funds in trust for [itself] and the beneficial owners of the Securities . . . and to make a wire transfer of such amount to Cede [& Co. ('Cede')], the registered owner of the Securities."  *Id*.  Cede then

[Footnote continued on next page]

"The test for specific performance" is "flexible."  *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 433 (2d Cir. 1993).  "It initially requires proof that (1) a valid contract exists between the parties, (2) the plaintiff has substantially performed its part of the contract, and (3) plaintiff and defendant are each able to continue performing their parts of the agreement."  *Id.*  Those issues are not disputed in this case.  After that initial showing, "[a] party seeking relief must show equitable factors in its favor, for example, the lack of an adequate remedy at law, and must also demonstrate that its risk of injury, *if* the injunction is denied, is one that after balancing the equities entitles it to relief."  *Id.*; *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Each of these elements overwhelmingly supports NML's requested relief.

1.     **Argentina's Breach Of The Equal Treatment Provision Caused NML Irreparable Injury For Which There Is No Adequate Remedy At Law**

Given that Argentina has breached the Equal Treatment Provision by lowering NML's rank relative to other creditors, there is no doubt that NML has suffered and continues to suffer

---

[Footnote continued from previous page]

distributes the payment to its participants, who in turn distribute the money to their customers that hold beneficial interests in the bonds.  Such agencies in the chain of distribution—BNY, Cede, and Cede's participants—are located in this jurisdiction.

The 2010 exchange bonds follow the same process, although some of the parties are different.  Argentina must provide BNY Mellon or its trustee paying agent with the payment "in immediately available funds, not later than 1:00 P.M. local time at the place of payment, not later than the Business Day prior to . . . each Interest Payment Date," and it must direct BNY Mellon to hold the funds in trust and then wire them to The Bank of New York Depositary (Nominees) Limited, as the registered owner of the Securities.  Cohen Decl. Ex. M ¶ 2(a) (Form of 8.75% Global Bonds due 2017).  The Bank of New York Depositary (Nominees) Limited then distributes the money to its customers, who in turn distribute the money to their customers who hold beneficial interests.  While the Bank of New York Depositary (Nominees) Limited may not be located in New York, the distribution begins with BNY Mellon, which is subject to this Court's jurisdiction, and likely ends with New York banks and brokerage entities that distribute the interest payments to their customers who are beneficial owners of the bonds.  Therefore, if the Court granted NML the injunctive relief it seeks, Argentina could not make payments of interest on the 2005 or 2010 exchange bonds in violation of that injunction, *i.e.*, without a ratable payment to NML, without the assistance of agents and financial institutions that are subject to this Court's jurisdiction and contempt power.

an injury that cannot be cured with money damages.  The injury, after all, is not merely the lack of payment from Argentina, but the lack of payment on an *equal basis* with third parties, *i.e.*, other external creditors.  Money judgments that might someday be paid do absolutely nothing to secure NML's right to remain on equal footing with other external creditors who recover *actual cash payments*.  The *entire point* of an equal-treatment provision is to protect creditors such as NML against the debtor's refusal to honor its payment promises; it would make little sense to enforce such a guarantee through money judgments, which "are mere scraps of paper if they are not paid and cannot be enforced."  Apr. 7 Op. at *29.

As the Restatement of Contracts explains with respect to the availability of injunctive relief for the breach of a contract, "[e]ven if damages are adequate in other respects, they will be inadequate if they cannot be collected by judgment and execution."  Restatement (Second) of Contracts § 360 cmt. d.  Judgments cannot be collected when, for example, the defendant is "judgment proof" or "conceal[s] his assets."  *Id.*  In this case, Argentina has repeatedly stymied creditors by concealing its assets or spiriting them out of the country to evade judgments.  Therefore, only specific performance would adequately remedy NML's injury for Argentina's ongoing breach of the Equal Treatment Provision.  *See Archibald v. Marshalls of MA, Inc.*, No. 09 Civ. 2323(LAP), 2009 WL 3817404, at *4 (S.D.N.Y. Nov. 12, 2009) (injunction appropriate when wrongful conduct is continuing).

An injury that cannot be remedied with money damages constitutes an irreparable injury that weighs in favor of granting injunctive relief.  *See, e.g.*, *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (explaining that in conducting irreparable-harm inquiry, court must "pay[] particular attention to whether the remedies at law, such as monetary damages, are inadequate to compensate for that injury") (internal quotation marks omitted); *E.A. Renfroe & Co., Inc. v. Moran*,

249 F. App'x 88, 92 (11th Cir. 2007) ("Regarding the irreparable injury requirement, the [defendants] have given us no reason to doubt the district court's conclusion that [m]onetary damages are woefully inadequate . . . .") (internal quotation marks omitted; alteration in original).

The Court need not hold that specific performance is always the remedy when a debtor refuses to pay its creditors.  Specific performance is warranted here not merely because of the breach of the bonds' general payment obligations but also because of the separate contractual guarantee embodied in the Equal Treatment Provision, which, aside from the broader obligation to pay the debt, requires equal treatment of creditors.  Argentina's refusal to honor that provision constitutes an ongoing and irreparable injury that cannot be cured through money damages.

Injunctive relief is also appropriate because NML's damages from not being treated on par with other creditors are incalculable.  *See, e.g.*, *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 205 (2002) (explaining that traditionally courts of equity "would decree specific performance of a contract to transfer funds [in] suits that . . . sought to prevent future losses that . . . were incalculable"); *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673–74 (D.C. Cir. 2005) (per curiam) (joined by Roberts, J.) ("'[I]rreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.'") (quoting *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)).  To be sure, NML's damages from the overall breach of the bond are calculable.  But as to the right to equal payment specifically, it is impossible to determine the extent to which the loss of payment status relative to other creditors injures NML now or will injure NML in the future.  It is unclear which other creditors Argentina will choose to pay in the future, when or how much it will pay them, or how much they are owed.  That information is unavailable to NML.

Prospective relief, moreover, is the only relief that would protect NML against Argentina's continuing violations of the Equal Treatment Provision.  Argentina has proven its willingness to make payments to other creditors while denying payment to NML and to execute additional exchange offers as it pleases, further subordinating the rank of NML's debt.  That much is clear from past experience:  After the initial 2005 exchange, Argentina further breached the Equal Treatment Provision by amending its own laws in connection with the new exchange offer in 2010.  No money-damages award could be formulated to compensate NML for the possibility of such ongoing and additional breaches of NML's contractual right to equal treatment.  In these circumstances, an injunction ordering equal payment on a prospective basis is the only adequate remedy.  As the First Department explained with respect to a breach of a contractual provision requiring the debtor to give a security interest, the "damage resulting from the failure to give security is not ascertainable, and the legal remedy is therefore inadequate."  *BIB Constr. Co. v. Fireman's Ins. Co.*, 214 A.D.2d 521, 523 (1st Dept. 1995) (internal quotation marks omitted).

The injunctive relief NML requests here is similar to equitable relief that courts routinely grant in analogous circumstances involving a party's right to maintain a promised position among third parties.  For example, the Equal Treatment Provision is analogous to non-compete agreements, where a former employee is restricted from working for a competitor.  Like a non-compete clause, the Equal Treatment Provision constrains the promisor in dealings with third parties.  Pursuant to the non-compete clause, the promisor guarantees the promisee that she will not give a specified advantage to its third-party competitors, just as the Equal Treatment Provision guarantees that Argentina will not give a specified advantage to third-party creditors.  It is well-settled that courts will specifically enforce non-compete clauses so that the promisee maintains its promised status among others.  *See, e.g.*, *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68–

69 (2d Cir. 1999). Such agreements "'lend themselves principally to enforcement by injunction because of the difficulty of arriving at a dollar figure for the actual damage done as the result of the breach.'" *In re Worldcom, Inc.*, 343 B.R. 486, 495–96 (Bankr. S.D.N.Y. 2006) (quoting *Jewett Orthopaedic Clinic, P.A. v. White*, 629 So. 2d 922, 927 (Fla. Dist. Ct. App. 1993)). The same holds true for the Equal Treatment Provision here.

The Equal Treatment Provision is also comparable to a clause giving NML a certain priority in bankruptcy (were the debtor not a sovereign state), and in bankruptcy such a priority right would be specifically enforced through a bankruptcy judge's equitable disposition of estate assets. NML thus asks for nothing more than the same type of equitable relief that would be afforded it were Argentina a typical bankrupt debtor (as Argentina routinely laments that it is not). In both contexts, the point is that a right to a certain form of protection with respect to third parties in the event of non-payment cannot be enforced merely through money judgments that will never be paid.

At least one New York court, applying New York law, has held that bondholders may seek specific performance of a similar provision entitling those bondholders to "'equal and ratable' liens (i.e., *pari passu*) with any liens granted in the assets" of the bond issuer. *See TCW Gem V. Ltd. v. Grupo Iusacell Celular, S.A. de C.V.*, 801 N.Y.S.2d 243, 2004 WL 3267267, at *1, *4 (Sup. Ct. 2004) (unpublished). Like the Equal Treatment Provision here, the provision in *TCW* provided protection to bondholders by guaranteeing that certain of their rights in the event of default would not be subordinated to the rights of other creditors. When the plaintiffs asserted a claim for specific performance of that contractual protection, the defendants moved to dismiss on the ground that plaintiffs had an adequate remedy at law. *Id.* at *4. The court disagreed. It denied the motion, reasoning that "'[t]he damage resulting from the failure to give security is not

ascertainable, and the legal remedy is therefore inadequate.'"  *Id.* (alteration in original) (quoting *Nat'l Sur. Corp. v. Titan Constr. Corp.*, 26 N.Y.S.2d 227, 230 (Sup. Ct.), *aff'd*, 260 A.D. 911 (1st Dept. 1940)).

### 2.    The Balance Of Equities Favors Specific Performance

The balance of equities also decisively favors the issuance of an injunction.  On NML's side of the ledger, the harm to NML from declining to issue an injunction is unquestionably irreparable, a critical factor in the balance of the equities (*see Nemer*, 992 F.2d at 433):  Without injunctive relief, NML will have to continue chasing Argentina around the globe searching for assets to recover.  NML has already secured money judgments totaling billions of dollars on other bonds, but it has received no recovery from Argentina.  Another money judgment in its favor will do nothing to change that situation or prevent further violations of the Equal Treatment Provision.

On the other side of the equitable balance, Argentina can pay its outstanding judgments in full.  This Court has already found that Argentina is able to do so:  "[I]n all that has been said in the . . . eight years of litigation, there has been no suggestion that the Republic's finances through this whole time were such that the Republic could not afford to pay its judgment debts.  Indeed, the record shows that during certain of these years the Republic ran a surplus."  Apr. 7 Op. at *29.  In fact, when it served Argentina's purposes, Argentina prepaid its total outstanding obligation of over $9 billon to the IMF.  *Id.* at *12.  Argentina has trumpeted the fact that it has record reserves in excess of $51 billion.  SOF ¶ 25.  And Argentina has already eliminated existing legal impediments to using those reserves to pay its creditors.  Apr. 7 Op. at *10–14.  Thus, the injunction that NML requests will impose no hardship on Argentina other than complying with its contractual obligations on terms it is able to meet.

24

Additionally, a critical equitable factor here is Argentina's bad faith in its dealings with creditors and its intransigence in refusing to honor the judgments of U.S. courts.  In the most recent instance of Argentina's obstinacy, the Second Circuit called Argentina's arguments "disingenuous" and "unconvincing."  *NML Capital v. Republic of Argentina*, --- F.3d ---, Nos. 09-2707-cv(L) *et al.*, 2010 WL 3704570, at *6 (2d Cir. Sept. 23, 2010).  This Court has explained that "[w]hat is going on between the Republic of Argentina and the federal court system is an exercise of sheer willful defiance of the obligations of the Republic to honor the judgments of a federal court."  Apr. 7 Op. at *32.  Argentina made "illusory" promises to creditors by "guaranteeing legal channels to judgments which 'may be enforced' in the event of defaults," whereas in reality "there is nothing approaching an accessible path to payment enforcement."  *Id.* at *29.  Instead of honoring judgments as it promised, Argentina has "enmeshed the court in years of wasteful litigation with no end in sight."  *Id.* at *32.  Argentina's behavior is a significant equitable strike against it.

Conversely, equity favors specific performance because that is the only remedy that would be effective in ensuring that this Court's judgment would be honored.  Upon entry of an injunction, the simple expediency of hiding assets will no longer free Argentina from the constraints of justice; defiance of the Court would subject Argentina to contempt.  An injunction would also impose a practical bar to Argentina's noncompliance:  It would bind Argentina's "officers, agents, servants, employees, and attorneys" in the United States.  Fed. R. Civ. P. 65(d)(2).  Argentina could execute unlawful, nonratable payments to other bondholders only through those agents, including its legal counsel.  *See Chi. Truck Drivers v. Bhd. Labor Leasing*, 207 F.3d 500, 507 n.7 (8th Cir. 2000) ("Rule 65(d) expressly makes injunctions binding upon parties' attor-

neys."), *aff'd* 406 F.3d 955 (8th Cir. 2005).  By requiring their compliance, this Court can ensure

compliance from Argentina, bringing Argentina's extended evasion of the law to an end.

     **3.**    **The Public Interest In Enforcing Contractual Guarantees And Maintaining Confidence In Debt Markets Demands Injunctive Relief**

     It is beyond cavil that the "[e]nforcement of contractual duties is in the public interest."

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir.

2007) (reversing denial of preliminary injunction enforcing non-compete clause); *accord PCTV*

*Gold, Inc. v. SpeedNet, Inc.*, 508 F.3d 1137, 1145 (8th Cir. 2007) ("[The district court] did not

abuse its discretion by concluding its grant of a preliminary injunction promoted the public inter-

est by protecting freedom to contract through enforcement of contractual rights and obliga-

tions.").  It is particularly important that contractual provisions designed to protect creditors in

the event of default be enforced.  The injunction NML seeks would establish precisely the equi-

table payment system envisioned by the FAA.  Such enforcement instills confidence in partici-

pants in the debt markets that they can rely on such protections.  As the United States govern-

ment has told the Supreme Court in another case involving Argentina, "the United States has a

substantial interest in the operation of the international public debt market.  That market . . . in-

volves trillions of dollars, and its operation affects the economies of numerous nations through-

out the world, the work of international financial organizations, and the financial positions of

many private sector lending institutions and investors, as well as relations between the United

States and other countries."  Brief for the United States as *Amicus Curiae* Supporting Respon-

dents, *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) (No. 91-763), 1992 U.S.

S. Ct. Briefs LEXIS 199, at *1.

     The Court should not credit any argument by Argentina that those creditors who partici-

pated in the exchange offers will be harmed by the requested order of specific performance.

NML seeks an order requiring that it be paid ratably with those bondholders.  As discussed above, Argentina has ample resources to pay NML *and* its External Indebtedness.  The blame for any default on other debt would lie squarely with Argentina, not this Court.

## IV.   CONCLUSION

The Court should grant partial summary judgment for NML on its equal-treatment claim in these three cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708, each captioned *NML Capital, Ltd. v. Republic of Argentina*).  It should also specifically enforce the Equal Treatment Provision by issuing an injunction requiring Argentina to pay NML ratably if and when it pays bondholders who participated in the 2005 and 2010 exchanges.

Respectfully submitted,

October 20, 2010

By:/s/ Robert A. Cohen

| | |
|---|---|
| Theodore B. Olson | Robert A. Cohen |
| (tolson@gibsondunn.com) | (robert.cohen@dechert.com) |
| Matthew D. McGill | Charles I. Poret |
| (mmcgill@gibsondunn.com) | (charles.poret@dechert.com) |
| Jason J. Mendro | DECHERT LLP |
| (jmendro@gibsondunn.com) | 1095 Avenue of the Americas |
| GIBSON, DUNN & CRUTCHER LLP | New York, NY  10036-6797 |
| 1050 Connecticut Avenue, N.W. | (212) 698-3500 |
| Washington, DC  20036-5306 | |
| (202) 955-8500 | |

*Attorneys for Plaintiff NML Capital, Ltd.*