UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

NML CAPITAL, LTD.,

                        Plaintiff,

                - against -

THE REPUBLIC OF ARGENTINA,

                   Defendant.

------------------------------------------------------------------- X

08 Civ. 6978 (TPG)
09 Civ. 1707 (TPG)
09 Civ. 1708 (TPG)

## DECLARATION OF STEPHEN CHOI

Pursuant to 28 U.S.C. § 1746, Stephen Choi declares as follows:

1.     I am the Murray and Kathleen Bring Professor of Law at the New York
University Law School.  I received a J.D. from Harvard Law School in 1994 where I
graduated first in my class and was a Supervising Editor of the Harvard Law Review.
While at Harvard Law School I was awarded the Fay Diploma, the Sears Prize, and the
Irving Oberman Memorial Award.  I received a Ph.D. in economics with a focus on
corporate finance and industrial organization from Harvard University in 1997.  Before
joining the New York University Law School faculty I was the Roger J. Traynor
Professor of Law at the University of California, Berkeley Law School.

2.     My primary research focus is in the area of securities regulation.  I have published
more than 50 articles in journals including the Yale Law Journal, Stanford Law Review,
California Law Review, Columbia Law Review, University of Chicago Law Review,
Michigan Law Review, Journal of Empirical Legal Studies, Journal of Legal Studies, and
Journal of Law, Economics, and Organization.  Several of my papers have been
recognized by Corporate Practice Commentator's annual survey as one of the ten best
articles in the areas of corporate and securities law.  I am also the co-author of a casebook
on securities regulations used in law schools in the United States (Securities Regulations:
Cases and Analysis 2nd Edition, published by Foundation Press). I have written several
pieces related to the sovereign bond market including: *Innovation in Boilerplate
Contracts: The Case of Sovereign Bonds*, 53 Emory L. J. 929 (2004) (with Mitu Gulati);
*An Empirical Study of Securities Disclosure Practice*, 80 Tulane L. Rev. 1023 (2006)
(with Mitu Gulati); *Contract as Statute*, 104 Mich. L. Rev. 1129 (2006) (with Mitu
Gulati); and *Pricing Terms in Sovereign Debt Contracts: A Greek Case Study with
Implications for the European Crisis Resolution Mechanism* (Working Paper 2010) (with
Mitu Gulati and Eric Posner).

3.     · I have taught securities regulation since I entered into legal academia and
presently teach the course at NYU to over 100 students.  I was the chair of the

Association of American Law Schools' section on Securities Regulation for 2006-2007, a member of the Board of Directors of the American Law and Economics Association for 2007-2010, and a former term member of the U.S. Council on Foreign Relations for 2000-2005. In addition, I have made numerous presentations relating to corporate and securities issues.

4.      I have been asked by counsel at Cleary Gottlieb Steen and Hamilton LLP to give an opinion on the meaning of the Pari Passu clause in Argentina's 1994 "Fiscal Agency Agreement" (FAA).

5.      Because the Pari Passu clause is a common boilerplate term in sovereign bond agreements,[1] I refer to the history of the clause, market expectations and customary usage, and the best interests of the creditors (which provides evidence on what meaning the creditors would have negotiated to apply for the Pari Passu clause) in determining a consistent meaning of the Pari Passu clause contained in Argentina's 1994 FAA.[2] My conclusion, based on my review of these factors, is that the correct interpretation of the Pari Passu clause prohibits neither unequal payments to creditors nor the effect on holdout creditors of Argentina's enactment of the Lock Law (Argentine Law 26,017).

6.      The Pari Passu clause provides that the "payment obligations" of the unsecured bonds issued by Argentina in 1994 under the FAA shall "rank at least equally" with other "present and future unsecured and unsubordinated External Indebtedness" (Paragraph 1(c) of Argentina's 1994 FAA). Left undefined in the Pari Passu clause itself is what is meant by "rank at least equally".

7.      NML Capital, Ltd. (NML) argues that the phrase "rank at least equally" requires that Argentina "*pay* all holders demanding payment of External Indebtedness equally in all *payment* situations...."[3] Under NML's reading (referred to as the "equal payment" interpretation), "it would be a violation of the clause to repay certain creditors at a higher rate or sooner in time than others."[4]

---

[1] Variations exist in the exact wording of the Pari Passu clause across different sovereign bond deals. The variations do not change the fact that all Pari Passu clauses share a common history and purpose that reflects the longstanding market understanding of the usage of the Pari Passu clause. Together with Mitu Gulati, I make a more detailed analysis of the boilerplate nature of the Pari Passu clause despite variations in the language of the clause in Stephen J. Choi and G. Mitu Gulati, *Contract as Statute*, 104 Mich. L. Rev. 1129, 1136 (2006) (reporting from a study of sovereign bond Pari Passu clauses involving over thirty countries that: "There was no systematic pattern discernible in the data such as more creditworthy countries picking a certain clause and less creditworthy ones picking a different clause. The lack of a pattern is consistent with the view that the differences are more idiosyncratic than due to any purposeful intent to change the pari passu clause to favor (or disfavor) holdouts."). The *Contract as Statute* piece also reports that interviews with market participants confirmed that the Pari Passu variations "did not represent any conscious attempt to vary the pari passu clause." Id. at 1137.

[2] See *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982) (stressing the importance of giving boilerplate terms "a consistent, uniform interpretation.").

[3] See Memorandum of Law in Support of the Motion by NML Capital, Ltd. For Partial Summary Judgment and for Injunctive Relief Pursuant to the Equal Treatment Provision dated October 20, 2010 at p. 8.

[4] See id. at p. 11.

8.      NML's equal payment interpretation of "rank at least equally" however is simply inconsistent with the plain language of the Pari Passu clause and would impose large inefficiencies on sovereigns as well as future creditors. On a superficial level, making an unequal payment to creditors owed an equal payment is of course "unequal". However, the presence of the "rank at least equally" language in the Pari Passu clause indicates that the clause does not encompass every inequality—but instead refers to actions that subordinate or change the legal *rank* of unsecured debt in a limited number of situations.

9.      In the context of a corporate issuer, the "rank at least equally" language of the Pari Passu clause and the notion of legal rank have well-understood meanings. Outside of insolvency, issuers may make payments to creditors unequally if they so choose. The equal ranking of payment obligations for creditors occurs only in the event of an insolvency distribution for corporate issuers. Sovereigns, of course, cannot go into liquidation. Nonetheless, the usage of the Pari Passu clause in the corporate context demonstrates that the clause was not intended to act as a general prohibition on all unequal payments.

10.      In the sovereign context, the equal payment interpretation of the Pari Passu clause goes against longstanding expectation and customary usage in the sovereign debt market. Despite the presence of Pari Passu clauses in their bond covenants, sovereigns routinely have given certain parties, including international financial institutions such as the World Bank and the International Monetary Fund, de facto preference in payments. Granting such preferences allowed sovereigns unable to meet their external financial obligations to obtain access to needed additional financing to keep their economies afloat, ultimately to the benefit of all creditors (compared to the alternative where the sovereign in financial distress did not receive any additional financing and then faced the possibility of economic collapse). No creditor, to my knowledge, has ever made a challenge to the preference given to international financial institutions based on the Pari Passu clause.

11.      The rejection in customary usage of the equal payment interpretation of the Pari Passu clause occurs for good reason. Each time a sovereign runs into temporary difficulty making payments to one creditor, that single creditor under the equal payment interpretation of Pari Passu would have the ability to interfere with the sovereign's ability to pay all other creditors. Indeed, the single creditor could sue all the other creditors receiving payments. Lawsuits among creditors would not necessarily stop there. If a plaintiff-creditor received payment, then other creditors who did not receive payment could sue the original plaintiff-creditor for obtaining full payment while they did not—leading to subsequent rounds of lawsuits.[5] Creditors would then constantly have the fear of a possible lawsuit hanging over them in addition to the normal credit risk from making a loan to a sovereign borrower.[6] The possibility that one creditor may attempt to

---

[5] See Lee C. Buchheit and Jeremiah S. Pam, *The Pari Passu Clause in Sovereign Debt Instruments*, 53 Emory L. J. 869, 887-889 (2004).
[6] See Financial Markets Law Committee, Issue 79 – Pari Passu Clauses at p. 15 (March 2005) ("Creditors do not readily agree to lend money to debtors on terms that could potentially expose them to liability to third parties. This is not a risk that they agree to assume as part of the commercial deal to lend money to a debtor.").

intercept the payment directed to another creditor would also have a disruptive effect on the finality of transactions in the global payment systems.[7]

12.     Because of the high litigation costs associated with a requirement of equal payment, when creditors want the right to equal payments, they negotiate explicitly for a Sharing clause separate from a Pari Passu clause.  Sharing clauses occur frequently in syndicated loan arrangements.  In a syndicated loan agreement, a Sharing clause typically provides that "any disproportionate payment received by one member of the syndicate will be shared rateably by the rest."[8]  Importantly, Sharing clauses generally provide a coordinating mechanism to eliminate the possibility of multiple lawsuits—such as a provision for the borrower to make payments to an agent bank which in turn will distribute payments to creditors on a pro rata basis—something not found in a Pari Passu clause.  The absence of a coordinating mechanism in the Pari Passu clause and the separate existence of Sharing clauses (with detailed coordinating mechanisms) support the view that creditors do not expect the Pari Passu clause to provide equality of payments.[9]

13.     The benefit to sovereigns and creditors from engaging in consensual restructuring during times when the sovereigns are unable to meet all their financial obligations also supports a rejection of NML's equal payment interpretation of the Pari Passu clause. When creditors make loans to a sovereign, the hope on the part of all parties is that the sovereign's economy will grow and the sovereign will make full payment to the creditors. But sovereigns, much like corporate issuers, can face financial distress.  In such situations, allowing a sovereign to obtain additional financing may give the sovereign time to change policies and turn around its economy, allowing eventually greater payments to the group of all creditors.  For example, one can imagine a sovereign that owes $50 billion to one thousand bondholders.  Without the ability to favor particular creditors (to keep the economy working), the sovereign may have the ability to pay only 10 cents on the dollar, if anything, due to the possible economic collapse that will follow from the sovereign's inability to obtain further financing.  With the provision of additional financing (made possible by promising new creditors better payment terms than the existing creditors or by continuing payments only to certain creditors providing critical services), the sovereign may have the ability to pay 30 cents on the dollar.  While receiving only 30 cents on the dollar is less than full payment, it is better than the alternative of 10 cents on the dollar.  Of course not all restructurings increase the overall value for creditors; however value-increasing restructurings are probable when a large

---

[7] See Memorandum of Amicus Curiae the New York Clearinghouse Association L.L.C. in Support of Motion Pursuant to CPLR § 5240 to Preclude Plaintiff Judgment Creditors From Interfering With Payments to Other Creditors dated January 12, 2004 at p. 12 (noting that the equal payment interpretation would "inhibit the free flow of funds among financial institutions, create uncertainty as to rights and liabilities, and place intermediary banks in the middle of civil disputes.").

[8] Id. at p. 17.

[9] A similar argument can be made for the presence of Most Favored Nations clauses found in work-out agreements for the rescheduling of a borrower's debt.  One type of such clauses provides "that if any other foreign currency debt having the same maturity as the rescheduled debt is paid out more quickly, then the borrow must repay the rescheduled debt." Id. at 18.  To the extent Most Favored Nations clauses already deal with the problem of unequal payments, it is unlikely that unequal payments (as opposed to changes in legal rank) are covered by the Pari Passu clause.

percentage of creditors agree voluntarily to such a restructuring (as was the case in Argentina where 91% of the defaulted debt eventually agreed to restructuring through exchange offers in 2005 and 2010). The United States government has recognized the value-increasing function of voluntary restructurings and pursues a policy in favor of the "orderly and consensual restructuring of sovereign debt" in situations where a sovereign is unable to meet all its financial obligations.[10]

14.     Holdouts pose a very real risk to the process of value-increasing restructurings. Although a restructuring may be beneficial to the group of all creditors, an individual creditor may profit more by demanding a disproportionately greater payment than that received by the rest of the creditors. Being paid more than average, however, is not sustainable. Once other investors realize that a holdout creditor stands to make more individually, other investors will also adopt a holdout strategy. And the higher price demanded by an increasing number of holdouts ultimately may cause a restructuring to fail, to the detriment of both the sovereign and all the outstanding creditors. To continue with the example above, a value-increasing restructuring that raises the value of the bonds from 10 cents to 30 cents on the dollar will fail if a sufficiently large number of creditors demand 100 cents on the dollar. Failure to restructure will then lead to creditors receiving only 10 cents on the dollar, to the harm of all creditors. By using the Pari Passu clause to obtain a disproportionately higher payment than the other creditors, holdout creditors threaten the welfare of the entire group of creditors. Once a sovereign is in financial distress, an equal payment interpretation of the Pari Passu clause would encourage holdouts and thereby lead to fewer, value-increasing restructurings. It is therefore unlikely that creditors as a group would have negotiated for a Pari Passu clause that takes the equal payment interpretation advanced by NML.[11]

15.     For the reasons above, the United States government, the Federal Reserve Bank of New York, The New York Clearing House Association all rejected the equal payment interpretation of "rank at least equally".

16.     Not willing to rest their argument entirely on the questionable equal payment interpretation, NML makes the alternative argument that Argentina subordinated NML's debt by changing its legal rank in violation of the Pari Passu clause. NML cites Argentina's position that the Pari Passu clause exists "'to ensure that debt issued under the FAA will not be subordinated, *by law or contract*, to a senior payment right of any other class of unsecured debt; it does not, however, regulate the timing or amount of

---

[10] See Statement of Interest of the United States in the *Macrotecnic International Corp. v. Republic of Argentina* and *EM Ltd. V. Republic of Argentina* litigation dated January 12, 2004 at p. 2.

[11] One possible counterargument is that the prospect of a difficult restructuring may lead countries to take greater ex ante care in their economic decisions, reducing the likelihood of financial distress in the first place. While theoretically possible, the high cost imposed on countries and their citizens of financial distress even with a successful restructuring or bailout makes it unlikely that countries will take actions that increase the risk of financial distress to a great extent. The cost from any incremental, additional risk of financial distress therefore is likely outweighed by the benefit from the possibility of a successful, value-increasing restructuring, particularly when a super-majority of creditors approve of the restructuring. The position of the United States in favor of consensual restructurings, see supra note 10, is consistent with the overall positive effect of such restructurings.

payments made to any of the Republic's creditors.'".[12]  NML then argues in their brief that: "Through its enactment of the Lock Law, which repudiated all of NML's claims for payment, Argentina lowered the rank of its payment obligations to NML relative to its payment obligations to other investors."[13]

17.     The Lock Law, however, does not formally result in the legal subordination of NML's debt to the debt of other creditors.  The Lock Law simply prevents the Executive from reopening the swap process (Article 2) and entering into a settlement with the holdout creditors (Article 3).  The Lock Law also directs the Executive to remove the holdout creditor's bonds from listing on all domestic and foreign securities markets and exchanges (Article 4).   All creditors are given the same legal rights—either they may accept Argentina's 2005 Exchange Offer or face the consequences of the Lock Law.   No creditor is given any affirmatively greater legal rights. The Lock Law does not promise that the other creditors that agree to the exchange offer will be paid.  The Lock Law does not formally change the legal rank of the other creditors ahead of NML.

18.     Despite the lack of any affirmative grant of preference under the Lock Law to other creditors, NML argues that the effect of the Lock Law is non-payment to holdout creditors.  By paying holdout creditors nothing and leaving open the possibility that creditors participating in Argentina's exchange offers may get paid, presumably out of Argentina's general revenues and assets, the Lock Law, under NML's view, establishes a legal preference over all of Argentina's revenues and assets in favor of those creditors participating in the exchange offers.  Two responses are possible to this preference argument.  First, the Lock Law does not explicitly provide that the Holdout creditors will not be paid.  Indeed, Argentina's legislature enacted subsequent legislation later in 2010 providing for a new exchange offer for the holdout creditors, offering the possibility of at least partial payment.[14]

19.     Second, NML's view of what constitutes a legal preference for purposes of affecting "rank" as applied in the Pari Passu clause is overly broad.  Anytime a sovereign defaults on its payment (by contract or law) to a specific creditor, the sovereign by definition treats that creditor unequally and implicitly is applying the assets and revenues of the sovereign disproportionately to pay those creditors to whom payments are still made.   However, the mere fact that default occurs for payments to one creditor and a sovereign's revenues and assets remain available to pay other creditors cannot constitute an actionable change in legal ranking under the Pari Passu clause.  If it did, then any time a sovereign made the decision (by law or contract) to default on payments, the non-payment decision alone would trigger the Pari Passu clause.  This interpretation would therefore have the effect of reintroducing the equal payment interpretation of the Pari Passu clause under another guise—by equating non-payment with a change in legal rank.  Accepting such an interpretation would therefore lead to the same ill effects on

---

[12] NML Brief, supra note 3, at p. 13 (quoting D.E. 29, at 16, No. 03 Civ. 2507 (TPG) (S.D.N.Y. Dec. 12, 2003)).

[13] Id. at p. 14.

[14] See Argentine Law 26,547 enacted on December 9, 2009; The Republic of Argentina, Prospectus Supplement dated April 28, 2010.

sovereigns, creditors (adverse to the possibility of litigation), and value-increasing restructurings as the discredited equal payment interpretation.

20.     In opposition to an overly broad view of what constitutes a legal subordination, the historical evidence of the Pari Passu clause indicates that the clause takes a narrow approach to what is considered subordination or a change in legal rank.  Buchheit and Pam (2004), for example, note that commercial banks entering into the sovereign debt market in the 1960s were concerned about pre-existing local laws in certain sovereign nations that permitted an unsecured creditor to obtain priority over other unsecured creditors unilaterally.[15]  The Philippines, for example, gave first-in-time priority to unsecured creditors who notarized their debt in a public instrument.  Similarly, evidence exists that Pari Passu clauses were implemented in response to fears of foreign creditors that pre-existing local law may generally favor domestic creditors over foreign creditors.  None of these pre-existing local law measures were related to restructuring efforts or the specific bonds at issue—and instead, like the first-in-time priority law in the Philippines, were part of the background regime bondholders found themselves in when lending to the sovereign.

21.     In contrast, sovereigns intentionally may set aside assets or revenues in favor of a specific set of creditors as part of an effort to obtain new financing or restructure existing debt—a practice often referred to as "earmarking" when the preference does not rise to the level of a formal security interest.[16]  Buchheit and Pam (2004) relate how earmarking became an issue after Zaire attempted to direct proceeds from the sale of copper exports for deposit in Manufacturers Hanover Trust Company in the mid 1970s.  Under the earmarking arrangement, Manufacturers Hanover Trust Company would then have these funds available for an off set if its loans to Zaire were not paid, establishing an informal earmark.  Importantly, rather than turn to the Pari Passu clause, subsequent credit agreements with Zaire expanded the Negative Pledge clause to cover such informal grants of legal preference with respect to specific assets and revenue streams.[17]  The use of the Negative Pledge clause and not the Pari Passu clause to address intentional earmarks granted by a sovereign to specific creditors provides evidence that the Pari Passu clause does not cover subordination that occurs from such earmarks.

22.     The evidence that the Pari Passu clause prohibits only narrow instances of subordination (including pre-existing local laws relating to first-in-time priority) and not more intentional acts on the part of the sovereign to provide earmarking preferences in favor of specific set of creditors supports the interpretation that the Pari Passu clause does not cover any effect on holdouts from the operation of the Lock Law.  The Lock Law does not create any affirmative legal preference or rank for creditors participating in Argentina's 2005 Exchange Offer.  Even if the Lock Law could be construed as in effect preferring creditors participating in the Exchange Offer (an interpretation that would

---

[15] See Buchheit and Pam, supra note 5, 903-906, 914-17 (2004).
[16] See id. at 906-07.
[17] See id. at 910-11.

wrongly equate non-payment with a change in legal rank), the history of the Pari Passu clause indicates that it does not reach these forms of preferences.

23.    In sum, my analysis of the historical application of the Pari Passu clause, the market expectation and customary usage of Pari Passu, and the best interests of the creditors indicates that the Pari Passu clause contained in Argentina's 1994 FAA neither prohibits unequal payments nor the effect on holdout creditors of Argentina's enactment of the Lock Law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 10, 2010, in New York, New York.

STEPHEN CHOI

8