UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

NML CAPITAL, LTD.,

                             Plaintiff,

                - against -

THE REPUBLIC OF ARGENTINA,

                        Defendant.

-----------------------------------------------------------------------X

08 Civ. 6978 (TPG)
09 Civ. 1707 (TPG)
09 Civ. 1708 (TPG)

 

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTIONS FOR
PARTIAL SUMMARY JUDGMENT AND FOR INJUNCTIVE RELIEF
PURSUANT TO THE PARI PASSU CLAUSE**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for the Republic of Argentina

Of Counsel:

Jonathan I. Blackman
Carmine D. Boccuzzi

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ..................................................................... 1

BACKGROUND ........................................................................................ 3

    A.   The Pari Passu Clause ................................................................. 3

    B.   NML's Previous Attempt To Create A New Meaning For
          The Pari Passu Clause ................................................................ 5

    C.   The Republic Seeks, And NML Opposes, A Declaration As
          To The Proper Reading Of The Pari Passu Clause ........................ 6

    D.   The Republic Conducts Two Exchange Offers,
          Restructuring 91% Of Its Outstanding Indebtedness,
          Services Its Performing Debt For Over Five Years, And
          All The While NML Never Raises, And In Fact Disavows
          Any "Pari Passu" Claim ............................................................... 9

    E.   NML's Current Motions ............................................................... 11

ARGUMENT ............................................................................................ 13

I.     NML's CLAIMS ARE BARRED UNDER THE DOCTRINE OF LACHES ....... 13

    A.   NML Knew Of The Actions Allegedly Breaching The Pari Passu
          Clause Years Before Bringing The Current Claim ........................ 13

    B.   NML Inexcusably Delayed In Claiming Breach Of The Pari Passu Clause ... 14

    C.   The Republic, Its Citizens And Third Party Creditors Will Suffer
          Prejudice As A Result Of NML's Inexcusable Delay ..................... 15

II.    NML IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT
     BECAUSE ITS PARI PASSU THEORY IS WRONG AS A MATTER
     OF LAW .............................................................................................. 18

    A.   The Pari Passu Clause Does Not Require Simultaneous Pro Rata
          Payments Or Proportional Distribution Of Payment Amounts ...... 19

          1.   The Plain Meaning Of The Pari Passu Clause Deals Only With
               The Formal Ranking Of Creditor Claims ............................. 19

**Page**

2.   NML's Novel Interpretation Of The Pari Passu Clause Is Inconsistent With Canons Of Contract Interpretation And Leads To Absurd Results..................................................................   22

3.   NML's Interpretation Of The Pari Passu Clause Finds No Support In Caselaw ........................................................   27

B.   The 2005 "Lock Law" Did Not Violate The Pari Passu Clause ....................   28

III.   NML IS NOT ENTITLED TO INJUNCTIVE RELIEF .........................................   31

A.   NML Cannot Establish Irreparable Or Extreme Harm ...................................   32

B.   NML Is Unable To Demonstrate A Clear Entitlement To Relief, A Likelihood Of Success On the Merits Or The Existence Of Sufficiently Serious Questions Going To The Merits .........................................................   36

1.   NML Cannot Establish A Likelihood Of Success On The Merits.......   36

2.   NML's Request For Injunctive Relief Is Barred Under The FSIA......   37

C.   The Balance Of Hardships And The Public Interest Militate Decidedly In Favor Of Denial Of Injunctive Relief.........................................   38

D.   NML Is Also Not Entitled To Specific Performance......................................   39

CONCLUSION.......................................................................................................   41

## **TABLE OF AUTHORITIES**

Page(s)

<u>Cases</u>

*Allens Creek/Corbetts Glen Pres. Grp, Inc. v. West*,
2 F. App'x 162 (2d Cir. 2001) ................................................................. 13

*Arctic Ocean Int'l Ltd. v. High Seas Ltd.*,
No. 06 Civ. 1056 (LAP), 2009 WL 5103283 (S.D.N.Y. Dec. 28, 2009) ........... 33

*Aurelius Capital Partners LP v. Republic of Argentina*,
584 F.3d 120 (2d Cir. 2009)................................................................... 37

*Aurelius Capital Partners v. Republic of Argentina*,
No. 07 Civ. 2715 (TPG), 2010 WL 2925072 (S.D.N.Y. July 23, 2010) ........... 31

*Bailey v. Chernoff*,
846 N.Y.S.2d 462 (3d Dep't 2007)........................................................... 16

*Black United Fund of N.J., Inc. v. Kean*,
763 F.2d 156 (3d Cir. 1985)................................................................... 34

*Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*,
638 F.2d 568 (2d Cir. 1981)................................................................... 38

*Burns v. Egan*,
501 N.Y.S.2d 742 (3d Dep't 1986)........................................................... 16

*Carte Blanche (Singapore) PTE., Ltd. v. Carte Blanche Int'l, Ltd.*,
888 F.2d 260 (2d Cir. 1989)................................................................... 14

*Centauri Shipping Ltd. v. W. Bulk Carriers KS*,
528 F. Supp. 2d 186 (S.D.N.Y. 2007)....................................................... 34

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985)................................................................... 35

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010)..................................................................... 32

*City of N.Y. v. N.Y. Cent. R. Co.*,
275 N.Y. 287 (1937)...................................................................... 14, 39

*D.O. Haynes & Co. v. Druggists' Circular*,
32 F.2d 215 (2d Cir. 1929)..................................................................... 17

*Daubert v. Merrell Dow Pharm., Inc.,*
509 U.S. 579 (1993)........................................................................................... 20

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006)........................................................................................... 31

*EM Ltd. v. Republic of Argentina,*
131 F. App'x 745 (2d Cir. 2005) ................................................................... 9, 38

*Fox Film Corp. v. Springer,*
273 N.Y. 434 (N.Y. Ct. App. 1937)................................................................... 19

*Hayward v. Eliot Nat'l Bank,*
96 U.S. 611 (1871).............................................................................................. 15

*Holmberg v. Armbrecht,*
327 U.S. 392 (1946)............................................................................................ 15

*In re Lipper Holdings, LLC,*
766 N.Y.S.2d 561 (1st Dep't 2003) ................................................................... 24

*In re N. LaSalle St. P'ship,*
246 B.R. 325 (Bankr. D. Ill. 2000) .................................................................... 29

*In re Schulz,*
81 N.Y.2d 336 (N.Y. Ct. App. 1993)................................................................. 16

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.,*
309 F.3d 76 (2d Cir. 2002)................................................................................. 19

*Ivani Contracting Corp. v. City of N.Y.,*
103 F.3d 257 (2d Cir. 1997)............................................................................... 13

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*
596 F.2d 70 (2d Cir. 1979).................................................................................. 33

*Kamerling v. Massanari,*
295 F.3d 206 (2d Cir. 2002) (*per curiam*) ......................................................... 32

*Kumho Tire Co., Ltd. v. Carmichael,*
526 U.S. 137 (1999)............................................................................................ 21

*Laba v. Carey,*
327 N.Y.S.2d 613 (N.Y. Ct. App. 1971) ............................................................ 22

*Lightwater Corp. v. Republic of Argentina,*
No. 02 Civ. 3804 (TPG), 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003)............................ 7

*Lusk v. Vill. of Cold Spring,*
475 F.3d 480 (2d Cir. 2007)..................................................................... 31

*Muller v. Muller,*
266 N.Y. 68 (1934) ................................................................................. 39

*N.A.A.C.P. v. Town of E. Haven,*
70 F.3d 219 (2d Cir. 1995)................................................................... 32-33

*Nacional Financiera, S.N.C. v. Chase Manhattan Bank N.A.,*
No. 00 Civ. 1571 (JSM), 2003 WL 1878415 (S.D.N.Y. Apr. 14, 2003).......................... 22

*Nat'l Circle, Daughters of Isabella v. Nat'l Order of Daughters of Isabella,*
270 F. 723 (2d Cir. 1920)........................................................................ 14

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.,*
992 F. 2d 430 (2d Cir. 1993)................................................................. 39-40

*Newmont Mines, Ltd. v. Hanover Ins. Co.,*
784 F.2d 127 (2d Cir. 1986).................................................................... 22

*NML Capital Ltd. v. Republic of Argentina,*
No. 02 Civ. 3804 (TPG), 2005 WL 743086 (S.D.N.Y. Mar. 31, 2005),
*aff'd sub nom.,* 131 F. App'x 745 (2d Cir. 2005) .............................................. 2, 9

*Patterson v. Hewitt,*
195 U.S. 309 (1904)............................................................................. 14

*Plenum Fin. & Invs. Ltd. v. Bank of Zambia,*
No. 95 Civ. 8350 (KMW), 1995 WL 600818 (S.D.N.Y. Oct. 11, 1995) .......................... 34

*Pravin Banker Assocs., LTD. v. Banco Popular del Peru,*
109 F.3d 850 (2d Cir. 1997)................................................................... 7, 38

*Rothenberg v. Lincoln Farm Camp, Inc.,*
755 F.2d 1017 (2d Cir. 1985)................................................................... 22

*Seijas v. Republic of Argentina,*
352 F. App'x 519 (2d Cir. 2009) ............................................................... 31

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,*
691 F.2d 1039 (2d Cir. 1982)................................................................... 20

*Sokoloff v. Harriman Estates Dev't Corp.,*
96 N.Y.2d 409 (2001) ........................................................................... 39

*Tal v. Superior Vending, LLC,*
No. 11709/07, 2008 WL 2447365 (N.Y. Sup. Ct. Westchester Cty. June 6, 2008) ........... 16

*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*,
17 F.3d 38 (2d Cir. 1994)................................................................... 13

*Vivenzio v. City of Syracuse*,
611 F.3d 98 (2d Cir. 2010)................................................................ 18

*Weston Compagnie Finance et D'Investissement, S.A. v. La Republica del Ecuador*,
No. 93 Civ. 2698 (LMM), 1993 WL 267282 (S.D.N.Y. July 14, 1993) ........................... 34

<u>Rules and Statutes</u>

11 U.S.C. § 303(b)(1) ....................................................................... 24

11 U.S.C. § 303(h)(1) ....................................................................... 24

28 U.S.C. § 1610(a) .......................................................................... 37

N.Y. U.C.C. § 8-102(a)(7) ................................................................... 3

<u>Other Authorities</u>

American Heritage Dictionary (3d ed. 2000) ................................................. 19

Black's Law Dictionary (7th ed. 1999).................................................19-20, 21

Drew Benson & Ben Bain, *Defaulted Debt Trading Sinks as Elliott Bets on Courts: Argentina Credit*, Bloomberg (Sept. 20, 2010) ............................................. 15

Michael Bradley, James D. Cox, Mitu Gulati, *The Market Reaction to Legal Shocks and Their Antidotes: Lessons From the Sovereign Debt Market*, 39 J. Legal Stud. 289 (2010) .... 20

Lee C. Buchheit, *The Pari Passu Clause Sub Specie Aeternitatis*, 10 Int'l Fin. L. Rev. 11 (1991)........................................................................................ 23

Lee C. Buchheit & Ralph Reisner, *The Effect of the Sovereign Debt Restructuring Process on Inter-Creditor Relationships*, Univ. Ill. Law Rev. 493 (1988) ....................... 4

Ross P. Buckley, *The Bankruptcy of Nations: An Idea Whose Time Has Come*, 43 Int'l Law. 1189 (2009)................................................................................ 7

Stephen J. Choi & G. Mitu Gulati, *Contract as Statute*, 104 Mich. L. Rev. 1129 (2006).. 20-21

Carlos G. Fernández Valdovinos, Growth, Poverty, and Social Equity in Argentina, World Bank Newsletter, November 2005. No. 82, available at http://siteresources.worldbank.org/INTENBREVE/Newsletters/20847679/82-NOV05-AR_Growth.pdf ............................................................................... 7

Anna Gelpern, *After Argentina*, Rutgers Sch. of Law-Newark Research Paper Series Paper No: 011 (2005) ....................................................................... 30

Michael Gruson & Stephen Hutter, International Bar Association Project on Legal Opinions in International Business Transactions, 676 PLI/Comm 405 (Oct. 1993) .......... 21-22, 30

G. Mitu Gulati & Kenneth K. Klee, *Sovereign Piracy*, 56 Bus. Law. 635 (2001) ............ 1, 21, 23-24

Dee Martin Calligar, *Subordination Agreements*, 70 Yale L.J. 376 (1961) ...................... 30

N.Y. Jur. 2d, 96 Specific Performance § 6 ............................................................... 37

N.Y. Jur. 2d, 96 Specific Performance §§ 46-58 ..................................................... 37

N.Y. Jur. 2d, 96 Specific Performance § 50 ........................................................... 38

N.Y. Jur. 2d, 96 Specific Performance § 53 ........................................................... 38

Rodrigo Olivares-Caminal, Legal Aspects of Sovereign Debt Restructuring 306 (Sweet & Maxwell 2009) ............................................................................................... 6

Rodrigo Olivares-Caminal, *To Rank Pari Passu or not to Rank Pari Passu: that is the Question in Sovereign Bonds*, Working Papers ................................................... 29

Umakanth Varottil, *Sovereign Debt Documentation: Unraveling the Pari Passu Mystery*, 7 DePaul Bus. & Com. L.J. 119 (2008) .............................................................. 5

Philip R. Wood, *Pari Passu Clauses – What Do They Mean?*, Butterworths J. of Int'l Banking and Fin. L. 371, 371 (November 2003) ............................................... 4, 20, 23-24

United Nations Centre on Transnational Corporations Advisory Studies, No. 4, Series B, *International Debt Restructuring:  Substantive Issues and Techniques* (1989) ................ 4

July 19, 1990 Memorandum to the Executive Directors of the World Bank, Review of IBRD's Negative Pledge Policy with Respect to Debt and Debt Service Reduction Operations ...................................................................................................... 25-26

11A Wright & Miller, *Federal Practice and Procedure: Civil* § 2942 ............................ 31

Defendant the Republic of Argentina (the "Republic") submits this memorandum of law in opposition to plaintiff NML's motions for partial summary judgment and for injunctive relief pursuant to the "pari passu" clause.[1]

## PRELIMINARY STATEMENT

Nearly seven years ago, the Republic sought a declaratory judgment specifically to protect the anticipated restructuring of its unmanageable indebtedness from an attack by holdout creditors, in particular NML, based on a spurious and unprecedented reading of the "pari passu" clause previously invented by NML's corporate parent.  NML at that time *prevented* the resolution of the issue, arguing both in 2004 and at the time of the Republic's Exchange Offer in 2005, that it was premature to decide the question because there was supposedly no evidence that it would pursue a "pari passu" claim then or in the future.  After that time, the Republic and holders of interests in over 91% of its defaulted debt (over $74.5 billion) went forward with the largest sovereign restructuring in history through two Exchange Offers in 2005 and 2010, and the Republic has made regular interest payments totaling billions of dollars on the new performing bonds since June 2005.

---

[1]   Although plaintiff styles its motions as pursuant to the "Equal Treatment Provision," the established term for the provision in question is a "pari passu" clause.  *See, e.g.*, Gulati & Klee, *Sovereign Piracy*, 56 Bus. Law. 635, 636 (2001) ("Sovereign Piracy") (Ex. K).  As this term is also more accurate, the Republic will use it here.

Unless otherwise noted, exhibits are attached to the Declaration of Carmine D. Boccuzzi in support of the Republic's memorandum of law in opposition to plaintiff's motions for partial summary judgment and for injunctive relief pursuant to the pari passu clause, dated December 10, 2010.  Plaintiff's memorandum of law in support of the motions for partial summary judgment and injunctive relief, pursuant to the pari passu clause, dated October 20, 2010, is cited as "Pl. Inj. Mem."; the Declaration of Robert A. Cohen in support of the motions, dated October 18, 2010, is cited as "Cohen Inj. Decl."; the Declaration of Elliot Greenberg, dated October 18, 2010, is cited as "Greenberg Inj. Decl."; and the Declaration of Hal S. Scott, dated October 19, 2010, is cited as "Scott Decl."

Now, almost seven years after NML disavowed an intent to pursue its pari passu theory, and over five years after the successful completion of the Republic's first Exchange Offer (which NML sought to block, although on different grounds),[2] NML moves for summary judgment and injunctive relief under the same incorrect interpretation of the pari passu clause, based on alleged violations of the clause that supposedly began in 2005, when the Republic entered into its first Exchange Offer and began making payments on the new debt issued on that Offer.  This unjustified *five year* delay, and the serious harm to the Republic and its bondholders arising from that delay, bar NML's claim for injunctive relief under the doctrine of laches.

Were the Court, despite this extraordinary and prejudicial delay, to reach the "merits" of NML's motions, the plain language of the contract clause and the overwhelming weight of custom and scholarly authority establish that the Republic has not violated the pari passu clause.  NML claims that the pari passu clause prevents a debtor from paying any debt to any of its creditors, unless it simultaneously pays all of its other creditors, and asserts that this proposition means that the Republic cannot service its new restructured debt (which involved the participants in its Exchange Offers accepting a significant discount on their old defaulted debt), or anyone else to whom it owes money, unless it also pays NML the full amount of its non-restructured debt.  No U.S. court has ever accepted this radical and unprecedented interpretation, which this Court noted to be "very odd" when the issue was raised over six years ago.  To the contrary, caselaw, the overwhelming weight of academic commentary and statements by the United States government, the Federal Reserve Board of New York and the New York Clearing House Association have repeated again and again that the clause does not require a debtor to pay all creditors or pay none.  The clause simply forbids, at most, legal ranking among indebtedness,

---

[2]   *See NML Capital Ltd. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2005 WL 743086 (S.D.N.Y. Mar. 31, 2005) (denying NML motion to attach tendered bonds), *aff'd sub nom.*, 131 F. App'x 745 (2d Cir. 2005).

something that has not occurred here, notwithstanding NML's incorrect invocation of the so-called Argentine Lock Law, legislation in effect *since 2005* that in no way created any legal ranking precluded by the pari passu clause.

NML's failure to demonstrate the merits of its pari passu claim, combined with its inability to satisfy the standard for injunctive relief in support of that claim, require that its grossly belated motions be denied.

## BACKGROUND

### A.  The Pari Passu Clause

The October 19, 1994 Fiscal Agency Agreement ("FAA") governing the series of bonds in which NML owns interests[3] contains a standard clause found in sovereign (and non-sovereign) indebtedness known as the pari passu clause.  Section 1(c) of the FAA provides that:

> The Securities [the debt issued under the FAA] will constitute (except as provided in Section 11 below) direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank *pari passu* and without any preference among themselves.  The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement).

FAA, § 1(c) (Ex. P).  Similar language is included in the bond documentation for each of the bonds in which NML owns interests:

> The Securities of this Series shall constitute direct, unconditional, unsecured and unsubordinated obligations of the Republic.  Each Series will rank *pari passu* with each other Series, without any preference one over the other by reason of priority of date of issue or currency of payment or otherwise, and at least equally with all other present and future unsecured and unsubordinated External

---

[3]   Although the technical term for what NML and other creditors hold is a "security entitlement" with respect to the bonds issued by the Republic, terms such as "beneficial interests," "interests," "bonds," or "bondholders" are also used for simplicity's sake.  *See* N.Y. UCC § 8-102(a)(7).

Indebtedness (as defined in the Fiscal Agency Agreement) of the
Republic.

*See, e.g.*, Certificate of Bond ISIN US40114AN02 at A-6 ("NML Bond") (Ex. Q).  These

provisions are governed by New York law.  *See* FAA ¶ 23 (Ex. P); NML Bond at A-14 (Ex. Q).

Pari passu clauses "are a standard feature of unsecured debt agreements."  Philip

R. Wood, Pari Passu Clauses – What Do They Mean?, Butterworths J. of Int'l Banking and Fin.

L. 371, 371 (2003) ("Wood") (Ex. L); *id.* (typical pari passu clause "states that the 'payment

obligations of the borrower under the Credit Agreement rank at least pari passu with all its other

present and future unsecured obligations' or words to that effect" ).  When the FAA was

executed in 1994 – and for the many prior decades that the pari passu clause was a standard part

of loan documentation – it was commonly understood by participants in the sovereign debt

market that pari passu clauses prohibit a sovereign borrower from creating unsecured debt that

ranks senior in legal right of payment, but do *not*, as NML contends, regulate the order or

amount of payments made to its creditors, or require pro rata payments to creditors.  *See* United

Nations Centre on Transnational Corporations, Advisory Studies, No. 4, Series B, *International

Debt Restructuring:  Substantive Issues and Techniques*, at 29 (1989) (Ex. G) ("[pari passu]

clauses do not, of course, obligate the borrower to repay all of its debt at the same time.  A *pari

passu* covenant will, however, restrict the borrower from legally subordinating in a formal way

the debt being incurred or rescheduled in favour of some other external obligation").[4]

---

[4]   *See also* Lee C. Buchheit & Ralph Reisner, *The Effect of the Sovereign Debt Restructuring Process on
Inter-Creditor Relationships*, 1998 Univ. Ill. Law Rev. 493, 497 (1988) (Ex. F) ("[T]he borrower
violates [the pari passu clause] only by attempting to create a class of senior indebtedness in
preference to that outstanding under the loan agreement in which the clause appears.  The borrower
does not violate this clause by electing as a matter of practice to pay certain indebtedness in preference
to the obligations outstanding under the agreement in which this clause appears.").  Lee C. Buchheit is
a partner of Cleary Gottlieb who is uninvolved in its representation of Argentina, and wrote on this
subject long before the Argentine debt crisis began.  He is the author of two books in the field of
international financial law, including How to Negotiate Eurocurrency Loan Agreements (2d ed. 2000),

Indeed, notwithstanding the presence of pari passu clauses in debt instruments restructured during the 1980's and 1990's by Mexico, Russia, Ukraine, Pakistan and Ecuador, each of which was governed by New York or English law, no creditor during this period ever suggested that the pari passu clause legally precluded those sovereigns from making payments to critical creditors like the IMF before other groups of creditors, or prevented payment on restructured debt because debt held by creditors who declined to participate in the restructuring remained unpaid.

### B.  NML's Previous Attempt To Create A New Meaning For The Pari Passu Clause

Despite this long-settled understanding of the pari passu clause, in September 2000 Elliott Associates, a hedge fund specializing in buying and suing on distressed sovereign debt and NML's corporate parent, asserted for the first time the radical new theory that as long as any debt subject to a pari passu provision remained unpaid, the borrower was prohibited from paying *any* of its other debts or obligations.  *See* Umakanth Varottil, *Sovereign Debt Documentation: Unraveling the Pari Passu Mystery*, 7 DePaul Bus. & Com. L.J. 119, 121-122 (2008) (Ex. N).  Claiming that this theory represented well-settled New York law – although no New York case or treatise supported it – Elliott obtained an *ex parte* injunction from a Belgian court to prevent Peru from paying the new Brady Bonds issued to other creditors who had agreed to participate in Peru's restructuring.  *See Elliott Assocs. L.P. v. Banco de la Nacion*, General Docket No. 2000/QR/92) (Court of Appeals of Brussels, 8th Chamber, Sept. 26, 2000) (Cohen Inj. Decl. Ex. X).  The *only* "authority" supporting the decision was the conclusory declaration of a law professor that cited no relevant caselaw and would not have been admissible in a New York court.  *See* Letter from J. Blackman to Judge Griesa, *NML Capital, Ltd. v. The Republic of*

---

and more than 40 articles, and has taught in various capacities at the Chuo University in Japan, University of London, and Harvard Law School.

*Argentina*, 03 Civ. 8845 (TPG); *Macrotecnic Corp. v. The Republic of Argentina*, 02 Civ. 5932

(TPG); and *EM Ltd. v. The Republic of Argentina*, 03 Civ. 2507 (TPG), dated Jan. 15, 2004, at 2-

3 (Ex. T).  The effect of that misguided *ex parte* injunction was to give a single holdout creditor

the unprecedented ability to force Peru into default on its restructured obligations unless it paid

Elliot the full amount of its old debt.

The decision was universally criticized by practitioners, the United States

government, the Federal Reserve Bank of New York, The New York Clearing House

Association, and academics worldwide.  *See* Stephen J. Choi and G. Mitu Gulati, *Contract as*

*Statute*, 104 Mich. L. Rev. 1129, 1134, 1137-38 (2006)) ("Choi and Gulati") (Ex. M); *see also*

Troland Link Declaration, *LNC Invs. LLC v. Republic of Nicaragua,* Folio 2000 1061, R.K.

240/03 (Commercial Ct. of Brussels) ¶ 15) ("Link Decl.") (Ex. E).[5]  Belgium likewise recognized

the error of its court's *ex parte* ruling and subsequently passed a law making it impossible for a

creditor to obtain such an injunction.  *See* Rodrigo Olivares-Caminal, Legal Aspects of

Sovereign Debt Restructuring 306 (Sweet & Maxwell 2009).  The *only* partisans of NML's

"ratable" payment interpretation of the pari passu clause are vulture funds seeking to profit from

sovereign debt crises and a few law professors who act as their "experts."

### C. The Republic Seeks, And NML Opposes, A Declaration As To The Proper Reading Of The Pari Passu Clause

As the Court knows, in 2001 the Republic was forced to defer interest and

principal payments to its bondholders as a result of the worst economic crisis of its modern

---

[5]   Troland S. Link, currently a Senior Counsel at Davis Polk & Wardwell LLP, submitted a Declaration
in a 2003 dispute in Belgium involving Nicaragua regarding the interpretation of a similar pari passu
clause under New York law.  *See* Link Decl. (Ex. E).  Drawing on over forty years of experience
representing commercial banks and underwriters in connection with syndicated and non-syndicated
credit transactions and having directly participated in "literally hundreds of transactions" involving
sovereign debtors and pari passu clauses, Link unequivocally concluded that the pari passu clause
"cannot be given [a ratable payment] construction."  *See id.* ¶¶ 1, 3.

history, in which it suffered a cumulative fall in output almost twice that experienced by the United States during the Great Depression.  *See Lightwater Corp. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2003 WL 1878420, at *2 (S.D.N.Y. Apr. 14, 2003); *see generally* Paul Blustein, *And The Money Kept Rolling In (And Out):  Wall Street, The IMF, And The Bankrupting of Argentina* (2005).  This crisis made it impossible for the Republic to service its overwhelming debt burden – some $80 billion in public external debt alone – while maintaining basic governmental services necessary for the health, welfare, and safety of the Argentine populace.  *See, e.g.*, Carlos G. Fernández Valdovinos, Growth, Poverty, and Social Equity in Argentina, World Bank Newsletter, November 2005. No. 82, available at http://siteresources.worldbank.org/INTENBREVE/Newsletters/20847679/82-NOV05-AR_Growth.pdf (last visited Dec. 10, 2010); Ross P. Buckley, *The Bankruptcy of Nations: An Idea Whose Time Has Come*, 43 Int'l Law. 1189, 1196 (2009).

Consistent with the customary practice of sovereigns forced to default on unsustainable debt, the Republic sought to voluntarily restructure its indebtedness.  *See Pravin Banker Assocs., LTD. v. Banco Popular del Peru*, 109 F.3d 850, 853, 855 (2d Cir. 1997) (noting that IMF debt resolution procedures, which are commonly followed and consistent with U.S. policy, include voluntary debt restructurings).  Concerned that certain plaintiffs were planning to disrupt the Republic's payments to the IMF and in its anticipated restructuring in a manner similar to what Elliott had done in the Peru case, the Republic moved in December 2003 to preclude plaintiffs from using the pari passu clause to interfere with payments to other creditors. *See* Mem. of Law in Supp. of Mot. Pursuant to CPLR §5240 to Preclude Pl. Judgment Creditors from Interfering with Payments to Other Creditors, dated Dec. 12, 2003 ("§5240 Mot.").  NML, which had filed suit in November 2003, submitted a letter to the Court in response to the

Republic's motion, asserting its interpretation that the pari passu clause required the Republic to pay its creditors "ratably," but urging the Court *not* to decide the issue at that time because no plaintiff had yet actively brought a pari passu claim.  *See* Letter from K. Reed to Judge Griesa, *NML Capital, Ltd. v. The Republic of Argentina*, 03 Civ. 8845 (TPG); *Macrotecnic Corp. v. The Republic of Argentina*, 02 Civ. 5932 (TPG); and *EM Ltd. v. The Republic of Argentina*, 03 Civ. 2507 (TPG), dated Jan. 14, 2004) ("Reed Letter") (Ex. S).  At a hearing on January 15, 2004, the Court declined to rule on the merits of the pari passu dispute, although it noted that the NML interpretation of the pari passu clause was "very odd."  *See* Jan. 15, 2004 Hr'g Tr. at 14:10 (Ex. U).

   In light of NML's pari passu theory and its suspected affiliation with Elliott,[6] the Republic brought a counterclaim for declaratory relief on the meaning of the pari passu clause in its February 2004 answer to the complaint in *NML I.  See* Answer and Counterclaim, dated Feb. 3, 2004, *NML Capital, Ltd. v. Republic of Argentina*, 03 Civ. 8845 (TPG) ("*NML I* Answer") ¶¶ 47-48 (Ex. V) (informing NML that the Republic had continued to pay the IMF and certain other creditors following the moratorium on FAA debt payments in 2001, and intended "to make an exchange offer of new debt for non-performing debt under the FAA, and to make payments to service that new debt, notwithstanding the non-payment of debt that remains outstanding under the FAA").  Consistent with its concern that NML would seek to disrupt its planned debt restructuring by invoking the pari passu clause, the Republic during the period of its 2005 Exchange Offer also asserted a counterclaim for declaratory relief on the pari passu clause in its answer to a second complaint filed by NML.  *See* Answer and Counterclaim, dated Apr. 29, 2005, *NML Capital, Ltd. v. Republic of Argentina*, 05 Civ. 2434(TPG) ("*NML II* Answer")

---

[6] NML at the time had sought to conceal its ownership by Elliott, but was required by the Court to disclose this, *see* Apr. 2, 2004 Hr'g Tr. at 4:13-19 (Ex. W), and eventually did so publicly, *see* Nov. 9, 2006 Hr'g Tr. at 8:19-21 (Ex. Z).

¶ 44 (Ex. X) (stating that the Republic had carried out a restructuring for new performing debt in January and February of 2005 and would make payments on new performing debt issued in the Exchange Offer, notwithstanding holdout nonperforming debt).

> ### D. The Republic Conducts Two Exchange Offers, Restructuring 91% Of Its Outstanding Indebtedness, Services Its Performing Debt For Over Five Years, And All the While NML Never Raises, And In Fact Disavows, Any "Pari Passu" Claim

In 2005, the Republic completed a global, voluntary exchange offer of new, performing bonds for 76% of its non-performing debt, or approximately $62.5 billion in principal amount, making it the largest sovereign debt restructuring in history (the "2005 Exchange Offer").  *See* Jan. 28, 2010 Registration Statement, Amend. No. 1, at 4 (the "Registration Statement") (Ex. CC).  Final settlement of the 2005 Exchange Offer was delayed for two months when NML obtained *ex parte* restraining and attachment orders relating to bonds tendered by participating creditors, which this Court ultimately vacated.  *See NML Capital Ltd. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2005 WL 743086 (S.D.N.Y. Mar. 31, 2005), *aff'd sub nom.*, *EM Ltd. v. Republic of Argentina*, 131 F. App'x 745, 747 (2d Cir. 2005) (affirming the Court's vacatur, noting that the Republic's "restructuring is obviously of critical importance to the economic health of a nation").  Apparently for tactical reasons, NML did *not* assert any pari passu claims as part of its challenge to the 2005 Exchange Offer, although it could have done so then.

After the litigation over the 2005 Exchange Offer was resolved, the Exchange Offer successfully settled on June 2, 2005.  *See* Registration Statement at 4 (Ex. CC).  Tendering bondholders received the first payment on the new performing debt issued in the Exchange Offer in June 2005, and the Republic has since made regular interest payments on the new performing debt according to the schedules set forth in the governing bond documents.  *Id.*  Following the

success of the 2005 Exchange Offer, the Republic earlier this year re-opened its offer to holders

of eligible securities who had not tendered in 2005, and owners of approximately $12.8 billion of

old debt tendered into the offer.  *See* Republic of Argentina, Annual Report (Form 18-K) (Oct. 1,

2010) ("Annual Report") at 17 (Ex. FF).  While certain class action plaintiffs tried to enjoin the

2010 Exchange Offer in April 2010, *see, e.g.,* Notice of Motion for Preliminary Injunction, dated

Feb. 2, 2010, *H.W. Urban GmbH, et al., v. Republic of Argentina*, No. 02 Civ. 5699 (TPG) (Ex.

DD), NML brought no action to interfere with the 2010 Exchange Offer and gave no indication

at any point that it would break its years-long silence and launch a belated pari passu clause

claim in connection with payments on the Republic's performing debt.

       As a result of the 2005 and 2010 Exchange Offers, the Republic has now

successfully restructured a total of approximately 91% of its non-performing debt.  *See* Annual

Report at 17.  Participation by over 90% of creditors in a debt restructuring is widely considered

to be a benchmark for a fair and successful sovereign debt restructuring, as even plaintiffs

acknowledge.  *See, e.g.,* Br. of *Amicus Curiae* Prof. Hal S. Scott in Supp. of Plaintiffs-Appellees,

dated July 6, 2010 at 11.

       As for the Republic's two counterclaims against NML seeking declaratory relief

on the meaning of the pari passu clause, although the first was denied from the bench as moot in

response to NML's urging in April 2004, *see* Apr. 2, 2004 Hr'g Tr. at 8:20-21 (Ex. W), the

second remained pending in this Court through March 2008.  NML vehemently asserted that

there was no need to decide the issue because it had not filed a pari passu claim and there was

"nothing in the record" to suggest there was "a likelihood that such an event will happen at any

time in the near or distant future."  *See* Mem. of Law in Supp. of Pl.'s Mot. to Dismiss

Counterclaim, dated May 23, 2005, at 8 ("Pl. May 23, 2005 Mem").  Based on NML's

categorical disavowals of an intent to pursue a pari passu claim, and after years of quiescence from NML on the subject, the Court granted NML's motion to dismiss the counterclaim in March 2008.  *See* Order, dated Mar. 28, 2008, 05 Civ. 2434 (TPG) (Ex. AA).

### E. NML's Current Motions

On October 20, 2010, NML moved in three of its eleven actions[7] for partial summary judgment on its interpretation of the pari passu clause and for injunctive relief.  These motions come (i) almost seven years after NML's first letter to the Court advocating the Elliott interpretation of the pari passu clause, (ii) after at least three instances in which NML successfully urged the Court *not* to address the meaning of the pari passu clause because NML said it had no intention of bringing a pari passu clause claim, and (iii) after the Republic's successful restructuring of over 91% of its defaulted debt through two exchange offers, in which the participants accepted a substantial discount to the face amount of their original debt (which was cancelled) in reliance on the Republic's promise to pay them on the new debt that they received in exchange.  Notwithstanding this history, NML belatedly alleges in its motions that the Republic has been in violation of the pari passu clause since 2005, and asks the Court for an injunction ordering the Republic to "restore" NML's rank and to "pay NML ratably" under the pari passu clause,[8]  Pl. Inj. Mem. at 17, and to enforce this injunction by precluding any payments to the holders of the Republic's new debt unless NML is paid as well.

---

[7]   In the other eight actions, all but one of which were initiated after the 2005 Exchange Offer, NML sought and was subsequently granted summary judgment on the merits *without* once asserting a pari passu clause claim.

[8]   NML simultaneously moved to amend the same three complaints to include claims raised in these motions and for summary judgment for principal and interest on the same beneficial interests subject to these motions.  The Republic separately opposes these motions in its Mem. of Law in Opp. to Pl.'s Mot. for Partial Summary Judgment for Principal and Interest Due and Mot. for Leave to Amend, dated Dec. 10, 2010.

While NML coyly does not explain what exactly "pay NML ratably" might mean, it is obvious from its motions, and from the substance of its pari passu argument as asserted (but not pursued) by NML five years ago, that in NML's eyes "ratable" means paying NML's defaulted debt in full if the Republic makes payment of its new performing debt.  Under NML's theory, therefore, since the Republic is paying the full amount of interest, and ultimately principal on its new debt, it would also be required to pay the full amount of interest and principal on the old debt held by NML, even though the new debt represents a fraction of the amount of the old debt that the participants in the Republic's Exchange Offers previously held.  Far from seeking "Equal Treatment," as NML's Orwellian formulation would have it, NML therefore seeks to be treated far better than the 91% of the Republic's creditors who voluntarily restructured their debt in the 2005 and 2010 Exchange Offers (on pain to the Republic of being otherwise forced into an across-the-board default on all its debts).[9]

NML's motions do not contain *any* information necessary for it to assert this claim that was unavailable to it in 2005, when the first Exchange Offer was made.  The payment by the Republic of other creditors, and not NML, has of course been occurring since 2005.  And Argentine Law 26,017, the so-called "Lock Law" invoked repeatedly by NML as the legislative act creating the legal "ranking" forbidden by the pari passu clause, *has been on the books since February 9, 2005.  See* Lock Law (Cohen Inj. Decl. Ex. F).  The Lock Law was enacted by the Republic at the express urging of bondholder groups and other bondholder representatives to prevent the Republic's executive branch from unilaterally re-opening the 2005 Exchange Offer, or otherwise settling with creditors holding defaulted debt, without Congressional approval.  *Id.*

---

[9]   This result further demonstrates the inconsistency of NML's request for relief, as under NML's own interpretation of the clause, the Republic also may not "pay [NML] on terms more favorable than those enjoyed (or suffered) by [other external creditors]." *See* Pl. Inj. Mem. at 18.  NML of course makes no claim to real equal treatment – *i.e.*, that it wishes to be treated the same way as the creditors who accepted the 2005 and 2010 offers, and accept new debt on the same terms.

In conformance with the procedure set forth in the Lock Law, Congress enacted Law 26,547 on December 9, 2009, which suspended the effects of the Lock Law until December 31, 2010 or until the Ministry of Economy declared the second exchange offer complete, whichever came first.  *See* Law 26,547 (Cohen Inj. Decl. Ex. G).

## ARGUMENT

## POINT I

## NML'S CLAIMS ARE BARRED UNDER THE DOCTRINE OF LACHES.

Even if NML's pari passu claim had merit, which it does not, *see* Point II, *infra*, any such claim must be barred under the equitable doctrine of laches.  Laches bars equitable relief when a plaintiff is guilty of inexcusable delay in bringing a claim that results in prejudice to the defendant or third parties.  *See Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994); *Ivani Contracting Corp. v. City of N.Y.*, 103 F.3d 257, 259 (2d Cir. 1997). Laches is established when (i) the plaintiff knew of the defendant's alleged misconduct; (ii) the plaintiff inexcusably delayed in taking action; and (iii) the defendant was prejudiced by the delay.  *Allens Creek/Corbetts Glen Pres. Grp, Inc. v. West*, 2 F. App'x 162, 164 (2d Cir. 2001).

### A.  NML Knew Of The Actions Allegedly Breaching The Pari Passu Clause Years Before Bringing The Current Claim

NML had full knowledge of each relevant fact and alleged breach by the Republic of the pari passu clause, but failed to bring its claim until almost seven years after it first asserted its pari passu theory in this litigation and more than five years after the first alleged breach.  *See, e.g.*, FAA ¶ 1(c) (Ex. P); Reed Letter at 2, 8 (Ex. S); §5240 Mot.;  Apr. 2, 2004 Hr'g Tr. at 8-11 (Ex. W); *NML I* Answer ¶¶ 46-48 (Ex. V); *NML II* Answer ¶ 44 (Ex. X); Nov. 4, 2009 Hr'g Tr. at 4 (Ex. BB).

**B.      NML Inexcusably Delayed In Claiming Breach Of The Pari Passu Clause**

It is a "cardinal rule that in an action to specifically enforce a contract the one seeking enforcement must act promptly." *City of N.Y. v. N.Y. Cent. R. Co.*, 275 N.Y. 287, 293 (1937).  In reviewing plaintiff's delay, courts consider the delay in light of the circumstances to determine whether a plaintiff has failed to act with diligence.  *Nat'l Circle, Daughters of Isabella v. Nat'l Order of Daughters of Isabella*, 270 F. 723, 732-33 (2d Cir. 1920).  Consequently, even a delay of a few months can bar plaintiff's injunction claim.  *See, e.g.*, *Patterson v. Hewitt*, 195 U.S. 309, 319 (1904).

Here, NML's delay, for which it offers no explanation whatsoever in its preliminary injunction motion, was inexcusable.[10]  Although NML had fully developed its pari passu argument by January 2004 (indeed, Elliott had invented the argument in 2000) and alleges that the Republic has been in breach of the pari passu clause since 2005, NML has not only sat on its hands since then, but repeatedly objected in letters, hearings, and motions before the Court to any effort by the Republic to have the question resolved during the period when the alleged violations first occurred.  *See, e.g.*, Reed Letter at 2, 8 (Ex. S); Pl. May 23, 2005 Mem. at 8 (Ex. Y); Apr. 2, 2004 Hr'g Tr. at 8-11 (Ex. W).  Nor is NML's delay made any more excusable by the

---

[10]   The only excuse NML purports to provide for its undue delay, buried in a footnote in its Motion for Leave to Amend, is that it "waited until the completion of the 2010 Bond Exchange to bring this motion in deference to the Court's expressed reluctance to interfere with Argentina's bond exchanges."  Pl.'s Mem. of Law in Supp. of Its Mot. for Leave to Amend at 5 n.8 (although its motions would be a gigantic after-the-fact interference with the exchanges).  Rather than somehow justifying its delay, this excuse concedes that NML intentionally sat on its purported rights by deliberately waiting until the 2010 Exchange Offer had settled, and then sought to pounce at a time calibrated to cause the maximum disruption for the Republic and bondholders who participated in the two Exchange Offers.  And of course, this purported excuse does not explain NML's inaction on pari passu both in 2005, when it otherwise did seek to interfere with the first Exchange Offer, and from 2005 until 2010, when it was busy litigating against the Republic on a host of other grounds.

fact that it now chooses to bring its claim only in its three latest actions:[11] prior to these three latest actions, NML has of course been litigating against the Republic since 2003, bringing eight other lawsuits seeking a total of over $392 million in principal, plus interest.  There is no justification under the circumstances for NML's opportunistic decision to wait more than five years to raise these claims after the first alleged violation of the pari passu clause.  *See* Drew Benson & Ben Bain, *Defaulted Debt Trading Sinks as Elliott Bets on Courts: Argentina Credit*, BLOOMBERG (Sept. 20, 2010) (Ex. EE) (referring to NML as one of a "hard core of intransigent, hold-out investors who… [are] determined to prevent Argentina from ever issuing bonds in the overseas market").

## C.  The Republic, Its Citizens And Third Party Creditors Will Suffer Prejudice As A Result Of NML's Inexcusable Delay

The foremost consideration under laches is whether granting the relief sought would result in inequity toward the defendant or third parties.  *See Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946); *see also Hayward v. Eliot Nat'l Bank*, 96 U.S. 611, 618 (1871) (noting that plaintiff must "put forward his complaint at the earliest possible time," if the "rights and liabilities of others have been in the mean time varied").  This is especially true in the area of public sector finance: when claims are brought against governments regarding statutory and budget matters, even a relatively short temporal delay can significantly endanger the interests of citizens and creditors.

---

[11]  NML purports to reserve its "rights" to seek enforcement of the pari passu clause in its post-summary judgment cases.  Pl. Inj. Mem. at 2 n.2.  Such an attempt would be barred not only under laches, but also under the principle of merger, whereby any purported rights NML may have held under the bond contracts are merged into its judgments. *See Carte Blanche (Singapore) PTE., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 269 (2d Cir. 1989).  It is presumably in recognition of this separate bar to its action that NML has limited its motions to its pre-judgment cases.

For instance, New York courts have barred challenges to state financing programs under laches, even when such challenges were brought with significantly less delay than NML's here.[12]  In *Burns v. Egan*, 501 N.Y.S.2d 742, 745 (3d Dep't 1986), the court barred a lawsuit under laches that challenged a state law authorizing the issuance of certain municipal bonds, even though the suit was filed less than two years after the effective date of the statute. The court noted that plaintiff's twenty-one month delay was "delay prejudicial to the opposing party," because the defendant government had already issued $294 million in bonds and begun construction of public facilities with the proceeds.  *Id.* (internal quotation marks and citation omitted).

Similarly, in *In re Schulz*, the New York Court of Appeals held that laches barred appellants' challenge of state financing programs, even though the appellants had filed the lawsuit "within one year of the enactment of the enabling legislation . . . [and] within 60 days of the actual sale of bonds." 81 N.Y.2d 336, 337 (N.Y. Ct. App. 1993).  In its ruling, the court noted that over $377 million in bonds had been sold and considered the lawsuit's impact on "the operation and maintenance of orderly government, on those with whom the State engaged in these multimillion dollar financing transactions, and on society in general," concluding that

---

[12]  New York follows a 4-part test for laches that largely mirrors the federal test: (1) conduct by an offending party giving rise to the situation complained of, (2) delay by the complainant in asserting his or her claim for relief despite the opportunity to do so, (3) lack of knowledge or notice on the part of the offending party that the complainant would assert his or her claim for relief; and (4) injury or prejudice to the offending party in the event that relief is accorded the complainant. *Bailey v. Chernoff*, 846 N.Y.S.2d 462, 465 (3d Dep't 2007).  With respect to the third prong, a defendant is not considered on notice for a second suit by a plaintiff, even if the plaintiff previously brought a claim against him, if the second suit was brought after years of inactivity.  *See Tal v. Superior Vending, LLC*, No. 11709/07, 2008 WL 2447365, at *15 (N.Y. Sup. Ct. Westchester Cty. June 6, 2008) (noting that defendant could not have anticipated a second lawsuit when four years had passed since plaintiff first filed claims against him).  Here, the Republic had no notice or knowledge that NML would suddenly seek to interfere with payments on the Republic's performing bonds more than five years after they were first issued, particularly where NML in no uncertain terms disavowed any intent to seek such relief under the pari passu clause when they were issued in 2005, as well as after.  *See* Pl. May 23, 2005 Mem. at 8 (Ex. Y).

"great prejudice" would result when "financial transactions of such magnitude and destabilizing impact are at stake." *Id.* at 348, 350.

As in *Burns* and *Shultz*, NML here seeks to disrupt the restructuring of the Republic's sovereign debt that has already been completed, by obtaining an order designed to force the Republic to default on *all* of its new performing debt unless the Republic pays NML many multiples of what the participants in the restructuring will receive. Nothing could be further from equity. During the past five years in which NML had chosen not to seek injunctive relief based on the pari passu clause, the Republic has made regular payments on those bonds to the bondholders who tendered. The Republic and its citizens and third party creditors have developed legitimate expectations that the restructuring process was settled and the new bonds would continue to perform without interference by holdout creditors like NML. *See D.O. Haynes & Co. v. Druggists' Circular*, 32 F.2d 215, 217 (2d Cir. 1929) (laches serves to protect "the peace and repose of society" against belated claims).

The aggregate principal amount of bonds restructured by the Republic to date amounts to approximately $74.5 billion, or nearly a quarter of the Republic's total GDP for the year 2009. *See* Annual Report at 15, 17, 32, 87 (Ex. FF). A financial reorganization of such enormity cannot be altered or stopped in its tracks without serious harm to the Republic and third parties. As in *Schulz*, where the harm to economic interests of third parties resulted in "great prejudice" supporting the application of laches, the Court should deny NML's belated attempt to single-handedly hold hostage the 91% of the Republic's bondholders who tendered into the Exchange Offers.

And if this damage were not enough, NML has also made the even more extreme threat that it will use a pari passu order by this Court in connection with *any* external

indebtedness of the Republic, not only the debt issued in the Republic's Exchange Offers.  Pl.

Inj. Mem. at 17 n.11.  The potential inequitable harm and disruption to legitimate third party

creditor relationships from such a result would be virtually limitless.

*                              *                              *

If these facts do not present a case of laches, it is difficult to imagine anything that

would.  NML first rattled the sabre on its pari passu claim nearly seven years ago.  It then

deliberately and successfully sought to avoid adjudication of that claim before the Republic

launched its first Exchange Offer in 2005, despite the Republic's efforts to seek such

adjudication at that time precisely because of its concerns that NML would try to use this

spurious theory to disrupt its debt restructuring.  NML then sat on its hands for five years while

the pari passu clause was supposedly being violated, and then further withheld its hand while the

Republic launched and completed its 2010 Exchange Offer.  This calculated delay, and the

prejudice to the Republic and the vast majority of its creditors that would result from now

entertaining, much less granting, NML's claim for injunctive relief blocking payment to these

creditors resoundingly call for the application of the laches doctrine here.

**POINT II**

**NML IS NOT ENTITLED TO PARTIAL SUMMARY JUDGMENT BECAUSE ITS<br/>PARI PASSU THEORY IS WRONG AS A MATTER OF LAW**

It is well-settled that a district court may not grant summary judgment when, "in

light of the undisputed facts, the movant is not entitled to judgment as a matter of law."  *Vivenzio*

*v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (quoting Fed. R. Civ. Pr. 56(c)(2)).  Because

the pari passu clause, as a matter of law, does not require that payments be made to NML, the

Court must deny NML's motion for partial summary judgment.

**A.**     **The Pari Passu Clause Does Not Require Simultaneous Pro Rata Payments Or Proportional Distribution Of Payment Amounts**

   **1.**     **The Plain Meaning Of The Pari Passu Clause Deals At Most With The Formal Ranking Of Creditor Claims**

   Under New York law, where a boilerplate contract term is subject to only one reasonable interpretation, the Court must, as a matter of law, give such language its plain meaning as evidenced by the words of the contract itself, in light of custom and usage.  *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002); *Fox Film Corp. v. Springer*, 273 N.Y. 434 (N.Y. Ct. App. 1937).  Here, the repetitive use of the word "rank," as modified by the terms "pari passu" and "equally," makes clear that the clause concerns subordination and not "ratable" payments.  *See* FAA ¶ 1(c) (Ex. P) ("The Securities . . . shall at all times *rank pari passu* and without any preference among themselves.  The payment obligations of the Republic under the Securities shall at all times *rank at least equally* with all its other present and future unsecured and unsubordinated External Indebtedness") (emphasis added); NML Bond at A-6 (Ex. Q) ("Each Series will *rank pari passu* with each other Series, without any preference one over the other by reason of priority of date of issue or currency of payment or otherwise, and at least equally with all other present and future unsecured and unsubordinated External Indebtedness") (emphasis added); *see* Black's Law Dictionary at 1563 (defining subordinate as "to place in a lower *rank*, class, or position) (emphasis added).

   The term "rank" has a meaning of hierarchy, and not a quantitative or temporal meaning.  *See* Link Decl. ¶ 8 (Ex. E); *see also* American Heritage Dictionary at 1497 (3d ed. 2000) (defining the verb "rank" as "[t]o place in a row or rows" or "[t]o give a particular order or position to; to classify).  The correct adjectives to be used with "rank" are therefore those such as "senior," and "subordinate," not "earlier," "simultaneous" or "later."  Link Decl. ¶ 8 (Ex. E).  Likewise, although Black's Law Dictionary does not define "rank" per se, it defines "priority" as

"[t]he status of being earlier in time *or* higher in degree or rank," thereby recognizing the

distinction between a priority in timing of payment and a priority in legal rank.  Black's Law

Dictionary 1212 (7th ed. 1999) (emphasis added).  Put simply, "'[r]ank' means 'rank'.  It does

not mean 'will pay', nor does it mean 'will give equal treatment to creditors.'"  Wood at 372 (Ex.

L).  Thus where the FAA states that the "payment obligations . . . shall at all times rank at least

equally," the language means that the Republic will not *subordinate* the bondholders' right of

payment.[13]

        Examining the pari passu clause in the context of market custom and usage in

sovereign debt reinforces this plain meaning.  Boilerplate provisions such as the pari passu

clause must be given "a consistent, uniform interpretation."  *Sharon Steel Corp. v. Chase

Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982); *see also* Michael Bradley, James D.

Cox, Mitu Gulati, *The Market Reaction to Legal Shocks and Their Antidotes: Lessons From the

Sovereign Debt Market*, 39 J. Legal Stud. 289, 293 (2010) (Ex. O) (noting that "the pari passu

clause is included in all sovereign bond issues").  Although NML argues the clause is not

boilerplate because sovereign debt issuers make "considered choices" whether to include

"priority of payment" language in it, Pl. Inj. Mem. at 12, slight changes in wording do not detract

from the market's understanding of the clause as a boilerplate provision.[14]  *See* Choi and Gulati

---

[13]   NML's attempt to transform these few basic words into a complex mechanism intended to block
payments to other creditors is untenable.  A clause requiring the Republic to pay all of its external debt
on a simultaneous and proportionate basis would take up many more than the few lines devoted to the
pari passu clause in the FAA.  *See* Link Decl. ¶ 9 (Ex. E) (noting that the numerous considerations that
would need to have been addressed by such a mechanism "were not – indeed, could not have been –
remotely addressed in the drafting" of the pari passu clause).

[14]   Prof. Hal Scott's "analysis" provides no support for NML's "considered choices" conclusion. In no
way does Scott explain how the mere presence or absence of a few words constitutes a "considered
choice" on the part of a debtor as opposed to any other possible explanation.  Although Prof. Scott
implies that the changes in language are intentional, *see* Scott Decl. ¶¶ 19-21, such conclusory
statements, without explanation, cannot be considered by the Court.  *See Daubert v. Merrell Dow
Pharm., Inc.*, 509 U.S. 579, 589 (1993) ("To be admissible, expert testimony must be . . . reliable.");

(Ex. M) (noting variations in precise wording of pari passu clauses but concluding from practitioner surveys that the "differences are more idiosyncratic than due to any purposeful intent to change the pari passu clause to favor (or disfavor) holdouts.  A court attempting to read meaning into such differences runs a risk of misinterpreting the clause."); *id.* at 1150 ("With boilerplate, small differences in language should not be treated as having great meaning.  The market does not price these differences as meaningful, the lawyers do not understand them as such . . . the only people with an incentive to push these differences are the litigators representing typical holdout investors.").

In the context of private sector borrowers, "pari passu status is most relevant when bankruptcy intervenes (whether before or after the debt has matured) and the power to order payments of debt has been taken out of the discretion of the debtor and put into the judicially supervised workout [(Chapter 11)] mode" or liquidation (Chapter 7).  *See* Link Decl. ¶ 11 (Ex. E); *see also* Declaration of Professor Stephen Choi,[15] dated Dec. 10, 2010 ("Choi Decl.") ¶ 9.  In the case of sovereign borrowers, the function of the clause as it has been understood for over 50 years is to provide protection from legal subordination or other discriminatory legal ranking by preventing the creation of legal priorities by the sovereign in favor of the claims of creditors holding particular classes of debt.  *See id.*; *see also* Sovereign Piracy at 636 (Ex. K); Michael Gruson & Stephen Hutter, International Bar Association Project on Legal Opinions in International Business Transactions, 676 PLI/Comm 405, 421 (Oct. 1993)

---

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999) ("In gauging reliability, the district court should consider" whether the testimony is the product of reliable principles and methods).

[15]  Stephen Choi received his J.D. from Harvard Law School, where he graduated first in his class, and is currently the Murray and Kathleen Bring Professor of Law at the New York University Law School. Prof. Choi has published over 50 journal articles, several of which concern the meaning of the pari passu clause in the sovereign context, based on extensive empirical and academic research.

("Gruson & Hutter") (Ex. J).  The clause simply does not speak to whether, for any reason other than legal subordination, one creditor is paid ahead of another.

Significantly, NML fails to cite *Nacional Financiera, S.N.C. v. Chase Manhattan Bank N.A.*, No. 00 Civ. 1571 (JSM), 2003 WL 1878415, at *2 (S.D.N.Y. Apr. 14, 2003), in which a group of unpaid judgment creditors sought to sue another creditor who had been paid by their common debtor, claiming that this payment violated the pari passu clause.  The Court denied the creditors' motion to amend its pleadings to raise this claim, holding that as a matter of law no such claim could be stated.  *Id.*  While the Court declined to rule directly on whether *Elliott* was a correct interpretation of New York law on the grounds that the case before him involved an injunction against the debtor *after* payment had been made to other creditors rather than before, its denial of relief nevertheless implicitly rejected the underlying reasoning of *Elliott* because the payments in *Nacional Financiera* would have violated the pari passu clause under *Elliott*'s interpretation.  *See also Kensington Int'l Ltd. v. Republic of Congo*, 2002 No. 1088, 6 (Commercial Ct. 16 Apr. 2003) (judgment of Mr. Justice Tomlinson) (Ex. R) (describing the ratable payment interpretation of the pari passu clause as "novel and unprecedented").

   2.    **NML's Novel Interpretation Of The Pari Passu Clause Is Inconsistent With Canons Of Contract Interpretation And Leads To Absurd Results**

Under New York law, a contract must be read as a whole and should not be interpreted so as to leave any clause expressly included by the parties without effect or purpose, *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir. 1985); *Laba v. Carey*, 327 N.Y.S.2d 613, 618 (N.Y. Ct. App. 1971), nor should a clause be interpreted in such a way as to make it absurd, *see Newmont Mines, Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 135 (2d Cir. 1986).   NML's interpretation of the pari passu clause violates both of these principles.

*First*, NML's interpretation of the pari passu clause as requiring "ratable" payments to creditors would render meaningless other standard loan contract clauses, such as "most favored nation" clauses, "negative pledge" clauses, and "sharing" clauses, which do actually address the issue of payment to one creditor before another. *See* Lee C. Buchheit, *The Pari Passu Clause Sub Specie Aeternitatis*, 10 Int'l Fin. L. Rev. 11 (1991) (Ex. I); Wood at 373 (Ex. L) ("Where a wider equality is desired, creditors can and do draft an appropriate clause – a most favoured nation clause, a negative pledge, a pro rata sharing clause, a provision for payment to a trustee of a bond issue on default who then pays bondholders on a pro rata basis, or a cross default clause."); Sovereign Piracy at 646 (Ex. K) (under the *Elliott* interpretation of pari passu, the "mandatory prepayment clause," the "turnover clause," the "sharing clause," the "negative pledge clause," and the "acceleration clause" would each be rendered superfluous); Choi Decl. ¶ 12.

In the FAA, for instance, NML's pari passu interpretation would have the effect of rendering superfluous language in the negative pledge clause.  NML argues that the phrase "payment obligations of the Republic under the Securities shall at all times rank at least equally" with its other external indebtedness, means that the Republic undertook an obligation to pay such creditors "ratably," Pl. Inj. Mem. at 11, which presumes that "ratably" and "equally" have the same meaning under the FAA.  However, in the negative pledge clause the Republic agreed not to allow a lien upon its assets to secure its public indebtedness unless "at the same time or prior thereto the Republic's obligations under the Securities . . . are secured *equally* and *ratably* therewith."  FAA ¶ 11 (Ex. P) (emphasis added).  The usage of both "equally" and "ratably" in this protective clause makes clear that the words are intended to have legally distinct meanings in the FAA.  NML's interpretation of the pari passu clause would thus render the word "ratably" in

the negative pledge clause superfluous, in contravention of New York's well-settled rules of contract construction.

   *Second*, NML's interpretation of the pari passu clause would produce absurd results, to which neither the Republic, nor any other party subject to such a provision, would have intended to agree.[16]  *See In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (1st Dep't 2003).  Under NML's interpretation, a debtor would be precluded from making payments to *any* of its creditors unless it was able to *satisfy in full all of its obligations to all of its creditors*, and would be forced to default on *all* of its obligations upon default on any single obligation.  *See* Sovereign Piracy at 641; *see also* Wood at 372-73 (Ex. L).  A temporary shortfall of funds would thus automatically be converted into an across-the-board debt crisis every time a single creditor or small group of creditors was not paid, resulting in severe disruptions and uncertainty in the sovereign debt markets, as no bondholder or trader could ever know whether or when its payment streams might be enjoined by a single disaffected creditor.[17]  Creditors who wished to restructure would become hostage to those who do not, those willing to accept the financial sacrifices necessary to restructure would be blocked from receiving payment even on the new

---

[16]  In fact, creditors never even *attempted* to draft or negotiate such an interpretation.  *See* Link Decl. ¶ 4 (Ex. E]) ("Never in my experience did a creditor involved in [a sovereign transaction], whether as draftsman or negotiator, take the position . . . that a *pari passu* provision . . . should be construed in such a way as to require that all of the creditors of a sovereign debtor be paid simultaneously on a pro rata basis. . . . [T]his construction would have appeared inconceivable and unworkable to the lawyers actually drafting the transaction documents . . . whether from the perspective of prospective lenders, or the sovereign borrower itself.").

[17]  In the corporate context, NML's interpretation would also provide a single unpaid creditor holding debt with a pari passu clause with the *de facto* power to force a debtor into involuntary bankruptcy in violation of 11 U.S.C. § 303(b)(1), which provides that an involuntary bankruptcy case can be commenced "by *three* or more entities," and only if the Court finds that the debtor is "generally not paying [its] debts as such debts become due," 11 U.S.C. § 303(h)(1).  If the pari passu clause permitted a creditor to wield such power, it would certainly be a common tool in the creditors' arsenal and the subject of caselaw illustrating its deployment.  The fact that no such caselaw exists, and that the result would disrupt the well-understood rules of debtor-creditor relationships, again suggest the absence of any legal basis for NML's interpretation of the pari passu clause.

debt reflecting that sacrifice, and debt restructuring would effectively become impossible.  These are exactly the results that would obtain here with respect to the holders of 91% of the Republic's old debt, who accepted just such sacrifices in reliance on the terms of the two Exchange Offers.

Finally, accepting NML's fallacious reading of the pari passu clause would preclude the Republic from making any payments *to NML itself*, unless the Republic were also able to "ratably" pay any and all other outstanding debt, whether as performing or defaulted sovereign bonds, multilateral debt or trade debt, at the same time.  Any of the Republic's *other* unpaid external creditors would have just as much right to enjoin the Republic from paying NML on its judgments as NML would have to enjoin the Republic from paying the vast majority of creditors who do not hold defaulted claims against the Republic.  The result of this Hobbesian "war of all against all" would be market paralysis and chaos, and demonstrates why NML's interpretation is wrong as a matter of law.  *See* Choi Decl. at ¶ 11.

Indeed, notwithstanding the existence of pari passu provisions in most, if not all, debt instruments issued by sovereigns during the 1980's and 1990's, the common practice has been for sovereigns forced to restructure to treat the IMF and other multilateral institutions as *de facto* preferred creditors in order to ensure the continued functioning of the multilateral lending system and to maintain continued access to it.[18]  *See* Ibrahim F.I. Shihata, The Negative Pledge Clause, The World Bank Legal Papers, 303 n.1 (2000); Memorandum to the Executive Directors of the World Bank, Review of IBRD's Negative Pledge Policy with Respect to Debt and Debt

---

[18]   NML's interpretation of the pari passu clause would also constrain sovereign actions to an unheard of degree with respect to ordinary tools of debt management.  If sovereigns with boilerplate pari passu clause debt could not repay certain creditors at a higher rate or sooner in time, sovereigns would be prohibited from carrying out common operations such as voluntary prepayments on debt, selective redemptions of bond issues, or other liability management operations like exchange or tender offers, even outside of the default context.

Service Reduction Operations, dated July 19, 1990, at 2 (Ex. H).  No such treatment has ever been understood to violate the pari passu clause.  *See* Choi Decl. at ¶ 10.

Given the absurd results following from the NML reading of the clause, it is not surprising that it has been rejected again and again by entities and institutions charged with overseeing the integrity of the international financial architecture.  *See* Statement of Interest of the United States, dated Jan. 12, 2004, Nos. 02 Civ. 5932 and 03 Civ. 2507 at 11, 16) ("U.S. Statement of Interest") (Ex. A) (characterizing the ratable payment interpretation as "novel" and contrary to the interests of the United States and warning that its adoption would create a "threat of increased litigation by holdout creditors [that would] undermine[] the consensual restructuring process the United States has been at pains to foster for the past several decades"); Mem. of Law of *Amicus Curiae* Fed. Reserve Bank of N.Y., dated Jan. 12, 2004, Nos. 02 Civ. 5932 and 03 Civ. 2507 at 13 (Ex. B) (describing the ratable payment interpretation as "terrorism of payments and settlement systems" and "urg[ing] this Court to interpret the Pari Passu Clause . . . to encourage parties to compromise in sovereign debt restructurings."); Mem. of *Amicus Curiae* The New York Clearing House Association L.L.C., dated Jan. 12, 2004, Nos. 02 Civ. 5932 and 03 Civ. 2507 at 3 (Ex. C) (unequivocally stating that while "the [Republic's interpretation] reflects the view of how credit markets have negotiated and understood these clauses to operate for many decades, and is the correct reading of New York law," the ratable payment interpretation "is incorrect as a matter of law and would constitute a dramatic and disruptive departure from how New York law-based credit markets have functioned in this area.");[19] Bank of England Financial Markets Law Committee, Issue 79 – Pari Passu Clauses, 22 (Mar. 2005)

---

[19]   It underscores not only the lack of legal merit of NML's position, but also its laches, that these statements of interest and amicus briefs were all submitted in early 2004, when the Republic first sought a ruling on the pari passu issue, and NML vehemently argued that the Court should not decide the issue.

(Ex. D) (stating that "the consequences of the payment interpretation are such that both debtors and creditors would be prejudiced" and therefore that "the ranking interpretation is the proper interpretation of the *pari passu* clause in sovereign debt obligations"); *see also* Br. for the United States of America as *Amicus Curiae*, dated Nov. 3, 2010, *NML Capital, Ltd. v. Banco Central de la República Argentina*, No. 10-1487-cv(L) (2d Cir.), at 20 ("[T]he Republic's decision to pay the IMF in preference to its other creditors was consistent with the long-standing policy of the United States and the other sovereign members of the IMF to recognize the preferred creditor status of the IMF. In order to protect the funds of its member states (including the funds invested by the United States), the IMF rightly expects to be paid even when other creditors are not.").

### 3.   NML's Interpretation Of The Pari Passu Clause Finds No Support In Caselaw

It is undisputed that NML's interpretation of the pari passu clause has never been accepted by any New York court, either before or since the *ex parte* decision in the *Elliott* case in Belgium.  In fact, prior to the *Elliott* case, no court *anywhere*, nor any scholarly commentators, had subscribed to NML's interpretation.  Such a dearth of support is significant, given that the pari passu clause is a boilerplate provision that has been ubiquitous in contracts for decades.

NML's reliance on non-binding judicial decisions as universally supporting its interpretation is strained at best.  *See* Pl. Inj. Mem. at 11.  The one U.S. case cited, *Red Mountain Fin. Inc. v. Democratic Republic of Congo*, provides no support for NML's erroneous interpretation because the pari passu provision in the contract at issue was not analyzed by the court and did not serve as the basis of its (unexplained) decision to grant a payment injunction. *See* No. CV 00-0164 R, 2000 WL 34479543 (C.D. Cal. May 29, 2001) (Cohen Inj. Decl. Ex.

27

Y).[20]  The Belgian decision on which NML relies, *LNC Invs. LLC v. Republic of Nicaragua*, was the product of the much criticized *ex parte* decision in *Elliott Associates*, and like it has since been reversed and legislatively overruled by Belgian Law 4765, which was passed specifically to prevent future creditors from obtaining injunctions like the ones granted in those cases.  Folio 2000 1061, R.K. 240/03 (Commercial Ct. of Brussels Sept. 11, 2003), *rev'd by* Gen. Doc. No. 2003/KR/334 (Court of Appeals of Brussels, 9th Chamber, Mar. 19, 2004); *see* Olivares-Caminal, Legal Aspects of Sovereign Debt Restructuring 94 (Sweet & Maxwell 2009).

By contrast, besides the implicit rejection of the Elliott pari passu theory in *Nacional Financiera* under New York law, *see supra* Point II.A.1, the only other common law court to discuss the issue, the English High Court in *Kensington Int'l Ltd. v. Republic of Congo*, 2002 No. 1088 (Commercial Ct. 16 Apr. 2003) (Ex. R) (Judgment of Mr. Justice Tomlinson), also implicitly rejected that theory.  In that case, (brought by another Elliott affilliate) the English court denied the plaintiff's application for injunctive relief under the pari passu clause on equitable grounds, but in the course of doing so expressed skepticism, as did this Court, about the validity of this theory.  To our knowledge, no common law court, and certainly none applying New York law, has subscribed to the Elliott theory of the pari passu clause.

**B.**     **The 2005 "Lock Law" Did Not Violate The Pari Passu Clause**

The Republic's 2005 and 2010 Exchange Offers (the "Exchange Offers"), and the passage of the Lock Law and Law 26,547, which temporarily suspended the Lock Law, as a matter of law did not subordinate NML's debt in violation of the pari passu clause because under

---

[20]  In *Red Mountain*, Judge Real did not explain the basis for his injunction, but, presumably intentionally, crossed out the section of the proposed order tendered to him by the plaintiff that referenced and relied on the pari passu clause.  Cohen Inj. Decl. Ex. Y.  The case was settled before an appeal could be taken.

no rational interpretation of the facts did the Republic alter creditor priorities in a manner prohibited by the clause.  *See* Choi Decl. ¶¶ 17-19.

As discussed above, the pari passu clause bars the creation of a preferred class of creditors with legal priority in claims over other creditors.  NML argues that the Exchange Offers and Lock Law together served to create such a preferred class because the holders of exchanged debt receive, or will receive, interest and principal payments while holders of defaulted debt receive nothing.  Pl. Inj. Mem. at 14-15.  However, the Lock Law and Exchange Offers plainly did not do this.  *See* Choi Decl. ¶ 17.  NML's assertion that a pari passu clause violation occurs under its interpretation each time Exchange Offer participants are paid while it is not fails because it transparently and impermissibly invokes the legally incorrect ratable payment interpretation.  *See id.* ¶ 19 ("[NML's subordination] interpretation . . . ha[s] the effect of reintroducing the equal payment interpretation of the Pari Passu clause under another guise – by equating non-payment with a change in legal rank.  Accepting such an interpretation would therefore lead to the same ill effects as the discredited equal payment interpretation.").

At the heart of NML's argument lies a gross misunderstanding of what constitutes "priority" in the context of corporate insolvency and sovereign default.  *See* Choi Decl. ¶ 19 ("NML's view of what constitutes a legal preference for purposes of effecting "rank" . . . is overly broad"); Black's Law Dictionary at 1313 (defining priority as "a creditor's right to have a *claim* paid before other creditors of the same debtor"); *In re N. LaSalle St. P'ship*, 246 B.R. 325, 331 (Bankr. D. Ill. 2000) ("Subordination . . . affects the order of priority of payment of *claims* in bankruptcy.") (emphasis added); Rodrigo Olivares-Caminal, *To Rank Pari Passu or not to Rank Pari Passu: that is the Question in Sovereign Bonds*, Working Papers ("Olivares-Caminal") at 40 ("The priority of *claims* becomes relevant upon . . . [sovereign] default.") (emphasis added).

The pari passu clause only prohibits the creation of a preferred class of creditor *claims* after default, not the cancellation of existing claims and subsequent issuance of additional performing debt.[21] *See* Gruson & Hutter at 421-22 (Ex. J) ("the pari passu opinion . . . expresses two ideas: (i) neither the agreement in question nor any collateral agreement between the same parties contractually subordinates a party's *claim* covered by the opinion, and (ii) under the foreign law, no creditor can be given a preferred *claim* over another creditor without the subordinated creditor's consent") (emphasis added).

The Republic has indisputably treated creditor claims on defaulted debt equally. The Republic's moratorium on debt payments and the ability to participate in the Exchange Offers applied equally to all creditors with claims against the Republic on eligible debt. Far from granting a preference to participating creditors' claims with respect to the defaulted debt they held, the effect of the Exchange Offers was to *extinguish* such claims entirely, while creating new debt (on less advantageous terms to its holders) with no legal preference whatever *vis à vis* the old indebtedness. The passage of the Lock Law, which merely prohibits the Executive from unilaterally settling defaulted claims or re-opening the exchange offer without Congressional approval, therefore did not create a "a legal priority to those creditors that entered the exchange offer," Pl. Inj. Mem. at 15, in the sense prohibited by the pari passu clause or in any other sense. The Law did not create any preferred creditor class.

NML's claim that the Lock Law formally lowered its rank by "legally prohibiting [the Republic] from paying anything to NML" fails, because it relies upon an inaccurate

---

[21] NML's own cited source for its subordination argument acknowledges that subordination concerns only claims and not all payments. *See* Olivares-Caminal at 40.  Its other authorities are inapposite, *see* Dee Martin Calligar, *Subordination Agreements*, 70 Yale L.J. 376, 378 (1961) (defining "subordination agreement" and not subordination in the context of sovereign default), and speculative, *see* Anna Gelpern, *After Argentina*, Rutgers Sch. of Law-Newark Research Paper Series Paper No: 011, at 6 (2005) (surmising, five years ago, that holdout creditors may argue subordination).

characterization of the Lock Law.  Pl. Inj. Mem. at 14 (emphasis omitted).  The Lock Law

simply prevents the Executive from unilaterally re-opening the 2005 Exchange Offer or engaging

in settlements with defaulted bondholders.  *See* Lock Law (Cohen Inj. Decl. Ex. F); Choi Decl.

¶ 17.  The Congress retained for itself, and continues to hold, the ability to permit future

exchange offers, which is precisely what it did in 2009, when it suspended the Lock Law in 2009

in order to conduct the 2010 Exchange Offer.  *See* Law 26,547 (Cohen Inj. Decl. Ex. G).

Nothing in it constitutes a legal subordination of that debt.

## POINT III

### NML IS NOT ENTITLED TO INJUNCTIVE RELIEF

NML has failed to meet the standard for injunctive relief.  Preliminary injunctions

are permitted only where the moving party demonstrates "(1) a likelihood of irreparable harm in

the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently

serious questions going to the merits to make them a fair ground for litigation, with a balance of

hardships tipping decidedly in the movant's favor."  *Seijas v. Republic of Argentina*, 352 F.

App'x 519, 521 (2d Cir. 2009) (internal quotation marks and citation omitted).[22]

---

[22]  It is unclear whether NML in fact seeks a preliminary injunction, a permanent injunction, or specific performance.  *See* Pl. Inj. Mem. at 18-19.  Having failed to satisfy the requirements for a preliminary injunction, however, NML of necessity also fails to establish entitlement to a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006) ("[W]ell-established principles of equity" require a party seeking permanent injunction to satisfy four criteria:  "(1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."); *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007) (noting that "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success") (internal quotation marks and citation omitted); 11A Wright & Miller, *Federal Practice and Procedure: Civil* § 2942.  Specific performance is addressed in Point III.D, *infra*.

Where the moving party seeks a "mandatory" injunction to "alter the status quo by commanding some positive act, as opposed to a 'prohibitory' injunction seeking only to maintain the status quo," the party must meet the more stringent requirements for a mandatory injunction. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (internal quotation marks and citation omitted). Such mandatory injunctions, as the Second Circuit has cautioned, should "'issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Id.* (citation omitted).

Here, it is clear that NML seeks a mandatory rather than only a prohibitory injunction, whether describing the relief sought as "an injunction requiring Argentina to pay NML ratably if and when it makes payments to other external creditors," Pl. Inj. Mem. at 1, 27, or "specific performance . . . requiring Argentina to restore NML['s rank]," *id.* at 17. Either formulation inherently acknowledges that NML seeks to force Argentina to change the status quo that has prevailed for more than five years. NML manifestly fails to satisfy the requirements for such an injunction under Rule 65.

## A.     NML Cannot Establish Irreparable Or Extreme Harm

A showing of irreparable harm "is perhaps the single most important prerequisite for the issuance of a preliminary injunction," which "the moving party must show . . . before the other requirements for an injunction will be considered." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (*per curiam*) (internal quotation marks and citation omitted). It is axiomatic that an injury cannot constitute irreparable harm as a matter of law if it is "capable of being fully remedied by money damages." *N.A.A.C.P. v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995); *Arctic Ocean Int'l Ltd. v. High Seas Ltd.*, No. 06 Civ. 1056 (LAP), 2009 WL

5103283, at *1 (S.D.N.Y. Dec. 28, 2009) (citing *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)).  Where monetary damages are adequate compensation, an injunction is not available.  *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.* 596 F.2d 70, 72 (2d Cir. 1979).

      Although NML refuses to explicitly state what payment it would receive if the Court applied its vague "ratable" payment approach, it evidently intends that it will be paid in full and up front on its judgments for the full face value plus interest on the defaulted bonds, if any Republic bondholder is to receive even an interest payment from the Republic on its new debt.[23]  Couching that demand for payment of its judgments as one for "specific performance" of NML's novel (and incorrect) theory on the meaning of the pari passu clause does not disguise its true nature.  *See* Pl. Inj. Mem. at 1, 27.  That NML's ultimate relief can be reduced to the amount of its judgments for monetary damages, however, demonstrates that there is no irreparable harm.

      NML also asserts that "irreparable harm" arises from alleged violations of the pari passu clause in and of itself, but can point to *no* separate or distinct harm from such a violation, other than the continued nonpayment of claimed principal and interest.  Its claim that the "damages from not being treated on par with other creditors are incalculable," Pl. Inj. Mem. at 21, is thus doubly disingenuous:  NML's total damages for nonpayment under the bond documentation are eminently calculable (as this Court is aware from the judgments it has already entered in favor of NML and others) because they are limited to the face value of the debt plus applicable interest, and any inability to calculate purported damages from "not being treated on

---

[23]  Because NML moved for summary judgment for the full amount of principal and interest on its defaulted bonds *simultaneously* with its pari passu motions and requests the Court to adjudicate the motions together, if the Court ruled in NML's favor on all of the motions, NML would presumably claim that the "100% of what is currently due to [NML]," Pl. Inj. Mem. at 18, would be the full amount of the judgments.

par" is simply due to the fact that such "damages" are subsumed in the monetary damages from not being paid in the first instance.  That other bondholders may be paid interest because they participated in the Republic's Exchange Offers and extinguished their claims on old debt, while NML is not, does not cause any separately cognizable harm to NML, and certainly none that is not adequately remedied by the continued accrual of monetary damages in the form of applicable interest.  NML was invited to participate in the Republic's Exchange Offers on equal terms with all other holders of eligible debt, and, had it done so, would be receiving the same payments on the same proportionately reduced principal.  It cannot claim irreparable harm based on its own calculated financial decision to refuse to participate in the Exchange Offers.

NML's citation to the Restatement of Contracts for the proposition that the inability to collect a judgment makes money damages inadequate, is also unavailing.  Pl. Inj. Mem. at 20.  NML is actively pursuing enforcement of its judgments in the United States and elsewhere, which defeats any claim that it would necessarily be injured without an injunction here.  *See Plenum Fin. & Invs. Ltd. v. Bank of Zambia*, No. 95 Civ. 8350 (KMW), 1995 WL 600818, at *3 (S.D.N.Y. Oct. 11, 1995).  Mere difficulty in enforcing a judgment – which in the present case, is entirely the result of the limits imposed by Congress on execution under the FSIA and the comparable sovereign immunity laws of other nations – does not, as a matter of law, rise to the level of "irreparable harm."  *Centauri Shipping Ltd. v. W. Bulk Carriers KS*, 528 F. Supp. 2d 186, 194 (S.D.N.Y. 2007); *Weston Compagnie Finance et D'Investissement, S.A. v. La Republica del Ecuador*, No. 93 Civ. 2698 (LMM), 1993 WL 267282, at *2 (S.D.N.Y. July 14, 1993); *cf. Black United Fund of N.J., Inc. v. Kean*, 763 F.2d 156, 161 (3d Cir. 1985) (obstacles to enforcing judgment raised by Eleventh Amendment immunity does not transform money damages into irreparable injury for injunction purposes).

34

Furthermore, NML's own behavior rebuts its claim of irreparable harm.

*First*, NML claims that the Republic's alleged violation of the pari passu clause, and hence its alleged irreparable harm, began from the passage of the Lock Law in 2005 and the Republic's 2005 Exchange Offer.  Yet NML sought and obtained summary judgment in eight cases since 2005 solely for monetary damages, and filed three additional complaints in 2008 and 2009, with no mention of a pari passu claim or non-monetary damages.  Instead, as described in Point I, NML has waited more than *five years* to bring a claim under the pari passu clause.  In the face of this extensive delay, NML is now barred from claiming irreparable harm as a basis for injunctive relief.  *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (reversing preliminary injunction for lack of irreparable harm where movant waited approximately two months:  "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.").

*Second*, NML's claim of irreparable harm is belied by its continued, additional purchases of hundreds of millions of dollars of deeply discounted nonperforming Republic debt *after* the Republic's 2005 Exchange Offer, during the very time period that it now claims it was suffering "irreparable" harm because of the Republic's purported violation of the pari passu clause with respect to those bonds.  Greenberg Inj. Decl. at 3-39.  NML also admits that it continued to buy more nonperforming debt at least as recently as July 2010, after the tender period for the Republic's *second* Exchange Offer had closed.  *Id.* at 6.  A sophisticated hedge fund like NML would not have behaved in this fashion – doubling, tripling, and quadrupling its bets on potential damages recoveries – had it truly been subject to irreparable harm from these alleged violations of the pari passu clause.  Because irreparable harm is the *sine qua non*

requirement for any injunctive relief, and NML has failed to establish any such harm here, its request for injunctive relief must be denied.

**B.      NML Is Unable To Demonstrate A Clear Entitlement To Relief, A Likelihood Of Success On The Merits Or The Existence Of Sufficiently Serious Questions Going To The Merits**

**1.      NML Cannot Establish A Likelihood Of Success On The Merits**

As established in Point II of the Argument, NML is not entitled to relief on its belated pari passu claim because it is wrong as a matter of law in its interpretation and application of the clause.  A fortiori, NML cannot demonstrate either a likelihood of success on the merits or sufficiently serious questions going to the merits, and is not entitled to a preliminary injunction to enforce its erroneous pari passu claim.

In addition, NML's request for injunctive relief regarding the pari passu clause is improper because the pari passu clause is a covenant within the FAA whose breach would simply give bondholders certain rights for acceleration of principal, not "ratable" payments.  As set forth in Section 12 of the FAA:

> 12.  Default; Acceleration of Maturity.  If any of the following events ("Events of Default") with respect to the Securities of any Series occurs and is continuing:
>
> (a) Non-Payment: [. . .]
>
> (b) Breach of Other Obligations:  the Republic does not perform or comply with *any one or more of its other obligations in the Securities of such Series or in this Agreement* [. . .]
>
> then the holders of not less than 25 percent in aggregate principal amount of the Securities of such Series . . . shall declare the principal amount of all the Securities of such Series to be due and payable immediately . . . .

FAA § 12 (Ex. P) (emphasis added).  Thus, even if the Republic had breached the pari passu clause, which it has not, NML is limited to the contractually agreed remedy of

acceleration of principal of a series with the consent of 25% of the bondholders for each

series (other bond provisions of course permit it to sue for its own interest and principal, as

it has repeatedly done).  NML may not simply demand performance against the Republic

of one clause of the agreement in isolation, while ignoring the other provisions of the bond

documentation that apply to it.

      **2.**      **NML's Request For Injunctive Relief Is Barred Under The FSIA**

      The injunction sought by NML is inappropriate in the context of the FSIA, where

Congress has established express limitations on execution and enforcement, regardless of form,

against foreign states.  Section 1610 of the FSIA limits courts' jurisdiction to order enforcement

against a foreign state to specifically identified property of the foreign state in the United States

and used for a commercial activity in the United States.  28 U.S.C. § 1610(a); *Aurelius Capital*

*Partners LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009).  NML does not

specifically identify the assets from which it would require payment to be made to itself under its

pari passu theory, or allege that they are used for a commercial activity in the United States, but

tries to make an end-run around the FSIA by asking this Court to issue an injunction ordering the

Republic to pay NML, out of assets that are entirely *outside* of the United States.  Such use of an

injunction to obtain what the FSIA otherwise forbids is plainly improper.  *Cf. Aurelius Capital*

*Partners v. Republic of Argentina*, No. 07 Civ. 2715 (TPG), 2010 WL 2925072 at *4 (S.D.N.Y.

July 23, 2010).  As recognized by the United States, it is doubtful whether an injunction affecting

a foreign state's use of assets outside the United States could ever be permissible under the

FSIA.  *See* U.S. Statement of Interest at 18-19 (Ex. A).

**C.     The Balance Of Hardships And The Public Interest Militate Decidedly In Favor Of Denial Of Injunctive Relief**

As described above, the hardship alleged here consists at most of monetary damages, which NML undertook with full knowledge and as part of its strategy of speculation in defaulted sovereign debt.  Particularly here, when NML purchased the debt knowing not only that it was nonperforming, but also that the specific alleged violations of the pari passu clause at issue were ongoing, and then still waited years to sue, NML cannot seriously be heard to plead that the balance of hardships now "tip[s] decidedly in [its] favor."  *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981).

To the contrary, as described *supra* Point I.C, any injunction issued now to interfere with payments on the Republic's settled 2005 and 2010 Exchange Offers would result in substantial hardship to the Republic, its citizens, and holders of its performing debt, who all reasonably expected the continuation of the status quo during NML's long delay in bringing these claims.  The same policy concerns that weigh in favor of encouraging sovereign restructurings to take place, also weigh in favor of providing certainty that completed restructurings cannot be upset by holdout creditors – especially when those holdouts have waited until years afterward to bring their claims.  *See, e.g.*, *EM Ltd.*, 131 F. App'x at 747; U.S. Statement of Interest at 2-6 (Ex. 1); *cf. Pravin*, 109 F.3d at 855.[24]

---

[24]   As the Court is aware, holders of non-performing Republic debt in certain series of Brady bonds are seeking to complete an exchange offer with respect to their beneficial interests.  *See Capital Ventures Int'l v. Republic of Argentina*, Nos. 05 Civ. 4085 and 06 Civ. 207, Order Modifying Attachment and Restraining Orders, dated Oct. 29, 2010 (the "October 29 Order") (Ex. GG).  The Republic has since launched an exchange offer for the Brady bonds (the "Brady Exchange Offer").  *See, e.g.*, U.S. Prospectus Supplement, dated December 3, 2010 ("U.S. Prospectus Supplement") (Ex. HH).  The completion of the Brady Exchange Offer is conditioned upon the Court of Appeals' affirmance of this Court's October 29 Order and the vacatur of this Court's stay of that order.  *See, e.g.*, U.S. Prospectus Supplement at vi, viii, S-7, S-8, S-15, S-32, S-57 (Ex. HH).  If the Brady Exchange Offer is completed, NML's current motions would interfere with the stated desire of the Brady holders to exchange their debt in the Brady Exchange Offer, in addition to disrupting payments in connection with the completed 2005 and 2010 Exchange Offers.

**D.**     NML Is Also Not Entitled To Specific Performance

NML fails to establish the requirements for its claim for so-called "specific performance" of its interpretation of the pari passu clause.  Under New York law, specific performance is appropriate only where the subject matter of the contract is unique, with no suitable substitute or readily established market value, but NML's current request for an order requiring payment on its FAA bond claims meets none of these conditions.  *Sokoloff v. Harriman Estates Dev't Corp.*, 96 N.Y.2d 409, 415-16 (N.Y. Ct. App. 2001); *see generally* N.Y. Jur. 2d, 96 Specific Performance §§ 6, 46-58 (summarizing applications of specific performance).  Specific performance is not appropriate as a remedy for the collection of money, and may not be applied where, as here, monetary damages are both an adequate remedy and capable of being fully and accurately calculated.  *Muller v. Muller*, 266 N.Y. 68, 70 (1934); *Sokoloff*, 96 N.Y.2d at 415-16.

NML's unjustified delay in bringing these claims and the severe hardship to the Republic and third parties make granting such relief inequitable.  *See City of N.Y.*, 275 N.Y. at 293-94 (refusing to grant specific performance under laches where plaintiff has delayed in bringing its claim and hardship and injustice would arise due to a change in circumstances).  Even if the Republic had breached the pari passu clause through payments to other bondholders – which it has not – NML's delay of more than five years before objecting to such payments constitutes a waiver of its right to demand any "specific performance" of its interpretation of the pari passu clause now.  *Id.* at 293("It is a cardinal rule that in an action to specifically enforce a contract the one seeking enforcement must act promptly.  Unexplained delay is evidence of waiver and acquiescence in non-performance.") (internal citation omitted).

NML's cited cases on specific performance do not change this analysis, as none seeks enforcement of a straightforward contract for the payment of money.  *Nemer Jeep-Eagle,*

*Inc. v. Jeep-Eagle Sales Corp.*, 992 F. 2d 430, 433-34 (2d Cir. 1993), for instance, describes the

specialized caselaw regarding specific performance of a contract provision that explicitly

provides for a stay pending arbitration, in light of the fact that arbitrators and not the court would

decide the ultimate merits.  Pl. Inj. Mem. at 19.[25]  There is of course no such provision in the

bond documentation.

      NML's analogies to performance of non-compete agreements and contracts for

the provision of security, Pl. Inj. Mem. at 22-24, are similarly inapposite because these both fall

within well-defined judicial exceptions to the doctrine limiting application of specific

performance, and differ from the Republic's bond documents in critical elements such as

uniqueness and the possibility to precisely calculate the value of the contract.  *See* N.Y. Jur. 2d,

96 Specific Performance §§ 50, 53 (specific performance may be generally appropriate in the

specific cases of non-compete agreements and agreements for provision of security).

*    *    *

      NML's proposed application of the pari passu clause is so utterly contrary to the

weight of authority and leads to such absurd, impracticable results that it shows NML's true

objective in bringing this grossly delayed claim.  NML's goal is not to "vindicate" some strained

interpretation of "equal treatment" wrung out of the pari passu clause.  What NML wants is an

injunctive order that is so broad and unworkable – *i.e.*, a prohibition of the Republic from paying

---

[25]  NML's statement on page 19 of its brief that certain initial factors considered for specific performance "are not disputed in this case" is premature and wrong.  The Republic does not agree, for instance, that "plaintiff and defendant are each able to continue performing their parts of the agreement."  *See* Pl. Inj. Mem. at 19.  The Republic's default was caused by its inability to continuing performing under the FAA, and it still lacks the ability to pay all bondholders in full under the terms of the FAA, its own laws, or the terms of the Exchange Offers.  Nor would performance under the FAA be possible at all under NML's interpretation of the pari passu clause, as discussed.  In addition, as discussed *supra* at note 10, should plaintiffs obtain summary judgment on their monetary damages claim, the merger doctrine would preclude any further performance under the contract.

40

*any* external debt, including interest to the 91% of bondholders who accepted the Republic's Exchange Offers, unless *all* performing and defaulted external debt is paid in full at the same moment – that the Republic simply could not comply with it.  NML would then seize upon such noncompliance to seek sanctions that it hopes will go far beyond the scope of execution permitted under the FSIA, as it makes no attempt to hide.  *See* Pl. Inj. Mem. at 18.  This type of end-run around the FSIA is neither legally permissible nor would it in any event be a proper use of the Court's equitable powers.

NML, as a vulture fund whose business is speculating in defaulted sovereign debt, was fully aware of the limitations on execution established by Congress in the FSIA.  It should not now be permitted to impose an erroneous interpretation of the boilerplate pari passu clause that would result in the overwhelming majority of bondholders in a restructuring being held hostage to a few professional holdouts trying to extract a bigger payout than everyone else and preferential treatment, and that would effectively render any future sovereign restructuring impossible.

## CONCLUSION

For the foregoing reasons, NML's motions should be denied.

Dated: New York, New York
        December 10, 2010

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: ___/s/ Carmine Boccuzzi_____
    Jonathan I. Blackman (jblackman@cgsh.com)
    Carmine D. Boccuzzi (cboccuzzi@cgsh.com)

One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for the Republic of Argentina