UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

NML CAPITAL, LTD.,

Plaintiff,

v.

REPUBLIC OF ARGENTINA,

Defendant.
-------------------------------------------------------x

08 Civ. 6978 (TPG)
09 Civ. 1707 (TPG)
09 Civ. 1708 (TPG)

**REPLY IN SUPPORT OF THE MOTION BY NML CAPITAL, LTD. FOR PARTIAL SUMMARY JUDGMENT AND FOR INJUNCTIVE RELIEF PURSUANT TO THE EQUAL TREATMENT PROVISION**

**GIBSON, DUNN & CRUTCHER LLP**
Theodore B. Olson
Matthew D. McGill
Jason J. Mendro
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500

**DECHERT LLP**
Robert A. Cohen
Charles I. Poret
1095 Avenue of the Americas
New York, NY 10036-6796
(212) 698-3500

*Attorneys for Plaintiff NML Capital, Ltd.*

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. ARGUMENT ........ 2

A. Argentina Confirms That It Breached The Equal Treatment Provision. ........ 2

1. Argentina Fails To Defend The Lock Law And Other Measures Under Its Own Long-Held Interpretation Of The Equal Treatment Provision. ........ 3

2. Argentina Offers No Reasonable Alternative To The Plain Language Of The Equal Treatment Provision. ........ 6

B. NML's Claims Are Not Barred By Laches ........ 10

1. NML Did Not Engage In Any Unreasonable Delay. ........ 11

2. Argentina Did Not Suffer Any Prejudice From The Alleged Delay. ........ 12

3. Argentina Was Well Aware That NML Might Seek To Enforce The Equal Treatment Provision. ........ 12

C. Specific Performance Is The Only Equitable And Just Remedy. ........ 14

1. Equitable Relief Is Necessary To Avoid Irreparable Harm To NML. ........ 14

2. The Interests of Justice Support Equitable Relief. ........ 16

3. Granting Equitable Relief Violates Neither The FAA Nor The FSIA. ........ 18

III. CONCLUSION ........ 20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*BIB Constr. Co. v. Fireman's Ins. Co.*,
214 A.D.2d 521 (N.Y. App. Div. 1995) ....................15

*Burns v. Egan*,
501 N.Y.S.2d 742 (N.Y. App. Div. 1986) ....................12

*Coalition for Gov't Procurement v. Fed. Prison Indus., Inc.*,
365 F.3d 435 (6th Cir. 2004) ....................10

*Conopco, Inc. v. Campbell Soup Co.*,
95 F.3d 187 (2d Cir. 1996)....................10

*Daisley v. FedEx Ground Package Sys., Inc.*,
376 F. App'x 80 (2d Cir. 2010) ....................10

*Elliott Assocs. L.P. v. Banco de la Nacion*,
General Docket No. 2000/QR/92
(Court of Appeals of Brussels, 8th Chamber, Sept. 26, 2000)....................6

*EM Ltd. v. The Republic of Argentina*,
720 F. Supp. 2d 273 (S.D.N.Y. 2010)....................18

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*,
696 F. Supp. 2d 368 (S.D.N.Y. 2010)....................10

*Fin. One Public Co., Ltd. v. Lehman Bros. Special Fin. Inc.*,
414 F.3d 325 (2d Cir. 2005)....................17

*Galli v. Metz*,
973 F.2d 145 (2d Cir. 1992)....................2

*Harbor Ins. Co. v. Schnabel Found. Co.*,
946 F.2d 930 (D.C. Cir. 1991)....................18

*Nacional Financiera, S.N.C. v. Chase Manhattan Bank N.A.*,
No. 00 Civ. 1571 (JSM), 2003 WL 1878415 (S.D.N.Y. Apr. 14, 2003)....................7

*Nat'l Sur. Corp. v. Titan Const. Corp.*,
26 N.Y.S.2d 227 (N.Y. Sup. Ct. 1940) ....................15

*Newbro v. Freed*,
409 F. Supp. 2d 386 (S.D.N.Y. 2006)....................11

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Red Mountain Fin. Inc. v. Democratic Republic of Congo*,
No. CV 00-0164 R, 2000 WL 34479543 (C.D. Cal. Nov. 20, 2000) ....................................7

*In re Schulz*,
81 N.Y.2d 336 (N.Y. 1993) ....................................................................................12

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
128 S. Ct. 2531 (2008)....................................................................................16

*TCW Gem V. Ltd. v. Grupo Iusacell Celular, S.A. de C.V.*,
801 N.Y.S.2d 243, 2004 WL 3267267 (N.Y. Sup. Ct. 2004)..........................................15

*Titus v. Wallick*,
306 U.S. 282 (1939)....................................................................................16

*Travelers' Ins. Co. v. Brass Goods Mfg. Co.*,
146 N.E. 377 (N.Y. 1925)....................................................................................16

*Yeda Research & Dev. Co. Ltd. v. Imclone Sys., Inc.*,
443 F. Supp. 2d 570 (S.D.N.Y. 2006)....................................................................11

**STATUTES**

28 U.S.C. § 1610(a) ....................................................................................19

N.Y. C.P.L.R. § 213(2) ....................................................................................10

N.Y. Jur. 2d, 96 Specific Performance § 53 ............................................................15

**OTHER**

Olivares-Caminal, Rodrigo, Legal Aspects of Sovereign Debt Restructuring
(Sweet & Maxwell 2009)....................................................................................7

Olivares-Caminal, Rodrigo, *To Rank Pari Passu Or Not To Rank Pari Passu*,
15 L. & Bus. Rev. of the Americas 745 (2009) ..........................................................4

Restatement (Second) of Contracts § 360 cmt. d ..........................................................14

## I. INTRODUCTION

Argentina drafted a Fiscal Agency Agreement ("FAA") containing numerous promises calculated to entice investors to buy its bonds. Paramount among those promises was the Equal Treatment Provision, in which Argentina guaranteed investors that its "payment obligations" under the bonds at issue in this litigation "shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness." SOF ¶ 8. Now that Argentina has irrefutably lowered the rank of those payment obligations (to coerce bondholders to accept less than what is owed to them), Argentina contends that this promise is nothing but the emptiest of formalities. The plain text of the provision, however, demolishes that contention. At the very least—as Argentina has maintained throughout years of litigation, and as its expert asserts even now (Opp. 21 (citing Choi Decl. ¶ 9))—the Equal Treatment Provision bars Argentina from creating legal priorities that favor its payment obligations to certain unsecured creditors over its payment obligations to owners of the bonds, including NML Capital, Ltd. ("NML").

The undisputed facts demonstrate that Argentina has violated that prohibition. It created new payment obligations to investors who were willing to accept less valuable bonds in exchange for those issued under the FAA. It then enacted the Lock Law, which indisputably lowered the rank of payment obligations under the FAA to a non-performing status. That governmental action is the antithesis of equal treatment and an unmistakable breach of the FAA.

Argentina mounts no tenable defense for this breach. Instead, Argentina posits (30 pages into its brief) an entirely novel interpretation of the Equal Treatment Provision: that it requires Argentina to treat all *non-performing* debt equally but nevertheless permits Argentina to favor any unsecured creditor it wishes by issuing to that creditor new, performing debt. Opp. 30. In effect, Argentina asserts that it is merely barred from paying debt obligations that it already is not paying, and that it may create higher ranking payment obligations at will. That interpretation

would reduce the Equal Treatment Provision to a hollow expression that ensures no equal treatment whatsoever. It also flies in the face of the plain terms of the provision, which make clear that Argentina's payment obligations under the FAA must rank "at least equally" with payment obligations arising from "future" indebtedness, as well as then-current indebtedness. Argentina does not cite a single authority that supports its counter-textual arguments.

Unable to explain away the promise it authored and breached, Argentina urges this Court to steer clear of the issue based on the laches doctrine. But because NML brought this claim well within the statute of limitations and Argentina was on notice as to the existence of the claims years before that, Argentina's laches argument is meritless.

Argentina also implores this Court to deny NML's request for specific performance, presumably because Argentina realizes that it is liable for breach of contract and would prefer the Court to render another money judgment that it will simply disregard. These arguments are equally meritless. The Equal Treatment Provision guaranteed NML that it would maintain equal status among other creditors in the event of default, and analogous guarantees (such as contractual security interests) are routinely enforced through injunctive relief. Argentina fails, moreover, to overcome the powerful equitable factors in favor of specific performance: Argentina has repeatedly evaded its obligations and flouted this Court's judgments. It also has ample assets to honor its payment obligations *both* to NML *and* to investors who participated in the exchange offers. Equity compels that it do just that.

## II. ARGUMENT

### A. Argentina Confirms That It Breached The Equal Treatment Provision.

The Equal Treatment Provision is set forth on the second page of the FAA and contains sixty-eight words. Those words must mean something. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("[U]nder New York law, an interpretation of a contract that has the effect of render-

ing at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." (second alteration in original; internal quotation marks omitted)). Argentina's opposition memorandum virtually ignores its own long-held interpretation: that the provision forbids Argentina from lowering the rank of its payment obligations to NML "by law or contract." D.E. 29, at 16, No. 03 Civ. 2507 (TPG) (S.D.N.Y. Dec. 12, 2003). There is no dispute, even under this narrow construction, that by *contracting* to provide superior payment obligations to others and enacting a *law* relegating the payment obligations to NML to a non-performing rank, Argentina has done exactly what even Argentina acknowledged the provision prohibits.

**1. Argentina Fails To Defend The Lock Law And Other Measures Under Its Own Long-Held Interpretation Of The Equal Treatment Provision.**

Even under the interpretation to which Argentina had long adhered (until now), the formal, legal steps that Argentina has taken to discriminate against NML violate the Equal Treatment Provision. Argentina's own authorities make clear that measures such as the Lock Law, which formally declare as a matter of Argentine law that NML's debt will not be paid on equal terms as other external indebtedness, violate the provision. For example, an article by Lee C. Buchheit (a partner at the law firm representing Argentina in this case) explains that "if a sovereign borrower intends as a practical matter to discriminate among its creditors in terms of payments, the *pari passu* undertaking will at least prevent the sovereign from attempting to legitimize the discrimination by enacting laws or decrees which purport to bestow a senior status on certain indebtedness or give a legal preference to certain creditors over others." Opp. Ex. I. at 12. Thus, even under Buchheit's cramped interpretation of the provision, as a sovereign borrower "you can do pretty much whatever you want in discriminating among creditors (in terms of who gets paid and who does not), but do not try to justify your behavior by taking steps that purport to establish *a legal basis for the discrimination*." *Id.* (emphasis added).

Argentina's other authorities echo Buchheit's analysis. One authority, for example, states that the "narrow meaning" of the clause (as opposed to the plain language of the provision) "is that the obligations rank pari passu as a matter of mandatory law, ie *the legal regime requires that the debts are paid at least pro rata where there is competition between creditors*." Opp. Ex. L, at 372 (emphasis added). Another source cited by Argentina explains that the purpose of an equal treatment provision is "to prevent the sovereign from *adopting legal measures which have the effect of preferring one set of creditors against the others*." Opp. Ex. D, at 7 (emphasis added). All of Argentina's other citations adopt a similar interpretation of the clause.[1] The Federal Reserve Bank of New York took the same position when it addressed this issue in 2004. *See* Amicus Br. of Federal Reserve at 5, *Macrotecnic Int'l Corp. v. Republic of Argentina*, No. 02 CV 5932 (TPG) (Jan. 12, 2004). As explained by all of these authorities, there is no question that a *law* requiring Argentina to pay other external indebtedness before paying NML violates the Equal Treatment Provision. One of Argentina's authorities even explains that "disregarding the consequence of such formal legislative action, Argentina . . . made itself more vulnerable [in passing the Lock Law]; a legal subordination of the holdout creditors was formally made that might give rise to a breach of the *pari passu* clause." Rodrigo Olivares-Caminal, *To Rank Pari Passu Or Not To Rank Pari Passu*, 15 L. & Bus. Rev. of the Americas 745, 775 (2009).

Confronted with the fact that it has acted in violation of the very interpretation it has touted for years, Argentina resorts to advocating an entirely new and incomprehensible interpre-

---

1 *See* Opp. Ex. E, at ¶ 11 ("the function of the clause is to provide . . . protection from subordinate or otherwise discriminatory legal ranking by preventing the creation of legal priorities by the sovereign in favor of creditors holding particular classes of debt"); Ex. G, at 29 ("A *pari passu* covenant will . . . restrict the borrower from legally subordinating in a formal way the debt being incurred or rescheduled in favour of some other external obligation."); Ex. K, at 640 ("the *pari passu* clause works as a covenant by the borrower that it will not bestow a legally senior priority status on certain lenders . . . . 'Ranking' *pari passu*, therefore, is . . . about the alteration of payment priorities by law . . . .").

tation of the clause: "The pari passu clause only prohibits the creation of a preferred class of creditor *claims* after default, not the cancellation of existing claims and subsequent issuance of additional performing debt." Opp. 30 (emphasis in original). In other words, Argentina contends, it is prohibited from legally requiring the payment of claims of other *defaulted* debt before NML's debt, but it is permitted to issue new and higher ranking debt to other unsecured creditors and it is permitted to require payment of *that* debt before payment to NML. Under this view, the Equal Treatment Provision never requires equal treatment. "[C]ontrary to New York law," this construction would render the Equal Treatment Provision "meaningless or superfluous." *Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003).

Argentina's modified interpretation also fails because it ignores the provision's unambiguous guarantee that the payment obligations to NML will rank equally not only with Argentina's *then current* external indebtedness, but also with its *future* external indebtedness. SOF ¶ 8. The possibility that Argentina might try to discriminate against NML and similar bondholders by issuing new debt is thus expressly contemplated and *foreclosed* by the plain text of the Equal Treatment Provision.

Argentina cites only one "authority" for its implausible new construction of the Equal Treatment Provision. That authority, a 1993 PLI article, does not remotely support Argentina's view. The article does not define the circumstances in which an equal treatment provision would be violated and does not discuss such clauses in the context of sovereign debt—the context for which Argentina inexplicably cites the article. *See* Opp. 21, 30; Ex. J., at 420–22.

Argentina's claim that the Lock Law is not a formal, legal prohibition on paying NML's debt on equal terms with other external indebtedness (Opp. 31) is grossly misleading. Although Argentina correctly observes that the law forbids the "Executive from unilaterally re-opening the

2005 Exchange Offer or engaging in settlements with defaulted bondholders" (*id*.), the law goes far beyond that. It specifies a category of bonds (which includes the bonds owned by NML), and it prohibits the "*national State*" from "conducting any type of in-court, out-of-court or private settlement with respect to the bonds." Cohen Decl. Ex. F, Arts. 1 & 3 (emphasis added). The Lock Law thus, by formal enactment, relegates Argentina's payment obligations to particular bondholders to a non-performing class, and it also mandates defiance of this Court's judgments. Argentina's argument that "Congress retained for itself . . . the ability to permit future exchanges offers" (Opp. 31) proves far too much: A nation's legislative body typically retains the ability to amend or repeal its laws. If Argentina's originally proffered interpretation of the Equal Treatment Provision to require formal, legal subordination meant that the subordination must be such that a legislature could never reverse it, the protection would be meaningless.

**2. Argentina Offers No Reasonable Alternative To The Plain Language Of The Equal Treatment Provision.**

Defeated under its long-held interpretation of the Equal Treatment Provision, Argentina spends a great deal of its brief arguing against the provision's plain language. Although the Court need not reach this interpretation to grant summary judgment in NML's favor, it bears emphasis that Argentina loses even the battle that it would prefer to fight.

The Equal Treatment Provision provides that the "*payment obligations* of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness." SOF ¶ 8 (emphasis added). That language means that Argentina may not make preferential *payments* to other creditors, as the court held in *Elliott Associates L.P. v. Banco de la Nacion*, General Docket No. 2000/QR/92 (Court of Appeals of Brussels, 8th Chamber, Sept. 26, 2000). Argentina's claim that *Elliott Associates* was "universally criticized" (Opp. 5–6), is contradicted by Argentina's own source, which observed

that the case's "reading of the clause ha[s] found sympathy with multiple courts, including some federal courts in the U.S.," whereas Argentina's reading "ha[s] not found favor anywhere as yet." Ex. M, at 1137.[2]

Indeed, courts that addressed the issue have adopted NML's position regarding the clause. Opening Mem. 11–12.[3] In a weak attempt to distinguish one of NML's cases, Argentina claims that the injunction entered in *Red Mountain Finance Inc. v. Democratic Republic of Congo*, No. CV 00-0164 R, 2000 WL 34479543 (C.D. Cal. Nov. 20, 2000), does not indicate that the Central District of California endorsed NML's position because the injunction did not contain a lengthy legal analysis. Opp. 27–28. But the primary basis on which the injunction was requested by the plaintiff in *Red Mountain* was the equal treatment provision in the underlying bond documents, so the language of the provision was almost certainly the basis for the Court's order. Mem. of Points and Authorities In Support of the Mot. for Specific Performance in Aid of Execution and Assignment of Assets, D.E. 98, No. CV 00-0164 R, at 6–9 (Apr. 30, 2001).[4]

---

[2] Argentina also misleadingly suggests that *Elliott Associates* has been nullified by the Belgian legislature. As Argentina's cited source explains, however, the law to which Argentina refers prohibited injunctions only against the intermediary settlement system Euroclear, and did not take a position on the meaning of any equal-treatment provision. *See* Olivares-Caminal, Legal Aspects of Sovereign Debt Restructuring 306 (Sweet & Maxwell 2009).

[3] Argentina ironically criticizes NML for relying on non-binding precedents (Opp. 27), when Argentina relies on *inferences* from non-binding precedents (and mistaken inferences at that). For example, Argentina claims that an English judicial decision "expressed skepticism" about the meaning of clause, but one searches the cited case in vain for any expression of skepticism. *See* Opp. Ex. R. Argentina also cites *Nacional Financiera, S.N.C. v. Chase Manhattan Bank N.A.*, No. 00 Civ. 1571 (JSM), 2003 WL 1878415 (S.D.N.Y. Apr. 14, 2003), but that case addressed whether a *third-party creditor* could be enjoined from *receiving* payments due to an equal treatment provision, not whether the debtor itself could be enjoined from *making* preferential payments. *See id.* at *2. Although *Nacional Financiera* declined to decide the issue, it expressly contemplated that "[i]t may be that the FAA would have given the [plaintiffs] the right to obtain an injunction to bar [the debtor] from making preferential payments to some of its note holders." *Id.* (citing *Elliott Associates*).

[4] The plaintiff's only other argument was based on a negative pledge clause. That was a short and secondary argument that went little beyond quoting the clause, which is virtually identical to the negative

[Footnote continued on next page]

Argentina's only textual counterargument—that "[t]he term 'rank' has a meaning of hierarchy, and not a quantitative or temporal meaning" (Opp. 19)—is implausible. It is true that "rank" implies a "hierarchy," but the only conceivably relevant hierarchy in the sovereign-debt context is priority of *payment*, which is why the text of the provision refers to "payment obligations." As Argentina's sources explain, although "rank" has a distinctive meaning in the context of bankruptcy (as establishing the order of preference for the distribution of a bankrupt debtor's assets), it could not possibly have the same meaning in a sovereign-debt instrument because sovereigns cannot enter into bankruptcy.[5] The *only* possible effects of a sovereign's decision to lower the rank of its payment obligations is that the sovereign will stop paying one class of debt or give payment priority to others.

The plain language interpretation of the Equal Treatment Provision is in harmony with the other provisions of the FAA. The "negative-pledge" clause, which is the only clause Argentina references from the FAA to argue otherwise (Opp. 23), is distinct from the Equal Treatment Provision. The negative-pledge clause refers to equal and ratable "security interest[s]," whereas the Equal Treatment Provision concerns "payment obligations." *See* Cohen Decl. Ex. A ¶ 11.

---

[Footnote continued from previous page]
pledge clause in the FAA. *Id.* at 8–9. Moreover, the remedy the court granted—requiring equal *payment*—is consistent with enforcing an equal treatment provision.

[5] As Cleary Gottlieb partner Buchheit puts it, "when a sovereign promises in a loan agreement that the loan will rank pari passu with all of the sovereign's other external indebtedness, the lender is not being told anything about where it will stand in a queue of bankruptcy creditors." Ex. I, at 11. *See also, e.g.*, Ex. D, at 7. Because it is clear that an equal-treatment provision has a very different meaning in bankruptcy, Argentina's objection that NML's interpretation of the provision in the *sovereign-debt* context would allegedly violate a provision of the bankruptcy code (Opp. 24 n.17) rings hollow.

Those protections are unmistakably different, and (as explained above) the latter, in particular, is essential to investors where the debt-issuer is a sovereign that is not subject to bankruptcy.[6]

This Court should not be misled by Argentina's dire predictions of what would follow from equitable enforcement of the Equal Treatment Provision. Argentina's suggestion that "[u]nder NML's interpretation, a debtor would be precluded from making payments to *any* of its creditors unless it was able to *satisfy in full all of its obligations to all of its creditors*." Opp. 24 (emphasis in original), fails upon analysis. In the first place, it assumes that *every* instrument of a sovereign's external indebtedness contains a comparable equal treatment provision, but, as NML discussed in is opening memorandum, Argentina itself has elected to exclude provisions guaranteeing equality among its "payment obligations" in many of its debt instruments. *See* Opening Mem. 12. More importantly, it is incorrect that a sovereign would be required to pay each creditor protected by an equal treatment provision "in full." Opp. 24. What would be required is *pro rata payment of obligations that are due*—that is, Argentina must pay the same percentage of debt for which payment is due to the creditor protected by the Equal Treatment Provision as it pays to other holders of external indebtedness. Argentina would not have to make ratable payments on debt that is not protected by an equal treatment provision; nor would it have to make payment on debt that is not yet due. Argentina's argument that by effectively prohibiting the selective repudiation of the payment obligations, the Equal Treatment Provision makes it more difficult to accomplish sovereign-debt restructurings may be valid, but the entire point of the clause is to induce lenders to make loans by giving them a measure of protection against a

[6] Argentina also notes that the negative-pledge clause uses both the words "equally" and "ratably," suggesting that "equally" in the Equal Treatment Provision does not mean "ratably." Opp. 23. Argentina misses the point: *Ratable* payment is merely an equitable remedy that would cure Argentina's breach of its promise that the debt will "rank at least equally" with other external indebtedness. It would have been nonsensical for the provision to say that the debt must "rank ratably."

recalcitrant debtor's efforts to selectively repudiate payment obligations. A sovereign cannot entice investment with such contractual guarantees and then protest when creditors invoke them.

**B. NML's Claims Are Not Barred By Laches.**

Argentina's laches arguments are nothing more than an attempt to sidestep its breach of the Equal Treatment Provision.

It is settled that "[w]hen a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show . . . circumstances exist which require the application of the doctrine of laches," *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) (ellipsis in original; internal quotation marks omitted), and "there is a strong presumption that a plaintiff's delay in bringing suit is reasonable." *Coalition for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 466 (6th Cir. 2004); *see also Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 380 (S.D.N.Y. 2010). Here, the relevant statute of limitations is six years. *See Daisley v. FedEx Ground Package Sys., Inc.*, 376 F. App'x 80, 80 (2d Cir. 2010) (citing N.Y. C.P.L.R. § 213(2)). Because NML has filed its motion well within that time,[7] it is presumptively timely and the burden is on *Argentina* to demonstrate that special circumstances nevertheless compel a finding of laches. Argentina has not come close to making that showing. Nor has Argentina shown that it has suffered any prejudice from the timing of NML's claims.

New York courts have recognized four elements to a laches defense: "(1) conduct by an offending party giving rise to the situation complained of, (2) delay by the complainant in asserting his or her claim for relief despite the opportunity to do so, (3) lack of knowledge or notice on the part of the offending party that the complainant would assert his or her claim for relief, and

[7] Under its long held interpretation, Argentina breached the Equal Treatment Provision when it enacted the Lock Law in 2005. Opp. 9. NML purchased the bonds at issue in this case in 2008 and 2009 and promptly brought suit in August 2008 and February 2009. NML then filed this motion in October 2010.

(4) injury or prejudice to the offending party in the event that relief is accorded the complainant." *Newbro v. Freed*, 409 F. Supp. 2d 386, 399 (S.D.N.Y. 2006), *aff'd*, 2007 WL 642941 (2d Cir. 2007) (internal quotation marks omitted); *see also King v. Innovation Books, a Div. of Innovative Corp.*, 976 F.2d 824, 832 (2d Cir. 1992). The last three factors are not satisfied here.

**1. NML Did Not Engage In Any Unreasonable Delay.**

Argentina can point to no action (or inaction) by NML that would overcome the "strong presumption" that this motion is timely.

Argentina errs as a matter of law in assuming that the period of alleged delay began when motions were filed in *other cases* previously litigated by NML or others. Rather, the period runs from when the plaintiff actually knew of its claim in the case at bar. *Yeda Research & Dev. Co. Ltd. v. Imclone Sys., Inc.*, 443 F. Supp. 2d 570, 629 (S.D.N.Y. 2006). In the three instant cases, NML purchased the bonds in 2008 and 2009. *See* Compl., D.E. 1, No. 08 Civ. 6978, at ¶ 7-34 (Aug. 5, 2008); Complaint, D.E. 1, No. 09 Civ. 1707, at ¶ 8 (Feb. 24, 2009); Compl., D.E. 1, No. 09 Civ. 1708, at ¶¶ 8-43 (Feb. 24, 2009). NML filed suit within months of acquiring the bonds and filed this motion two years later, even though New York law affords a six-year period within which to bring contract claims. There is thus no serious argument that NML unreasonably delayed.

Even if it were proper to assess NML's period of "delay" from dates before the claims here accrued, NML acted reasonably. For years, NML has vigorously pursued—and obtained—money judgments against Argentina in other cases, but it has become apparent that Argentina will flout this Court's judgments as long as it can get away with it. Recently, NML has elected to pursue a different strategy by invoking the Equal Treatment Provision to guarantee that it will be kept on at least an equal footing with other creditors—which is precisely the purpose of the provision. It would be perverse to hold that NML has engaged in unreasonable delay by seeking

Argentina's satisfaction of this Court's money judgments in prior cases before relying on a secondary form of security promised by Argentina.

**2. Argentina Did Not Suffer Any Prejudice From The Alleged Delay.**

Argentina does not and cannot demonstrate that any alleged "delay" caused it any prejudice. Argentina's apparent assertion that it would not have engaged in the exchange offers had NML sought to enforce the Equal Treatment Provision earlier is not plausible. Argentina (which bears the burden of proving laches) has not supplied any evidence that it would have withdrawn the 2005 Exchange Offer if NML had sought to enforce the provision when the Lock Law was first enacted. Argentina's unsupported assertions for purposes of this motion are not credible.

Nor is there any basis for Argentina's misleading suggestion that forcing it to honor its contractual obligations to NML would interfere with payments to other creditors. Opp. 17. The requested injunction would merely require Argentina to pay NML ratably whenever it makes payments to other bondholders. Argentina has more than sufficient funds to meet all of its obligations that are both due and subject to the Equal Treatment Provision.[8]

**3. Argentina Was Well Aware That NML Might Seek To Enforce The Equal Treatment Provision.**

Argentina was clearly on notice that NML or another party might raise the Equal Treatment Provision as a ground for relief if Argentina steadfastly refused to honor this Court's judgments. In December 2003, for example, when Argentina moved in cases to which NML was not a party to have this Court adjudicate the meaning of the provision, NML wrote a letter to this

[8] The only support that Argentina cites for its prejudice argument are two state-court cases in which the plaintiffs sought to "have the bonds recalled and refunded and the nonbond transactions nullified." *In re Schulz*, 81 N.Y.2d 336, 348 (N.Y. 1993); *see also Burns v. Egan*, 501 N.Y.S.2d 742, 744 (N.Y. App. Div. 1986). It was that complete unwinding of the bond issuances—"putting genies back in their bottles"—that the courts found to "possibly caus[e] traumatic disturbance to settled matters of public finances and governance." *Schulz*, 81 N.Y.2d at 348. NML has not requested such extraordinary relief, so those cases are inapposite.

Court urging it to adopt the plain-language interpretation of the Equal Treatment Provision, but also arguing that *if* the Court were inclined to adopt Argentina's interpretation, it should permit discovery on which interpretation the contracting parties intended. Opp. Ex. S, at 8.[9] In February 2004, when Argentina brought a counterclaim against NML directly seeking a declaratory judgment adopting its interpretation of the Equal Treatment Provision, this Court denied the motion and explained that "[m]y denial of the plaintiff's motion to dismiss does not mean that I am ruling on the merits at all. It simply means that *I don't believe that the time is ripe or the record is ripe for a ruling*." *See* Tr. 9, Apr. 2, 2004 (emphasis added). And after the court granted NML summary judgment on its claim for money damages, Argentina's counsel informed the Court that "the Republic's pending counterclaim for declaratory judgment relating to the [Equal Treatment Provision] remains open, having been held in abeyance since the denial of NML's motion to dismiss in April 2004," and that Argentina was "content to leave [its counterclaim] in suspense pursuant to the Court's prior rulings unless NML takes some action that would require us to activate it." Cohen Decl. in Further Support of Motion to Amend Ex. 2.[10] In light of this sequence of events, Argentina cannot seriously maintain now that it was not on notice of the possibility that this claim would be raised.

9 NML also agreed with the plaintiffs that Argentina's motion was nonjusticiable. Ex. S., at 2.

10 Argentina filed a second counterclaim in April 2005 in a separate case, shortly after the Lock Law had been enacted—but before Argentina had started making payments to participating bondholders. *See* D.E. No. 05 Civ. 2434 (TPG) (S.D.N.Y.). Again, NML obtained a money judgment and did not raise the Equal Treatment Provision. *See* Op., No. 05 Civ. 2434 (TPG) (May 10, 2006).

**C. Specific Performance Is The Only Equitable And Just Remedy.**

Equity compels enforcement of the Equal Treatment Provision through specific performance, which is commonly granted to enforce analogous promises to provide security interests, because such relief is the only means by which Argentina can be held to its obligations.

**1. Equitable Relief Is Necessary To Avoid Irreparable Harm To NML.**

Argentina's contention that because "NML's ultimate relief can be reduced to the amount of its judgments for monetary damages . . . there is no irreparable harm" (Opp. 33), misconstrues the Equal Treatment Provision. NML already had the right to recover the principal and applicable interest in the event that Argentina defaulted. The Equal Treatment Provision provided *further protection* by making sure that *if Argentina failed to meet its payment obligations in full, any payments Argentina did make to its external creditors would be paid ratably to all unsecured bondholders*.[11] This contracted-for protection would be meaningless if all NML could ultimately obtain for the provision's breach were the same money judgment to which it already had a right as a result of Argentina's mere failure to make its scheduled payments. Furthermore, Argentina has no answer to the principle that injunctive relief is appropriate when collection "by judgment and execution" is not possible. Opening Mem. 20 (citing Restatement (Second) of Contracts § 360 cmt. d).

This case provides a textbook illustration of how failure to specifically enforce the Equal Treatment Provision will lead to irreparable harm. The harm to NML from Argentina's breach was not merely monetary, like the harm from Argentina's failure to make payments. Rather, it is

[11] Argentina's argument that "[m]ere difficulty in enforcing a judgment . . . does not, as a matter of law, rise to the level of 'irreparable harm'" (Opp. 34) thus misses the mark, as does its citation to cases stating that specific performance is unavailable in suits for mere collection of money (Opp. 39). Argentina's breach of the Equal Treatment Provision has removed a bargained-for protection that is distinct from any money judgments NML can secure as a result of Argentina's default.

also the loss of NML's bargained-for position among other unsecured creditors in the event that Argentina failed to make its payments in full. Argentina's argument that NML has obtained several unpaid money judgments (Opp. 35) only further illustrates this point. Argentina's default and subsequent lowering of the rank of its payment obligations to NML in favor of payment obligations to other unsecured bondholders creates *exactly* the situation against which the Equal Treatment Provision was created to guard.

The Equal Treatment Provision is analogous to a contracted-for promise to provide security. A creditor may choose to protect against the possibility that the debtor will default by contracting for a security, like the posting of some property with regard to which the creditor has the senior-most rank. It would make no sense to hold that a breach of a promise to provide security must be compensated with money damages, as the point of such a provision is to protect against the chance that the debtor's recoverable assets will prove insufficient. As Argentina concedes, New York courts specifically enforce promises to provide security. Opp. 40; *see also* N.Y. Jur. 2d, 96 Specific Performance § 53; *BIB Constr. Co. v. Fireman's Ins. Co.*, 214 A.D.2d 521, 523 (N.Y. App. Div. 1995); *Nat'l Sur. Corp. v. Titan Const. Corp.*, 26 N.Y.S.2d 227, 230 (N.Y. Sup. Ct. 1940); *TCW Gem V. Ltd. v. Grupo Iusacell Celular, S.A. de C.V.*, 801 N.Y.S.2d 243, 2004 WL 3267267, at *1, *4 (N.Y. Sup. Ct. 2004) (unpublished).

The Equal Treatment Provision, like promises to provide a security, provides protection in the event of default by prioritizing a creditor's payment rights vis-à-vis those of other creditors. The difference is that while a security provision usually promises that the creditor will hold a specified rank with regard to the relevant *property*, the Equal Treatment Provision promises that the creditor will hold a specified rank with regard to any *payments* Argentina makes to other external creditors. The only adequate remedy for the breach of the right to a security interest or

equal treatment in payment is specific performance because the very circumstance of default—*i.e.*, the only circumstance in which these rights generally matter—renders money judgments as worthless as the defaulted debt obligations themselves. Argentina does not offer *a single colorable reason* why a creditor who is promised a security interest, but not NML, should be entitled to equitable relief to protect its rank.

Argentina's argument that NML could not suffer irreparable harm because it purchased defaulted bonds (Opp. 35) is unfounded. It is settled that "the assignee of a cause of action recovers in the right of his assignor and to the extent that the assignor might himself recover." *Travelers' Ins. Co. v. Brass Goods Mfg. Co.*, 146 N.E. 377, 378 (N.Y. 1925); *see also, e.g.*, *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 128 S. Ct. 2531, 2534–35, 2546 (2008); *Titus v. Wallick*, 306 U.S. 282, 289 (1939).

**2. The Interests of Justice Support Equitable Relief.**

Argentina's claim that granting equitable relief would put NML on terms more favorable than those of other unsecured bondholders (Opp. 12 n.9) misstates NML's requested relief. NML is not asking to be treated differently from other unsecured bondholders; it is asking to be treated the same, which is precisely what Argentina promised. If Argentina pays a portion of the debt it owes to other external creditors, all the provision would require is that NML receive similar, ratable payments of the obligations that are due to NML.[12]

The fact that Argentina currently owes less to participants in the exchange offers than it owes to NML is not a ground for denying specific performance. The bondholders who participated in the 2005 and 2010 Exchanges voluntarily restructured their payment obligations and are

[12] The exact scope of relief would be subject to further consideration by the Court, which has broad discretion to fashion a fair and just remedy.

now owed only regular interest payments. These bondholders made the business judgment to accept Argentina's promise of prompt payments on new bonds rather than bear the risk and expense of chasing Argentina from courtroom to courtroom in an effort to recover the full amount owed to them.[13] NML made the opposite judgment and continues to pay extensively for that decision. As Argentina *admits* (Opp. 12), the result of NML's decision is that Argentina's current obligations to NML are the entire amount of the unpaid principal and interest. The fact that NML's ratable payments would be larger than payments to exchange participants is not inequitable. Equity does not require that creditors owed different amounts be paid the same amounts. *Fin. One Public Co., Ltd. v. Lehman Bros. Special Fin. Inc.*, 414 F.3d 325, 344 (2d Cir. 2005) ("LBSF is receiving merely what it is entitled to under the bills, and if other creditors do not receive the same thing that is because LBSF is differently situated from other creditors.").

Argentina's threats to default on its new payment obligations if it also has to honor its old obligations do not remotely tip the scales of equity in its favor. Argentina has assets sufficient to satisfy its obligations to NML *and* the participants in the exchanges offers, which is what NML urges it to do. Argentina's threats to do otherwise tarnish the Republic, not NML, which has every right and reason to seek payments justly owed to it. In any event, Argentina's threats are not credible, as Argentina would suffer grave reputational harm if it defaults on its obligations under the exchange offers.[14]

---

[13] They also appear to have urged Argentina to breach the Equal Treatment Provision. SOF ¶ 11; Cohen Decl. Ex. F (Law 26,017); *id*. Ex. J, at 4 (2010 exchange prospectus).

[14] Argentina would not be relieved of its obligation to make ratable payments even if it could not make payments in full, but that contingency is inapplicable in the present case. Argentina has reserves of more than $50 billion—more than enough to pay all of its external debts currently due.

The Court will no doubt see through Argentina's attempt to blame the very creditors it swindled for its predicament. Argentina claims that NML's difficulties are either "*entirely the result of the limits imposed by Congress* on execution under the FSIA" or are all NML's fault because "*NML was invited to participate in the Republic's Exchange Offers* on equal terms with all other holders of eligible debt." Opp. 34 (emphases added). A summary of the sequence of events is instructive: To secure buyers for its bonds, Argentina waived its protections under the Foreign Sovereign Immunities Act ("FSIA") to the fullest extent permitted by law and promised not to lower the rank of any payment obligations under the Equal Treatment Provision. *EM Ltd. v. The Republic of Argentina*, 720 F. Supp. 2d 273, 278 (S.D.N.Y. 2010). Argentina then defaulted on its obligations, flouted judgments entered to enforce them, and spirited its assets beyond this Court's reach. *See id.* at 304 ("What is going on between the Republic of Argentina and the federal court system is an exercise of sheer willful defiance of the obligations of the Republic to honor the judgments of a federal court."). Argentina then offered NML and other bondholders take-it-or-leave-it exchange offers, which paid dimes on the dollar, even though Argentina had ample resources to pay off all of its obligations. *Id.* at 301. It now argues that the parties that resisted its attempts at extortion are really to blame and that this Court should take pity on Argentina in its battle against these so-called "professional holdouts." Opp. 41. This "equitable" argument should be rejected under the venerable Chutzpah Doctrine. *See Harbor Ins. Co. v. Schnabel Found. Co.*, 946 F.2d 930, 937 & n.5 (D.C. Cir. 1991) ("[C]hutzpah is a young man, convicted of murdering his parents, who argues for mercy on the ground that he is an orphan." (internal quotation omitted)).

**3. Granting Equitable Relief Violates Neither The FAA Nor The FSIA.**

Argentina's last-ditch argument that equitable relief is barred by the FAA and the FSIA finds no support in either source. With regard to the FAA, Argentina's points in a conclusory

manner to section 12 (Opp. 35–36), which allows a holder of a large amount of Argentine debt to accelerate the principal in cases of default or other breach of the FAA. But section 12 does not state or imply that it is the exclusive remedy for any breach, let alone limit this Court's inherent authority to issue equitable relief.

Argentina's FSIA argument is similarly meritless. The only provision of the FSIA that Argentina references, 28 U.S.C. §1610(a) (Opp. 36), concerns attachments and executions against state-owned property used for commercial activity in the United States.[15] NML is not requesting any attachment or execution, but rather is asking for equitable relief requiring Argentina to pay NML ratably if it chooses to pay other bondholders. Argentina points to no provision in the FSIA that even arguably bars this Court from issuing such relief. Finally, Argentina's intimation that NML's requested equitable relief would "affect[] a foreign state's use of assets outside the United States" (Opp. 37) is inaccurate. NML seeks equitable relief that would stop Argentina from using its agents within the United States to continue its scheme to breach NML's contractual rights, not relief directing how Argentina can use its funds outside of the United States.

[15] *See* 28 U.S.C. § 1610(a) (stating circumstances under which "[t]he property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution").

## III. CONCLUSION

For the reasons stated above, in NML's opening memorandum, and at argument, the Court should grant partial summary judgment for NML on its claim for breach of the Equal Treatment Provision. It also should specifically enforce the Equal Treatment Provision by issuing an injunction requiring Argentina to pay NML ratably if and when it pays bondholders who participated in the 2005 and 2010 Exchange Offers.

Dated: January 14, 2011

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP
Theodore B. Olson
(tolson@gibsondunn.com)
Matthew D. McGill
(mmcgill@gibsondunn.com)
Jason J. Mendro
(jmendro@gibsondunn.com)
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500

DECHERT LLP

By: /s/ Robert A. Cohen
Robert A. Cohen
(robert.cohen@dechert.com)
Charles I. Poret
(charles.poret@dechert.com)
1095 Avenue of the Americas
New York, NY 10036-6796
(212) 698-3500

*Attorneys for Plaintiff NML Capital, Ltd.*